# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| GERALD BURTON, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DISTRICT OF COLUMBIA,<br><br>    Defendant. | Civil Action No. 10-1750 (BAH)<br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Plaintiffs are nineteen African-American current and former employees of the District of Columbia Fire and Emergency Medical Services Department ("DCFEMS"). Along with twenty-five of their colleagues, the current plaintiffs sought to initiate a class action against DCFEMS on behalf of themselves and all African-American firefighters and EMS employees subject to discipline or denied promotion by DCFEMS on or after October 15, 2007. *See* Am. Compl., ECF No. 20. Following extensive pre-certification discovery, the plaintiffs elected not to move for class certification. Pls.' Status Report, ECF No. 64. Thereafter, eighteen of the original plaintiffs voluntarily withdrew their claims against the District, leaving twenty-six plaintiffs pursuing claims against the District individually in the Second Amended Complaint, *see* Sec. Am. Compl. ("SAC"), ECF No. 86-2, for which individual claims the Court permitted an additional ten months of discovery, *see* Minute Order, dated July 31, 2014. Pending before the Court are twenty motions filed by the District of Columbia seeking summary judgment on the

remaining claims set out in the plaintiffs' Second Amended Complaint. For the reasons set out below, each of these motions for summary judgment is granted.[1]

## I.      BACKGROUND

Although this case was commenced as a putative class action, in its present iteration, the plaintiffs' allegations separately describe the individual experiences of nineteen current and former African-African DCFEMS employees. Various plaintiffs challenge several of the same DCFEMS programs or procedures, but their allegations more obviously demonstrate the unique circumstances giving rise to their distinct claims of discrimination. They were employed in a variety of capacities and served in separate components throughout DCFEMS. While certain plaintiffs allege only that they were subjected to a racially discriminatory disciplinary regime, others variously allege that they were not promoted, were forced to obtain EMT training and certification, or were subjected to harassment and ridicule on account of their race. Finally, while at least eight of these plaintiffs have separated—voluntarily or otherwise—from DCFEMS, the remaining plaintiffs continue to work for DCFEMS.

The plaintiffs' written submissions—including the 47-page Second Amended Complaint and an 86-page Omnibus Opposition to the instant summary judgment motions—do little to explain the degree to which their allegations are mutually supportive or otherwise interrelated. As a result, the task of organizing the plaintiffs' allegations into a more comprehensible form in order to draw all inferences in their favor on their respective claims of workplace discrimination has posed a challenge. Even after indulging in ample discovery throughout nearly two years, the

---

[1]       The plaintiffs requested oral argument on the pending motion to dismiss, *see* Pls.' Opp'n Def.'s Mot. Dismiss ("Pls.' Opp'n") at 1–2, but given the sufficiency of the parties' written submissions, this request is denied. *See* LCvR 7(f) (stating allowance of oral hearing is "within the discretion of the court").

plaintiffs each have failed to demonstrate sufficient record evidence to support their various claims to raise a genuine factual issue requiring resolution at trial.[2]

## A.    PROCEDURAL HISTORY

Claiming violations of 42 U.S.C §§ 1981 and 1983, forty-four African-American current and former DCFEMS employees filed this lawsuit to pursue a class action on behalf of "all current and former African American Firefighters and EMS employees at the D.C. Fire and EMS Department who experienced a hostile work environment, were subjected to unfair termination, to discipline unequal to that of their similarly situated White colleagues, were discriminatorily denied promotions that were awarded to their White colleagues, or were otherwise subjected to discrimination within the applicable statute of limitations." *Burton v. District of Columbia*, 277 F.R.D. 224, 227 (D.D.C. 2011) (citing Am. Compl. ¶ 16). The plaintiffs requested declaratory and injunctive relief, including reinstatement of wrongfully disciplined employees and expungement of discriminatory disciplinary actions; retroactive promotion of all African-American employees denied promotions based on the 2006, 2008, and 2010 DCFEMS promotional examinations; back pay and benefits; compensatory damages for, *inter alia*, loss of reputation and physical and emotional distress; and punitive damages. *Id.* (citing Am. Compl. ¶¶ 115–120).

The plaintiffs' motion for class certification was provisionally denied, on December 23, 2011, since the Amended Complaint failed to allege with sufficient detail the District's discriminatory disciplinary process and use of "a biased testing procedure to evaluate

---

[2]     Over the course of discovery, the District produced "over 50,000 discrete responsive documents" consisting of more than 120,700 pages, Def.'s Opp'n Pls.' Mot. Compel & Extend Discovery Deadline at 1, 6 n.7, ECF No. 127, and "made available numerous DCFEMS officials for deposition, including current Fire Chief Kenneth B. Ellerbe and seven different Rule 30(b)(6) designees," *id.* at 1. The documents produced included "all DCFEMS disciplinary files for disciplinary cases concluded during calendar years 2007–2010, [and] all examination files for employees who sat for the 2006, 2008, and 2010 promotional examinations." *Id.* at 4.

employees" or that the District operated under a general policy of discrimination, in order to satisfy the commonality requirement of Federal Rule of Civil Procedure 23(a)(2). *Burton*, 277 F.R.D. at 228–30 (citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2553 (2011)). Nonetheless, because the plaintiffs alleged a "potentially viable class claim," the Court granted an initial sixty days of pre-certification discovery. *Id.* at 230–31.

Nearly two years later, following numerous extensions of the pre-certification discovery deadline, *see* Minute Orders, dated February 10, 2012, March 26, 2012, April 18, 2012, May 25, 2012, July 13, 2012, September 17, 2012, November 5, 2012, January 22, 2013, May 10, 2013, and October 25, 2013 (extending discovery deadline to June 25, 2014), the plaintiffs notified the Court that they would no longer seek class certification and would instead litigate the respective claims of certain of the original forty-four plaintiffs. *See* Pls.' Status Report, ECF No. 64. Thereafter, on November 8, 2013, twenty-six of the original forty-four plaintiffs jointly filed a Second Amended Complaint alleging specific instances of discrimination experienced by the remaining plaintiffs. *See generally* SAC.

The Second Amended Complaint alleges three causes of action. Count I, pursued only by three plaintiffs, Gerald Burton, Joshua Fuller, and Tawanna Robinson, alleges the DCFEMS subjected the plaintiffs to a hostile work environment, and racially discriminatory discipline, and otherwise intentionally discriminated against the plaintiffs, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq.* SAC ¶¶ 397–414. Count II, pursued by all plaintiffs, alleges that the DCFEMS subjected the plaintiffs to a hostile work environment through discriminatory discipline and non-promotion, in violation of 42 U.S.C. § 1981. *Id.* ¶¶ 415–25. Count III, also pursued by all plaintiffs, alleges discriminatory punishment and promotion, as well as maintaining a hostile work environment, in violation of 42 U.S.C § 1983.

*Id.* ¶¶ 426–35. The plaintiffs seek declaratory and injunctive relief, including that the District institute additional anti-discrimination policies and training. *Id.* ¶¶ 438–49.

Despite the extensive pre-certification discovery, the plaintiffs requested additional discovery, on grounds that such discovery was necessary to obtain information relevant to each remaining plaintiff's circumstances. *See* Pls.' Mot. Compel & Extend Discovery Deadline, ECF No. 123 (requesting, over objection by the District, an extension of the discovery deadline to allow the plaintiffs to "review the District's outstanding discovery and to schedule further fact and Rule 30(b)(6) witnesses"). This final request was granted, and discovery then continued. *See* Minute Order, dated July 31, 2014. Along the way, the claims of seven of the remaining plaintiffs were dismissed, either voluntarily or in response to a motion by the District, *see* Minute Orders, dated April 30, 2014, May 13, 2014, June 2, 2014, June 12, 2014, March 11, 2015, April 2, 2015, and May 1, 2015, leaving the current nineteen plaintiffs.

The District now moves for summary judgment as to the remaining § 1982 and Title VII claims of each current plaintiff separately. ECF Nos. 145–47, 150–57, 159–162, 163–66.[3] The District likewise renewed its motion to dismiss the plaintiffs' claims arising under 42 U.S.C. § 1981. ECF No. 143.[4]

## B.   FACTUAL BACKGROUND

Each current plaintiff alleges that he or she was discriminated against on the basis of race during the course of his or her employment by DCFEMS. Despite this facial similarity, however, each plaintiff asserts unique factual allegations underlying his or her individual claims,

---

[3]    Since these motions include potentially sensitive, non-public information regarding third parties, the District filed each of these motions under seal, *see* ECF Nos. 145–47, 150–57, 159–66, and, as required by the Court's November 14, 2014 Sealed Order, ECF No. 167, also separately filed redacted versions of each motion, *see* ECF Nos. 169–73, 176–88, 190.

[4]    As discussed *infra* Part III.A.1., this motion also seeks dismissal of Plaintiff Kwame Agyeman, on the grounds that dismissal of the plaintiffs' § 1981 will resolve all claims asserted by this plaintiff.

which also vary among the plaintiffs.  For example, only three plaintiffs (Gerald Burton, Joshua Fuller, and Tawanna Robinson) assert causes of action under Title VII.  Likewise, while all but three of the plaintiffs allege that they were subjected to racially discriminatory discipline, only six plaintiffs (Charles Addo, Jonathan Morris, Nelson, Robert Person, John Thomas, and Anthony Walker) allege that they were not selected for promotion during the relevant years on account of their race.  Although Counts II and III suggest that each plaintiff alleges that he or she was subject to a hostile work environment, *see* SAC ¶¶ 424, 436, the Second Amended Complaint lacks any specific hostile work environment allegation with respect to five plaintiffs (Daniel Botts, James Johnson, Albert Montgomery, Nelson, and Christopher Walker), *see* SAC ¶¶ 74–83, 155–86, 216–28, 355–62.  Finally, four plaintiffs allege that they were subjected to disparate treatment when they were required to attend a training academy to obtain EMT certification.

The individual discrimination claims asserted by each plaintiff are summarized in the chart below, with checkmarks indicating the claims asserted by individual plaintiffs.

|   | Name | Count I | Counts II & III | | | |
|---|---|---|---|---|---|---|
|   |   | Title VII | Non-Promotion | Discipline | Hostile Work Environment | Training Academy |
| 1 | *Charles Addo* | NO | ✓ | ✓ | ✓ | NO |
| 2 | *Kwame Agyeman* | NO | NO | ✓ | ✓ | ✓ |
| 3 | *Daniel Botts* | NO | NO | NO | NO | ✓ |
| 4 | *Gerald Burton* | ✓ | NO | ✓ | ✓ | NO |
| 5 | *Lawrence Clark* | NO | NO | ✓ | ✓ | NO |
| 6 | *Charles Florence* | NO | NO | ✓ | ✓ | NO |
| 7 | *Joshua Fuller* | ✓ | NO | ✓ | ✓ | NO |
| 8 | *James Johnson* | NO | NO | NO | NO | ✓ |
| 9 | *Albert Montgomery* | NO | NO | ✓ | NO | ✓ |
| 10 | *Jonathan Morris* | NO | ✓ | ✓ | ✓ | NO |
| 11 | *Wayne Nelson* | NO | ✓ | NO | NO | NO |
| 12 | *Robert Pearson* | NO | ✓ | ✓ | ✓ | NO |
| 13 | *Charles Rayford* | NO | NO | ✓ | ✓ | NO |
| 14 | *Tawanna Robinson* | ✓ | NO | ✓ | ✓ | NO |
| 15 | *Michael Sims* | NO | NO | ✓ | ✓ | NO |
| 16 | *John Thomas* | NO | ✓ | ✓ | ✓ | NO |
| 17 | *Christopher Walker* | NO | NO | ✓ | NO | NO |
| 18 | *Anthony Williams* | NO | ✓ | ✓ | ✓ | NO |
| 19 | *Antoine Williams* | NO | NO | ✓ | ✓ | NO |

As this chart indicates, and as evidenced by the plaintiffs' aborted effort to pursue their claims as a class action, the plaintiffs' claims present a morass of similar, but distinct allegations of discrimination. With this in mind, the Court begins by summarizing the relevant undisputed facts common to two or more of the plaintiffs' allegations. This summary is followed by a detailed review of each plaintiffs' individual claims, in alphabetical order, drawing all justifiable inferences in favor of the plaintiff and accepting the plaintiff's evidence as true, to assess the degree to which each plaintiff has presented a triable issue of fact to overcome the District's motions for summary judgment. *Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (2014) (per curiam).

Before doing so, however, the Court pauses to comment on the record evidence advanced by the plaintiffs in opposition to the instant motions. In compliance with this Court's rules, the

plaintiffs submitted a Statement of Material Facts in Genuine Dispute ("Pls.' SMF"), ECF No. 202-22, that purports to identify elements of the record tending to support their own claims, as well as noting that the plaintiffs "rely upon [each general factual statement] as it relates to themselves and the Statements of the other Plaintiffs." Pls.' SMF at 1; *see* LCvR 7(h) (requiring non-moving party to "set[] forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated" with "references to the parts of the record relied on"). This technical compliance with this Court's rules does little to mask that the "genuine issues" identified by the plaintiffs are drawn nearly exclusively from their own views and beliefs based on anecdotal information or hearsay, as expressed in their deposition testimony or interrogatory responses.

While no doubt earnestly held, the plaintiffs' subjective impressions and beliefs regarding their experiences while employed by DCFEMS generally are insufficient to raise a genuine factual dispute requiring resolution at trial. Indeed, although the D.C. Circuit recently noted that "a plaintiff's own firsthand observations of relevant facts are probative evidence, and . . . we must not set them aside merely because they come from a party who necessarily has a stake in the outcome," the Court ultimately concluded that, where a plaintiff's ostensibly plausible observations differ with other just as plausible observations and inferences, the plaintiff's version of the facts "is not, without more, grounds on which a reasonable jury could conclude that" the employer "was so far off base as to suggest that [it] acted with a racial motive" and, therefore, are insufficient to defeat summary judgment for employer. *Burley v. Nat'l Passenger Rail Corp.*, No. 14-7051, 2015 WL 5474078 at *6 (D.C. Cir. Sept. 18, 2015); *see also Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) (affirming summary judgment in favor of defendant where plaintiff's conclusory assertions about incidents outside her personal knowledge

and without "evidence, affidavits, or deposition testimony . . . to back up her account of these incidents," were insufficient to show that any similarly situated individual outside of her protected class was treated more favorably); *Turner v. Shinseki*, 824 F. Supp. 2d 99, 118 (D.D.C. 2011) ("[W]hen considering a summary judgment motion 'the Court need not rely on any conclusory allegations unsupported by factual [evidence].'") (quoting *Harris v. Wackenhut Servs., Inc.*, 648 F. Supp. 2d 53, 58 (D.D.C. 2009)) (latter alteration in the original); *Gen. Elec. Co. v. Jackson*, 595 F. Supp. 2d 8, 36 (D.D.C. 2009) (observing that when a "declaration is self-serving and uncorroborated," it is "of little value at the summary judgment stage"); *Fields v. Office of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007) ("Self-serving testimony does not create genuine issues of material fact, especially where that very testimony suggests that corroborating evidence should be readily available."). This demand for competent corroborating evidence is particularly pronounced where, as here, the parties have engaged in extensive discovery, thereby affording the plaintiffs with ample opportunity to uncover such evidence.

Accordingly, to the extent the plaintiffs' Statement of Material Facts in Genuine Dispute either fails to contest facts stated in the District's assorted Statements of Material Facts or, in so contesting, fails to refer to admissible evidence uncovered during discovery supporting the factual dispute, the Court will "assume that facts identified by the [District] in its statement of material facts are admitted." LCvR 7(h).

### 1.   *Common Undisputed Facts*

Many of the plaintiffs' claims of workplace discrimination rely on allegations that certain DCFEMS procedures were implemented in a discriminatory manner. The Court thus begins by summarizing the undisputed facts relevant to the operation of these DCFEMS policies or procedures regarding (1) the use of a biannual testing regime to guide the promotion of

DCFEMS employees; (2) internal DCFEMS disciplinary procedures; and (3) DCFEMS's implementation of the District of Columbia Emergency Medical Services ("EMS") Act of 2008, DC Code §§ 7-2341.01 *et seq.*

### a)      DCFEMS Promotion and Testing Procedures

Promotions within DCFEMS are governed by the terms of the Collective Bargaining Agreement ("CBA") between the District and the D.C. Fire Fighters Association. *See* Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Morris)"), Ex. C (Collective Bargaining Agreement with Local 36), Art. 20, ECF No. 166-6. Under the CBA, employees eligible for promotion to Sergeant, Lieutenant, or Captain sit for biannual examinations. *Id.* The examination process includes both a written examination and an interview-based oral evaluation. *Id.* The written examination is scored out of 100 points, with test takers eligible to receive additional points based on their educational attainment and seniority. *Id.* Following administration and scoring of the exam, DCFEMS must make reasonable efforts to notify candidates promptly of their final score and relative standing with regard to other applicants. *Id.*

Based on the results of these examinations, DCFEMS produces and disseminates a ranking based on total overall score of each employee taking the exam, and this ranking dictates the order in which these employees are eligible to be promoted to the next-highest rank. *Id.* Under the terms of the CBA, DCFEMS uses this list to guide promotion decisions beginning on October 16 following the administration of each examination and ending when the list expires on October 15 two years thereafter. *Id.* Promotion decisions must be made on a rank-order, non-discriminatory basis, and must be made consistent with District of Columbia equal opportunity laws and any affirmative action plan adopted by the District. *Id.* Certain plaintiffs challenge their non-promotion as discriminatory based on two aspects of the promotion process discussed

in more detail below: namely, a 2008 change to the scoring procedure and an incident of employee misconduct in connection with the 2010 examinations.

### (i)      2008 Modifications to Exam Scoring Procedures

Prior to the 2008 examination, education and seniority enhancements were automatically included in the final score for all test takers. Def.'s SMF ("Def.'s SMF (Addo)") ¶ 68, ECF No. 146-2. Beginning in 2008, however, DCFEMS instituted a "cut-off" below which applicants would not be allowed to proceed past the multiple choice portion of the examination and therefore would not receive the benefit of their education and seniority enhancements. *Id.* The parties do not dispute that the CBA neither required nor prohibited these changes. Def.'s Resp. Pls.' SMF ("Def.'s Resp.") at 110, ECF No. 212–1. The change to implement a cut-off score was instituted when DCFEMS engaged a third-party human resources consulting firm, named I/O Solutions, to redesign the promotional test. Def.'s SMF (Addo) ¶ 69.

### (ii)      Misconduct Linked to 2010 Exam

In preparation for the 2010 promotional exam, DCFEMS selected various DCFEMS employees to serve on a subject-matter expert panel tasked with assisting in the examination's design. District's SMF ("Def.'s SMF (Pearson)") ¶ 41, ECF No. 156-2. Prior to the administration of the exam, all members of the expert panel were sequestered from other DCFEMS employees. *Id.* ¶ 42. This prohibition notwithstanding, a DCFEMS Captain serving on the expert panel violated the terms of the sequester order by communicating with a number of DCFEMS employees (including at least one of the plaintiffs). *Id.*; Def.'s SMF ("Def.'s SMF (Robinson)") ¶ 20, ECF No. 165-2. The District asserts that the Captain was promptly removed from the expert panel before the exam material was written and therefore received no

examination materials. Def.'s SMF (Pearson) ¶ 43. Consequently, DCFEMS maintains that this violation of the sequester order did not compromise the integrity of the examination. *Id.*

### b)       DCFEMS Disciplinary Procedures

Under the terms of the CBA, disciplinary procedures within DCFEMS are generally governed by the provisions of Chapter 16 of the District Personnel Manual and the DCFEMS Rules and Regulations and Order Book. CBA, Art. 32. Under these procedures, prior to the initiation of any disciplinary action, employees must receive, within seventy-five days of an alleged infraction, an "Initial Written Notification" and, within sixty days thereafter, a notice of "Proposed Action" describing the range of discipline being considered and indicating the adjudicatory body within DCFEMS that will consider any appeal of the Proposed Action. *Id.*

Three separate adjudicatory bodies, a Battalion Chief's Conference, a Deputy Chief's Conference and a Trial Board, are available to review charges against DCFEMS employees, depending upon the potential severity of any recommended punishment. Specifically, a Battalion Chief's Conference may be convened to consider challenges to Proposed Actions for minor infractions, for which the maximum penalty imposed does not exceed a 72-hour suspension. *Id.* Decisions from a Battalion Chief's Conference may be appealed, first, to the Assistant Fire Chief and, ultimately, to the Fire Chief. *Id.* Proposed Actions alleging more serious infractions, for which maximum suspensions imposed range between 72 hours and 120 hours, are considered by a Deputy Chief's Conference and appealed to a Trial Board. *Id.* Finally, Proposed Actions alleging serious infractions are referred to a Trial Board, which is comprised of two Captains and two Battalion Fire Chiefs, appointed by the Fire Chief. *Id.* Trial Boards are responsible for making a determination as to the guilt or innocence of the employee for the charged infraction and recommending appropriate penalties to the Fire Chief, who is

responsible for adopting or modifying the proposed penalty, or dismissing the case against the employee. *Id.* An employee may appeal a final decision by the Fire Chief only to the D.C. Office of Employee Appeals. *Id.*

### c)  EMT Certification Requirement and Training Academy

Since 1987, the DCFEMS Order Book has required all DCFEMS EMS providers, including all firefighters who assume duty on an EMS unit, to maintain a valid EMT card. Def.'s SMF ("Def.'s SMF (Botts)") ¶ 11, ECF No. 147-2; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Botts)"), Ex. E (DCFEMS General Order Book, Art. XXIV) §§ 1–3, ECF No. 147-8. Despite this longstanding requirement, however, employees hired before 1987 cannot be terminated for failure to obtain or maintain a valid EMT card. *Id.*

In 2009, the D.C. Council enacted the District of Columbia EMS Act. The EMS Act provides that "no person shall perform the duties of emergency medical services personnel in the District, whether for compensation or not for compensation, without first having obtained a certification from the Mayor to do so." D.C. Code § 7-2341.05. The D.C. Department of Health has since adopted, as the District's required EMS certification standard, a certification by the National Registry of Emergency Medical Technicians ("NREMT"), which is a private, non-profit organization that administers a nationally recognized, industry-accepted EMT certification process for state and local emergency medical services providers. Def.'s SMF ("Def.'s SMF (Johnson)") ¶¶ 20–21, ECF No. 151-2. Effective July 1, 2009, all DCFEMS employees certifying or re-certifying as EMS providers were required to complete the NREMT certification process. *Id.* ¶ 22. No DCFEMS employees are exempt from obtaining NREMT certification as a condition for obtaining a D.C. EMS certification card, *id.* ¶ 27, although—as noted—

employees hired before 1987 are not subject to termination for failing to obtain a certification card.

Beginning in 2007, in accordance with recommendations issued by the Mayor's Task Force on EMS and in anticipation of the statutory requirement adopted in the EMS Act, DCFEMS assigned employees to NREMT certification courses at the NREMT "Training Academy." *Id*. ¶¶ 23–24. Employees were detailed to certification courses and the Training Academy on a staggered basis, such that, by December 2010, a total of 1,573 DCFEMS employees had obtained NREMT certification, with only approximately sixty active firefighters still awaiting an EMT class. *Id*. ¶¶ 25–26; Def.'s Mem. (Johnson), Ex. I (Exec. Summary on the Status of NREMT) at 37–38, ECF No. 151-12. While detailed to the Training Academy, DCFEMS employees are not eligible to work overtime. Def.'s SMF (Johnson) ¶ 33; *see also* Def.'s Mem. (Johnson), Ex. J (Decl. of Brian K. Lee) ¶ 14, ECF No. 151-13.

### 2. *The Plaintiffs' Individual Allegations*

As noted, despite ample opportunity for discovery, the plaintiffs rely heavily on their own uncorroborated beliefs and feelings for their allegations of discriminatory treatment within DCFEMS. This reliance is highlighted in the summaries that follow of each plaintiff's allegations.

### a) **Plaintiff Charles Addo**

Charles Addo worked for DCFEMS from 1982 until his retirement in 2013. SAC ¶¶ 37, 48; Def.'s SMF (Addo) ¶¶ 4, 6. During this time, Addo alleges that he was subjected to discriminatory non-promotion due to his non-ranking for promotion in 2008 and low ranking in 2010; racially discriminatory discipline because he was more promptly disciplined than white firefighters for the same infractions; and a hostile workplace environment. SAC ¶¶ 49, 51–53.

### (i)       Non-Promotion Allegations

Addo took both the 2008 and 2010 DCFEMS promotional examinations seeking to be promoted to Captain.  Def.'s SMF (Addo) ¶¶ 70, 79.  In 2008, Addo failed to meet the cut-off score, and his education points therefore were not added to his composite score.  *Id.* ¶ 71.  As a result, Addo did not qualify for the oral assessment portion of the 2008 exam.  *Id.*  In 2010, Addo exceeded the cut-off score and was ranked in the 40s on the resulting promotional list, but he again was not promoted.  *Id.* ¶¶ 79–80.  Addo asserts that he would have been promoted to Captain in 2008 but for the cut-off score.  *Id.* ¶ 72.  He alleges that the modifications to the examination procedure implemented in 2008 made it more difficult for African-American candidates to be promoted.  *Id.* ¶ 74.

### (ii)       Discriminatory Discipline Allegations

In 2009, DCFEMS initiated a disciplinary action against Addo after he failed to provide timely reports of his supervision of another firefighter's training.  SAC ¶ 39; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Addo)"), Ex. C (Pl. Charles Addo's Answers Def.'s Am. Interrogs.), No. 2, ECF No. 169-6.  The Proposed Action recommended a 72-hour suspension. Def.'s SMF (Addo) ¶ 25.  Addo successfully contested the proposed discipline at a Battalion Chief's Conference and received only an official reprimand in connection with the incident. Def.'s SMF (Addo) ¶ 28.

Addo was again disciplined in 2010 for missing a series of medical appointments at the D.C. Police and Fire Clinic ("PFC").  First, Addo accepted a 12-hour suspension after missing an appointment on June 11, 2010.  Def.'s SMF (Addo) ¶¶ 50–51.  Thereafter, Addo missed two additional PFC appointments on June 24 and July 22, 2010.  Def.'s SMF (Addo) ¶¶ 52–53.  On September 1, 2010, a Deputy Fire Chief's Conference recommended an 84-hour suspension in

connection with these missed appointments.  Def.'s SMF (Addo) ¶ 54.  After appealing, Addo

ultimately agreed to serve a 24-hour suspension.  Def.'s SMF (Addo) ¶ 55.  Addo alleges that,

while he was disciplined within days of missing his PFC appointments, white DCFEMS

firefighters were not promptly disciplined for similar infractions.  SAC ¶¶ 47, 49, 54–55; Pl.

Addo's Resps. Def.'s SMF ("Addo Resps.") ¶¶ 56–64, ECF No. 202-3.

### (iii)     Hostile Workplace Allegations

In addition to these specific instances of discrimination, Addo asserts various instances of

workplace harassment due to his race.  SAC ¶¶ 50–51, 53.  First, Addo alleges that, beginning in

2007, his supervisors often unfairly criticized his work performance.  Pls.' SMF at 4–8; SAC ¶¶

19–20, 39, 48.  Addo claims that he complained about his supervisor's harassing conduct to

DCFEMS leadership on three occasions.  Def.'s Mem. (Addo), Ex. B at 48:19–49:1.

In addition, in October 2009, Addo injured his shoulder while on duty.  Def.'s SMF

(Addo) ¶ 33; Def.'s Mem. (Addo), Ex. B at 67:19–68:2, 74:3-5.  At the PFC, Addo requested

treatment from a particular doctor and was advised that this doctor was unavailable.  Def.'s SMF

(Addo) ¶¶ 34–38.  When Addo requested that his preferred doctor perform a required surgery to

repair the injury, he was again informed that this doctor was unavailable and he would therefore

have to pay for the surgery himself in order to have it performed by his preferred doctor.  Def.'s

SMF (Addo) ¶ 39.  The surgery was ultimately performed by another doctor at the expense of

DCFEMS.  Def.'s SMF (Addo) ¶ 41.  Although DCFEMS maintains no formal choice-of-doctor

provision, *see* Def.'s SMF (Addo) ¶¶ 43, Addo alleges that white employees are permitted to

choose their doctor, SAC ¶ 44; Def.'s Mem. (Addo), Ex. C at 5.

### b)      Plaintiff Kwame Agyeman

Kwame Agyeman has served as a DCFEMS firefighter since 1985.  Def.'s SMF ("Def.'s SMF (Agyeman)") ¶ 3, ECF No. 162-2.  During the course of his employment  Agyeman alleges that he was subject to racially disparate discipline  and a hostile work environment.   SAC ¶¶ 65, 68–69.

### (i)      Discriminatory Discipline Allegations

From approximately 2000 to 2002, and again in 2006, Agyeman served in the DCFEMS Fire Investigation Unit.  Def.'s SMF (Agyeman) ¶¶ 4, 9, 18.  At some point during his second assignment to the unit, Agyeman was charged with recording false information  on an arrest warrant review checklist and providing  false information to the U.S. Attorney's Office.  *Id.* ¶ 21; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Agyeman)"), Ex. F (Letter of Decision/Not Guilty), ECF No. 162-9.  Apparently as a result of these charges, the U.S. Attorney's Office placed Agyeman on a list of investigators  ineligible  to testify in court (called the "Lewis List").  Def.'s SMF (Agyeman) ¶ 16; Def.'s Mem. (Agyeman), Ex. F.  Consistent with DCFEMS policy, Agyeman was transferred from the Fire Investigation  Unit, in December 2006, as a result of his placement on this list.  Def.'s SMF (Agyeman) ¶¶ 15–18.

In March 2007, however, the Trial Board considering  the charges concluded that Agyeman submitted the challenged report "in the honest believe  that it was truthful and correct," and found Agyeman not guilty of the charged infractions.  Def.'s SMF (Agyeman) ¶ 22; Def.'s Mem. (Agyeman), Ex. F.  Noting that Agyeman was apparently erroneously placed on the list of investigators  ineligible  to testify at trial, the Trial Board ordered its decision to be forwarded to the U.S. Attorney's Office.  Def.'s SMF (Agyeman) ¶¶ 24–25.  Agyeman does not believe that the Trial Board was racially  biased, and he acknowledges that he ultimately  did not receive any

discipline as a result of the Trial Board hearing. *Id.* ¶¶ 26–27. Nonetheless, Agyeman alleges that he was disparately disciplined based on the District's refusal to reassign him to the Fire Investigation Unit. SAC ¶¶ 64–65.

### (ii)   Hostile Work Environment Allegations

When he was reassigned to the Fire Investigators Unit in early 2006, Agyeman avers that his supervisors described the transfer as a promotion. Pl. Agyeman's Resps. Def.'s SMF ("Agyeman Resps.") ¶ 5, ECF No. 202-4. Although internal DCFEMS notices announcing the transfer did not describe Agyeman's new position as a promotion, Def.'s SMF (Agyeman) ¶ 9, Agyeman contends that the transfer was intended to be a promotion, for which he was entitled to a pay increase while serving in the unit, *id.* Agyeman did not receive his desired pay increase, and the parties disagree as to whether Agyeman properly submitted his request. Agyeman Resps. ¶¶ 11–14.

Agyeman further contends that DCFEMS engaged in a systematic effort to remove African-American employees from the Fire Investigation Unit. Although acknowledging that DCFEMS maintains a policy of summarily removing from the unit investigators who are placed on the Lewis List, Agyeman asserts that African-American investigators were replaced in the unit with white investigators. Agyeman Resps. ¶¶ 19–20.

Finally, Agyeman avers that he was wrongfully denied certification as a foam unit technician and was required to attend the DCFEMS mandatory EMT recertification program, despite being ineligible for termination for failure to maintain EMT credentials. *Id.* ¶¶ 28–29; Pls.' SMF at 10–12.

### c)   Plaintiff Daniel Botts

Daniel Botts began service as a DCFEMS firefighter in 1982 and was, in 2004, promoted to a fire inspector in the Fire Marshal's Office. Def.'s SMF (Botts) ¶¶ 3–4. Botts alleges that he was wrongfully assigned to the NREMT Training Academy and subjected to a hostile work environment. SAC ¶¶ 74–83.

### (i)   NREMT Training Allegations

Botts allowed his EMT Card to expire in January 2009, resulting in his transfer to the NREMT Training Academy later that year. Def.'s SMF (Botts) ¶ 21.[5] Botts avers that he is not an EMS provider, Pl. Botts' Resps. Def.'s SMF ("Botts Resps.") ¶ 20, ECF No. 202-5, and was told that he did not need an EMS card while working in the Fire Marshal's Office, Def.'s Mem. (Botts), Ex. B at 76:6-9. Consequently, he contends that his assignment to the Training Academy was due to racial discrimination since similarly situated white firefighters were not required to obtain NREMT certification. SAC ¶ 83; Def.'s SMF (Botts) ¶ 27. Citing his deposition testimony and interrogatory responses as support for this contention, Botts claims that he was told that as many as 100 white firefighters hired before 1986 did not have to go to the Training Academy. Def.'s SMF (Botts) ¶ 37; Pls.' SMF at 13. After initially indicating that he could not recall how he obtained this information, Botts later claimed that a Fire Sergeant named "Maria" told him about the alleged racial disparity in the Training Academy. Def.'s SMF (Botts) ¶ 37. Further, he claims that an unnamed superior expressed his concern to Botts that African-American firefighters were required to attend the Training Academy while "a lot of white guys are out there who don't have to come down here [to the Training Academy]." *Id.* ¶ 38.

---

[5]   The Second Amended Complaint incorrectly states that Botts was transferred to the Training Academy in 2004. SAC ¶ 77.

Botts took and failed the NREMT certification exam five times between January 2009 and August 2010. *Id.* ¶ 23. While he is not subject to termination for failing to maintain EMT certification, he alleges that DCFEMS employees told him that he could be fired if he did not pass the NREMT examination. Botts Resps. ¶¶ 25–26.

### (ii)     Hostile Work Environment Allegations

Botts does not expressly allege that he was subjected to a hostile work environment, *see* SAC ¶¶ 74–83, but asserts that he was frequently harassed by fellow firefighters both on account of his race, Def.'s Mem. (Botts), Ex. A at 33:18-21, and his unrelated personal views (*e.g.*, his religious beliefs, vegetarianism, and belief in UFOs), Def.'s SMF (Botts) ¶¶ 39–40.[6] As evidence, Botts claims that, in 2002 or 2003, his car was keyed and broken into and his personal effects were disturbed and stolen. *Id.* ¶ 41. In the same time period, Botts asserts that someone put "charred" glass in his firefighting equipment. *Id.* The Metropolitan Police Department ("MPD") investigated this latter incident and was unable to substantiate Botts' claim. *Id.* Although he does not know who broke into his car or placed glass in his gear, he asserts that these incidents were motivated by race. Pls.' SMF at 17–18.

In addition, following his promotion to Fire Inspector in 2004, Botts alleges that an accompanying pay raise was not timely processed. SAC ¶¶ 77–78; Def.'s SMF (Botts) ¶¶ 5–7. After Botts submitted a complaint to the DCFEMS Equal Opportunity Office ("EEO") in 2006 regarding the overdue raise, the EEO found no evidence of discrimination. Def.'s Mem. (Botts), Ex. C (Ltr. from Detria J. Liles Hutchinson to Daniel Botts), ECF No. 147-6. Ultimately, Botts was awarded the pay increase in 2006 and received back pay for the period during which the raise was not in effect. Def.'s Mem. (Botts), Ex. A, Ex. 9. According to Botts, the paperwork

---

[6]     The Second Amended Complaint contains no allegation regarding any alleged religious discrimination and Botts does not describe his religious beliefs in any detail. *See generally* SAC.

for a white employee, who was also promoted, was processed three weeks after he was transferred. SAC ¶ 79.

Finally, although he does not provide specific dates, Botts asserts various additional instances of workplace harassment, including: (1) DCFEMS not allowing African-American employees to work overtime, Def.'s Mem. (Botts), Ex. A at 35:2-5; (2) a physical altercation between Botts and a Fire Chief "years ago," *id.* at 34:11-14; (3) white firefighters tampering with African-American firefighters' equipment, *id.* at 35:12-1; (4) disparate assignment practices, *id.* at 35:6-11; and (5) two instances of white firefighters using racial epithets, *id.* at 37:20–38:1.

### d)    Plaintiff Gerald Burton

Gerald Burton is an African-American firefighter employed by DCFEMS. Def.'s SMF ("Def.'s SMF (Burton)") ¶ 1, ECF No. 145-2. Burton alleges that he was subjected to racially disparate discipline that amounts to a hostile work environment. SAC ¶¶ 94, 99–101.

His allegations stem from an event that occurred on November 21, 2007, when Burton requested permission to respond to a dispatch call transmitted to all D.C. Fire Department units regarding a house fire. Def.'s SMF (Burton) ¶¶ 3–4; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Burton)"), Ex. C (Stmt. of Michael T. Reilley, 1st Battalion Fire Chief), at 2, ECF No. 145-3. The District contends that Burton was returning from a training drill at the time of the relevant dispatch call and Burton alleges that he was heading *to* the drill and driving in the direction of the house fire, when he requested permission to respond to the call. Pl. Burton's Resps. Def.'s SMF ¶¶ 3–4, ECF No. 202-6. Although Burton's superior ordered him to disregard the alarm, Burton proceeded to the scene of the fire. Def.'s SMF (Burton) ¶ 5. According to Burton, once he reached the vicinity of the fire, nearby citizens requested that he attend to it. Burton Resps. ¶ 5, ECF No. 202-6. Burton further asserts that he heard "crackling"

21

noises and decided to address the fire despite his contrary orders.  Def.'s Mem. (Burton), Ex. A at 31:1-4.

Upon arriving on the scene, Burton's superior ordered Burton to take a support role in assisting the larger response to the fire.  Def.'s SMF (Burton) ¶ 7.  Burton contends that he could not take such a role because no other fire truck was on the scene.  Def.'s Mem. (Burton), Ex. A at 30:10-16.  Burton contends that he did not ignore this second order, but concedes that he did not take the support role as instructed.   Burton Resps. ¶ 7.  Thus, he acknowledges that he did not follow orders.  Def.'s Mem. (Burton), Ex. A at 31:9-18.  Burton asserts that he was successful in preventing the fire from spreading elsewhere in the building  and that his superior ultimately agreed that he helped to subdue the fire.  *Id*.

Two weeks later, however, Burton received an initial written notification of pending disciplinary  charges against him for having disobeyed orders.  Def.'s SMF (Burton) ¶ 14; Def.'s Mem. (Burton), Ex. E (Initial Written Notice), ECF No. 145-3.  Following this initial notice, Burton's attorney spoke to the press on his behalf.  Def.'s SMF (Burton) ¶ 15.  Thereafter, Burton received a Proposed Action notice alleging four infractions: (1) falsely representing that his engine company was already at the scene of the active fire at the time of the call; (2) disobeying a direct order of a superior not to respond to the scene; (3) disregarding the subsequent order and failing to adhere to standard practices in fighting fire which "could have jeopardized the lives of the firefighters battling the fire and could have caused additional loss of property;" and (4) "through his representative, . . . provid[ing]  false information to the media" that compromised the image of DCFEMS and using the media "to influence the public in impacting an internal disciplinary case."  Def.'s Mem. (Burton), Ex. I (Proposed Action), ECF No. 145-3.  The Trial Board considering these charges determined that the plaintiff disobeyed

orders and ignored proper procedures at the scene of a fire, resulting in a unanimous recommendation for a 180-hour suspension. Def.'s SMF (Burton) ¶¶ 23–24; Def.'s Burton Mem., Ex. G (Trial Board Letter of Decision/Suspension), ECF No. 145-3. Burton successfully appealed the Trial Board's recommendation, resulting in a reduction of his punishment to seventy-two hours, with reimbursement of the back pay and benefits for the 108 hours that were set aside. Def.'s SMF (Burton) ¶ 26; Def.'s Mem. (Burton), Ex. J (Amended Letter of Decision/Suspension), ECF No. 145-3. Burton appealed his reduced punishment to the D.C. Office of Employee Appeals, which declined to consider the appeal because the reduced suspension did not meet the Office's jurisdictional threshold. Def.'s SMF (Burton) ¶ 28.[7]

Burton alleges that he was disparately disciplined compared to white firefighters, who were involved in "similar or more egregious actions." Def.'s Mem. (Burton), Ex. A at 157:11-17. Further, he alleges that he experienced a hostile work environment by being "subjected to a Deputy Fire Chief's Conference, Illegal Battalion Conference, a Trial Board, transferred to Engine 7, suspended and not allowed to work overtime, and given a discipline for actions that White employees were not disciplined for." Def.'s Mem. (Burton), Exh. O (Pl. Burton's Am. Answers Def.'s First Interrogs.), No. 11, ECF No. 145-3. Finally, he alleges that he was "served disciplinary papers for the same charges three (3) different times, at work in front of [his] co-workers, at the clinic and by federal express [sic] at [his] house." *Id.*

---

[7]     Burton also filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging that the Trial Board engaged in racial discrimination. Def.'s SMF (Burton) ¶ 29; Def.'s Mem. (Burton), Exh. L (EEOC Intake Questionnaire), ECF No. 145-3. Following an investigation, the EEOC concluded that "[t]he evidence [did] not show violations of Title VII of the Civil Rights Act of 1964," and that "it [was] unlikely that further investigation would lead to finding a violation of Title VII because the evidence [did] not show that race or protected activity factored in [Burton's] discipline or treatment." *Id.*

e)        **Plaintiff Lawrence Clark**

Lawrence Clark is a DCFEMS firefighter who was promoted to Lieutenant in early 2008. Def.'s SMF ("Def.'s SMF (Clark)") ¶¶ 1–2, ECF No. 157-2.  Clark alleges that he was subjected to racially disparate discipline after he assaulted another person with a knife during "horseplay," and a hostile work environment.  SAC ¶¶ 111–115.

His allegations stem primarily from an incident that occurred on September 16, 2008, when Clark reported to the fire department to retrieve gear before reporting to an overtime shift. Def.'s SMF (Clark) ¶ 3; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Clark)"), Ex. C (Pl.'s Supp. Answer & Obj. Def.'s First Interrogs.), No. 1, ECF No. 157-6.  Upon arrival, Clark encountered an EMT and a paramedic outside the firehouse.  Def.'s SMF (Clark) ¶ 4; Def.'s Mem. (Clark), Ex. D (Memorandum from Lawrence Clark to Brian Lee), ECF No. 157-7.  Clark approached the paramedic while holding an open pocketknife and began to "joke around" and engage in "horseplay" with him, including attempting to "tickle" the EMT's abdomen.  Def.'s SMF (Clark) ¶ 5; Def.'s Mem. (Clark), Ex. A (Dep. of Lawrence Clark) at 30:2-12; 33:2–11, ECF No. 157-4, Ex. C, No. 1.  During the course of this "horseplay," the EMT sustained a severe laceration on the back of his hand, which required emergency treatment at George Washington University hospital and ultimately resulted in the EMT's ambulance being placed out of service pending his recovery.  Def.'s SMF (Clark) ¶¶ 6–8; Def.'s Mem. (Clark), Ex. E (Photograph of Injured Hand) at 3, ECF No. 157-8.

Clark's superior learned of the incident and interviewed Clark, as well as the EMT and paramedic on the night it occurred.  Def.'s SMF (Clark) ¶¶ 9–10; Def.'s Mem. (Clark), Ex. G (Mem. from Raymond Gretz to Dennis Rubin), ECF No. 157-10.  The MPD also investigated the incident and interviewed each of the individuals involved.  Def.'s SMF (Clark) ¶ 12; Def.'s

24

Mem. (Clark), Ex. H (MPD WACIIS Investigative Supplement Report), ECF No. 157-11.  As a result of these investigations, Clark was summarily removed from his position and provided with a Proposed Action charging him with: (1) "knowingly and recklessly wav[ing] a pocket knife at [the EMT] causing significant bodily injury;" (2) "fail[ing] to take appropriate supervisory action" by leaving the scene of the incident "without documenting or otherwise giving notice to [his] supervisors . . . of this unusual incident;" and (3) "fail[ing] to take action to ensure that [the injured EMT] received appropriate medical care and attention."  Def.'s SMF (Clark) ¶¶ 13–18; Def.'s Mem. (Clark), Ex. F (Notice of Summary Removal and Proposed Action), ECF No. 157-11.

Following extensive proceedings before a DCFEMS Trial Board—during which Clark was represented by counsel and the Board received testimony from sixteen witnesses as well as audio and written evidence—the Board unanimously found Clark guilty of both assaulting the EMT and failing to report the incident.  Def.'s SMF (Clark) ¶¶ 22, 25, 27; Def.'s Mem. (Clark), Ex. I (Final Bd. Ltr. of Decision/Suspension/Demotion).  The Trial Board recommended that Clark be demoted to Sergeant and suspended for 240 hours.  Def.'s SMF (Clark) ¶¶ 30–31, 33.  As a result, Clark's summary removal was retracted and Clark received back pay to the date of his reinstatement.  Def.'s SMF (Clark) ¶¶ 34–35; Def.'s Mem. (Clark), Ex. J (Notification of Personnel Action), Ex. K (Reinstatement with Back Pay Worksheet/Check Off List).

Despite his reinstatement, Clark alleges that he was disparately disciplined in comparison to white DCFEMS employees for similar or more egregious actions.  SAC ¶¶ 111–114.  Moreover, he alleges that he was subjected to a hostile work environment as a result of DCFEMS's alleged policy of discriminatory discipline.  SAC ¶ 115.

### f)      Plaintiff Charles Florence

Charles Florence retired as a DCFEMS firefighter on July 30, 2010.  Def.'s SMF ("Def.'s SMF (Florence)") ¶ 27, ECF No. 155-2; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Florence)"), Ex. K (Optional Retirement Order), ECF No. 155-14.  Prior to his retirement, Florence alleges that he was subject to racially disparate discipline following allegations about Florence's harassing conduct towards female DCFEMS employees.

On April 8, 2009, a female DCFEMS Sergeant filed a complaint against Florence with the DCFEMS EEO officer.  Def.'s SMF (Florence) ¶ 4; Def.'s Mem. (Florence), Ex. A (EEO Complaint Form), ECF No. 155-4.  The complaint described various instances of Florence's alleged behavior while on duty, including five instances of sexually suggestive comments and/or contact with the Sergeant and a single instance of aggressive and threatening behavior arising from an argument between Florence and the complaining Sergeant.  *Id.*  During an ensuing investigation of these allegations, the DCFEMS EEO discovered numerous additional instances of Florence's allegedly harassing behavior towards the complaining Sergeant and other female DCFEMS employees.  Def.'s SMF (Florence) ¶¶ 5–7; Def.'s Mem. (Florence), Ex. A.

On July 13, 2009, DCFEMS provided Florence with a Proposed Action charging Florence with: (1) engaging in "on-duty or employment related act[s] or omission[s] that [he] knew or should have reasonably known was a violation of the law," with two specifications describing Florence's alleged sexually inappropriate behavior and otherwise aggressive conduct; and (2) engaging in "[a]ny on duty or employment related act or omission that interferes with the efficiency or integrity of government operations."  Def.'s SMF (Florence) ¶¶ 10–11; Def.'s Mem. (Florence), Ex. A.  These charges were considered by a DCFEMS Trial Board, which unanimously found Florence guilty of the charge related to his sexually inappropriate comments

and not guilty with respect to the other charges, and recommended that Florence be demoted to Sergeant, prohibited from taking the 2012 promotional exam, and suspended for 168 hours. Def.'s SMF (Florence) ¶¶ 13–14; Def.'s Mem. (Florence), Ex. B (Fire Board Findings of Fact, Conclusions, and Recommendations), ECF No. 155-4.

Following the conclusion of the Trial Board, Florence was given the option of retiring instead of being disciplined. Def.'s SMF (Florence) ¶¶ 21–22; Def.'s Mem. (Florence), Ex. C (Dep. of Charles Florence) at 25:8–26:19, ECF No. 155-5. Florence asserts that he chose to retire in order to avoid being publicly labeled as a sexual harasser, although the parties dispute whether this public labeling alone (*i.e.,* absent any corresponding discipline) would have prompted Florence to retire. Def.'s SMF (Florence) ¶¶ 23–26; Pl. Florence's Resps. Def.'s SMF ("Florence Resps.") ¶¶ 23–26, ECF No. 202-8.

In any event, Florence asserts that he was "unfairly subjected to a trial board hearing for events that did not establish sexual harassment," Def.'s SMF (Florence) ¶ 29; Def.'s Mem. (Florence), Ex. G (Pl. Florence's Answer Def.'s First Interrogs.) at No. 1, ECF No. 155-10, and alleges that he was disparately disciplined in comparison to white DCFEMS employees, who committed similar or more egregious infractions, SAC ¶ 126. Florence further alleges that he was subjected to a hostile work environment due to this allegedly disparate discipline. *Id*. ¶ 128.

g)      **Plaintiff Joshua Fuller**

Joshua Fuller was hired as a DCFEMS firefighter in February 2005. Def.'s SMF ("Def.'s SMF (Fuller)") ¶ 3, ECF No. 164-2. Fuller alleges that he was subjected to racially disparate discipline after his criminal conviction for possession of an unregistered firearm, and a hostile work environment. SAC ¶¶ 142–146.

Less than three years after he joined DCFEMS, Fuller was arrested, on May 20, 2007, by the MPD and charged with carrying a pistol without a license and possession of an unregistered firearm and ammunition.  Def.'s SMF (Fuller) ¶ 8; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Fuller)"), Ex. C (Dep. of Joshua Fuller) at 55:6-12, ECF No. 164-6.  The DCFEMS Order Book requires employees to "immediately notify" DCFEMS if they are arrested, although Fuller contends that the DCFEMS generally requires employees to report arrests within two to three days.  Def.'s SMF (Fuller) ¶ 9; Pl. Fuller's Resps. Def.'s SMF ("Fuller Resps.") at 3, ECF No. 202-9.  DCFEMS became aware of Fuller's arrest on the day of the arrest, but the parties dispute the date on which Fuller—as opposed to the MPD—informed DCFEMS of the incident.  Def.'s SMF (Fuller) ¶¶ 10–11; Fuller Resps. at 3.  In June 2007, Fuller pleaded guilty to the charges for which he was arrested.  Def.'s SMF (Fuller) ¶ 14.

Following his guilty plea, Fuller was charged by DCFEMS and ordered to attend a Trial Board hearing.  Def.'s SMF (Fuller) ¶ 15; SAC ¶ 136.  During the hearing, Fuller unsuccessfully attempted to introduce phone records purportedly showing that he attempted to contact his supervisor to alert him of his arrest soon after it occurred.  Def.'s SMF (Fuller) ¶ 21; Def.'s Mem. (Fuller), Ex. E (Transcript of Fuller Trial Board Hearing) at 224:22–225:8, 278:1-14, ECF No. 164-8.  The parties disagree as to whether these records were properly excluded from consideration by the Trial Board.  Fuller Resps. at 7.  The parties similarly disagree as to whether the Board prohibited Fuller from presenting a witness during the hearing.  Def.'s SMF (Fuller) ¶ 22; Fuller Resps. at 7.

Following the hearing, the Trial Board unanimously concluded: (1) that Fuller failed to notify DCFEMS promptly of his arrest; and (2) that Fuller had in fact pled guilty to the three charges for which he was arrested.  Def.'s SMF (Fuller) ¶ 23; Def.'s Mem. (Fuller), Ex. D (Ltr.

of Decision/Removal), ECF No. 164-7. The Trial Board recommended termination for these infractions. Def.'s SMF (Fuller) ¶ 24; Def.'s Mem. (Fuller), Ex. D.

Fuller appealed this recommendation with the D.C. Office of Employee Appeals. Def.'s SMF (Fuller) ¶ 26; Def.'s Mem. (Fuller), Ex. G (Petition for Appeal), ECF No. 164-10. In this appeal, Fuller did not assert that his termination was the result of racial discrimination, Def.'s SMF (Fuller) ¶ 27; Def.'s Mem. (Fuller), Ex. G, Ex. C at 75:15-20, and the Office of Employee Appeals affirmed the initial DCFEMS disciplinary action, Def.'s SMF (Fuller) ¶ 28; Def.'s Mem. (Fuller), Ex. B (Office of Employee Appeals Initial Decision), ECF No. 164-5.[8]

### h)   Plaintiff James Johnson

James Johnson served as a DCFEMS firefighter between 1983 and January 2011. Def.'s SMF (Johnson) ¶¶ 1–2. Johnson alleges he felt compelled to retire after continued discrimination and harassment that began on or around April 24, 2007, and continued until his retirement. SAC ¶ 157. His allegations center on two incidents: (1) an investigation into alleged misconduct in his engine company and his subsequent transfer, *id.* ¶¶ 158–61; and (2) his assignment to the NREMT Training Academy, *id.* ¶ 162.

### (i)   NREMT Training Allegations

Johnson was transferred to the NREMT Training Academy in March 2008 and remained at the Academy until his retirement. Def.'s SMF (Johnson) ¶ 28; Def.'s Mem. (Johnson), Ex. A (Dep. of James Johnson) at 70:15-17, ECF No. 151-4. During that time, Johnson sat for the NREMT certification examination six times and failed each time. Def.'s SMF (Johnson) ¶ 29; Def.'s Mem. (Johnson), Ex. E (Pl.'s Answer Def.'s Am. Interrogs.) at 4, ECF No. 151-8.

---

[8]     Fuller filed a complaint with the EEOC, which on September 30, 2013 issued Fuller a letter of Dismissal and Notice of Rights stating, "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes." Def.'s SMF (Fuller) ¶ 34; Def.'s Mem. (Fuller), Ex. J (EEOC Dismissal and Notice of Rights), ECF No. 164-13.

Johnson asserts that he was transferred to the Training Academy on account of his race and "as a result of testimony in support of a colleague, an African American." Pls.' SMF at 48. Johnson alleges that he should not have been required to complete the NREMT certification course because of his hire date. SAC ¶¶ 162–65, 168.

Johnson alleges that similarly situated white firefighters were not required to remain in the NREMT certification course, Pls.' SMF at 50–51, and that, of the people required to attend the Training Academy who were hired prior to the cut-off year, none were white, Def.'s SMF (Johnson) ¶ 45; SAC ¶ 168. Finally, Johnson claims that he was served with adverse action papers in November of 2010 for failing the NREMT certification six times and placed on administrative leave pending the resolution of that adverse action. Def.'s SMF (Johnson) ¶ 38; Def.'s Mem. (Johnson), Ex. E at 4, 7, 10. While the proposed adverse action was later recalled, Def.'s SMF (Johnson) ¶ 39; Def.'s Mem. (Johnson), Ex. E at 10, Johnson alleges that he chose to retire primarily due to his continued assignment to the Training Academy, SAC ¶ 169; Def.'s SMF (Johnson) ¶ 46; Def.'s Mem. (Johnson), Ex. E at 13–14.

### (ii)    Hostile Work Environment Allegations

Beginning in April 2007, DCFEMS began an investigation into alleged misconduct in the engine company to which Johnson was assigned. Def.'s SMF (Johnson) ¶ 3. The investigation initially centered on an allegation about tampering with a female African-American firefighter's self-contained breathing apparatus. *Id.*; Def.'s Mem. (Johnson), Ex. D (Mem. from James Talbert & Michael Willis to Lawrence Schultz), ECF No. 151-7. In connection with this investigation, Johnson submitted a report recommending discipline against white DCFEMS employees for their alleged harassment of the female firefighter. Def.'s SMF (Johnson) ¶ 4;

Def.'s Mem. (Johnson), Ex. E at 2–3.  Johnson likewise described "numerous incidents of discrimination, race, and gender" within his engine company.  *Id.*

The DCFEMS investigation eventually expanded to include a review of other significant operational issues within the engine company.  Def.'s SMF (Johnson) ¶ 3; Def.'s Mem. (Johnson), Ex. D. Johnson contends that this investigation turned into a "witch-hunt" focused on his character.  Def.'s Mem. (Johnson), Ex. A at 49:5.  In particular, he claims that during this investigation, DCFEMS employees asked his coworkers if he was racist or a troublemaker.  *Id.* at 51:15-16.  Although the District contests this characterization, individual investigators expressed their concern regarding Johnson's erratic and abrasive personality and called into question his competency, with some focus on a conflict between Johnson and another firefighter in the engine company.  Def.'s SMF (Johnson) ¶ 3; Def.'s Mem. (Johnson), Ex. D.  Ultimately, in May 2013, Johnson along with twenty-three other members of the engine company were transferred to different platoons or engine companies within DCFEMS.  Def.'s SMF (Johnson) ¶¶ 5–6; Def.'s Mem. (Johnson), Ex. C.  Despite the transfer, Johnson retained the same duties, responsibilities, salary, benefits, and promotion potential available to him in his prior assignment.  Def.'s SMF (Johnson) ¶ 9.

In June 2007, Johnson filed a complaint with the DCFEMS EEO and D.C. Office of Human Rights alleging that his transfer was the result of efforts to call attention to racist behavior in his engine company.  Def.'s SMF (Johnson) ¶ 15.  Johnson was reassigned to his original station in July 2007, which Johnson suggests demonstrates that his initial transfer was wrongful.  Def.'s SMF (Johnson) ¶¶ 10, 15; Def.'s Mem. (Johnson), Ex. E at 3.[9]

---

[9]     In September 2008, the EEOC issued Johnson a dismissal and notice of rights, in which the EEOC indicated that it was unable to conclude a violation of his rights had occurred and informed Johnson of his right to sue.  Def.'s Mem. (Johnson), Ex. A at 47.

### i)      Plaintiff Albert Montgomery

Albert Montgomery served as a DCFEMS firefighter from 1984 until his voluntary retirement in 2009.  Def.'s SMF ("Def.'s SMF (Montgomery)") ¶ 2, ECF No. 159-3; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Montgomery)"), Ex. A (Dep. of Albert Montgomery) at 11:17–12:5, ECF No. 159-4.  Montgomery asserts various instances of racial discrimination between his date of hire and 2008, including both discriminatory discipline and assignment to the NREMT Training Academy.

### (i)      Allegations Prior to 2007

In 1981, Montgomery asserts that he was discriminated against during the hiring process after scoring higher on the entry-level civil service examination than many white applicants.  Def.'s SMF (Montgomery) ¶ 4; Def.'s Mem. (Montgomery), Ex. B (Pl.'s Supp. Answer Def.'s Am. Interrogs.), No. 37, ECF No. 159-5.  Thereafter, between June 1984 and 1988, Montgomery alleges that he was subjected to harassment and physical assault by a white firefighter.  Def.'s SMF (Montgomery) ¶ 4; Def.'s Mem. (Montgomery), Ex. B at 27, 35.

Montgomery further claims that he received the following discriminatory disciplinary actions prior to 2007: (1) a reprimand for intervening in a house fire in September 1986; (2) a suspension for insubordination while off duty in May 1988; (3) a detail to a different duty station for over a year in August 1988; (4) a twelve-hour suspension after being found guilty of negligence while on duty in May 1991; (5) a 120-hour suspension for using discourteous language toward an African-American supervisor in February 2000; and (6) an official reprimand for failing to safeguard his equipment in late 2005 or early 2006.  Def.'s SMF (Montgomery) ¶ 4; Def.'s Mem. (Montgomery), Ex. B at 27, 35.

Montgomery also asserts that he saw racial epithets written "in dust on a window sill [sic] and window" in a firehouse locker room in 2003. Def.'s SMF (Montgomery) ¶ 4; Pls.' SMF at 54. Montgomery claims he sent a memorandum about this incident to a superior. Def.'s SMF (Montgomery) ¶ 4; Def.'s Mem. (Montgomery), Ex. B at 3–4. He alleges that he heard about similar language appearing on the windowsill and on the window on at least three other occasions, but he did not witness these incidents. Def.'s Mem. (Montgomney), Ex. A at 30:2–31:2.

### (ii)      NREMT Training Allegations

Sometime before 2007, Montgomery's EMT certification card expired. Def.'s SMF (Montgomery) ¶ 18; Def.'s Mem. (Montgomery), Ex. K (Mem. from Frederick Cooper to Douglas Smith), ECF No. 159-14. As a result, Montgomery was transferred to the NREMT Training Academy for recertification. Def.'s SMF (Montgomery) ¶ 19; Def.'s Mem. (Montgomery), Ex. K. Montgomery completed the NREMT certification process in December 2008, three months after being transferred to the Training Academy. Def.'s SMF (Montgomery) ¶ 24; Def.'s Mem. (Montgomery), Ex. L (Ltr. from William Brown to Albert Montgomery), ECF No. 188-15.

Montgomery alleges he was not required to go to the Training Academy because he was hired before 1987 and was not required to be an EMS firefighter. SAC ¶¶ 174–75. Further, relying on his deposition testimony and interrogatory responses, he alleges that similarly situated white firefighters were not required to take the recertification course. Pls.' SMF at 75; SAC ¶ 182.

### j)      Plaintiff Jonathan Morris

Jonathan Morris served as a DCFEMS firefighter from March 1992 until his termination in April 2010.  Def.'s SMF ("Def.'s SMF (Morris)") ¶ 3, ECF No. 166-2.  During his tenure with DCFEMS, Morris alleges that he was subject to racially discriminatory discipline and non-promotion, as well as a hostile work environment.  SAC ¶¶ 199, 201, 204–05.

### (i)      Non-Promotion Allegations

Morris sat for the 2006 promotional exam seeking promotion to Sergeant.  Def.'s SMF (Morris) ¶ 4.  Based on his composite score, Morris was ranked ninety-ninth out of 300 eligible firefighters on the promotional list at the time it expired on October 15, 2008.  Def.'s SMF (Morris) ¶¶ 6, 9.  The last employee to be promoted to Sergeant from the 2006 promotion list was ranked seventy-fifth.  Def.'s SMF (Morris) ¶¶ 7–8.  Morris alleges that DCFEMS allowed the 2006 promotion list to expire in order to promote more white firefighters.  *See* SAC ¶ 207.  He acknowledges, however, that he is unaware of any DCFEMS official or supervisor who indicated such a motive.  Def.'s SMF (Morris) ¶ 11.

### (ii)     Discriminatory Discipline Allegations

Morris alleges two instances of disparate discipline.  First, in 2007, Morris was suspended for seventy-two hours due to an away without leave ("AWOL") infraction he received for attending a fellow firefighter's funeral.  Def.'s SMF (Morris) ¶ 42; Def.'s Mem. (Morris), Ex. I (Pl.'s Answer Def.'s Am. Interrogs.) at 7, 11, ECF. No. 166-12.  Morris alleges that he was incorrectly deemed to be AWOL and asserts that he believed that he was granted leave to attend the funeral.  *See* SAC ¶ 197; Pl. Morris' Resps. Def.'s SMF ("Morris Resps.") ¶ 42, ECF No. 202-12.

Second, following an absence from a mandatory lineup in 2009, Morris spoke with two supervisors via telephone and falsely reported that he had been in a car accident in Atlanta and would be unable to report for his shift. Def.'s SMF (Morris) ¶¶ 22–25; Def.'s Mem. (Morris), Ex. A at 59:17–60:3, 62:9–64:4, 68:7-9. Three weeks later, Morris submitted a report indicating that he had been in a car accident in Prince George's County on the date of his absence. Def.'s SMF (Morris) ¶ 26. When asked to provide documentation in support of this report, Morris submitted a falsified traffic citation and an altered registration form for medical treatment at a hospital in eastern Maryland. Def.'s SMF (Morris) ¶ 27; Def.'s Mem. (Morris), Ex. A at 68:19–69:17.

In June 2009, DCFEMS notified Morris that he was being charged with making false statements and providing false documents in connection with his absence. Def.'s SMF (Morris) ¶ 30. At the resulting Trial Board hearing, Morris pleaded guilty to these charges knowing that doing so could result in his termination. Def.'s SMF (Morris) ¶¶ 31–34; Def.'s Mem. (Morris), Ex. A at 75:7-14, 81:9-14, 84:9-12. Accepting his guilty plea, the Trial Board split on its recommended punishment with respect to the charge of making false statements, with two members recommending a 216-hour suspension and two members recommending termination. Def.'s SMF (Morris) ¶¶ 34–36; Def.'s Mem. (Morris), Ex. H (Final Trial Bd. Ltr. of Decision/Suspension) at 1, ECF No.166-11. Consistent with the tiebreak procedures outlined in the CBA, the Assistant Fire Chief reviewed the case and recommended termination, and Morris was removed from DCFEMS service in April 2010. Def.'s SMF (Morris) ¶¶ 37, 39–40; Def.'s Mem. (Morris), Ex. H. Morris asserts that the Fire Chief pressured the Assistant Fire Chief to recommend termination, Morris Resps. ¶ 39, and alleges that he was disparately disciplined relative to white DCFEMS employees for similar or more egregious conduct, SAC ¶ 201.

### (iii)      Hostile Work Environment Allegations

Morris also alleges that he was subjected to a hostile work environment during the course of his tenure with DCFEMS. Pls.' SMF at 55–58; SAC ¶¶ 202, 205. First, he claims that a white coworker interfered with his medical care after Morris injured his back in early 2009. SAC ¶¶ 189–194. In particular, Morris avers that a DCFEMS PFC physician changed his diagnosis at the behest of a Battalion Fire Chief, who had no authority to make medical decisions. *Id.*; Def.'s SMF (Morris) ¶¶ 19–20.

Second, Morris alleges that he received unequal work assignments as compared to his white counterparts. SAC ¶ 195. Specifically, he asserts that he was assigned to areas of the District with which he was unfamiliar and to which white firefighters were not assigned, and that his lack of familiarity with these areas negatively affected his job performance. *Id.*; Def.'s SMF (Morris) ¶ 41. Morris also alleges that he was not permitted to work overtime assignments due to his race, Pls.' SMF at 46, though he acknowledges that he was not eligible for such assignments while he was designated as injured for performance of duty, Morris Resps. ¶ 43.

Finally, Morris alleges that a white firefighter was neither reprimanded nor disciplined after referring to Morris using a racial epithet on at least one occasion between 2006 and 2008. Def.'s SMF (Morris) ¶ 16; SAC ¶ 196. Morris concedes, however, that neither he nor the four African-American firefighters who allegedly witnessed this incident reported it to any other DCFEMS employees. Def.'s SMF (Morris) ¶ 17.

### k)      Plaintiff Wayne Nelson

Wayne Nelson has served as a DCFEMS firefighter since 1985. District's SMF ("Def.'s SMF (Nelson)") ¶ 2, ECF No. 152-2. Although Nelson was promoted to Lieutenant in August

2013, he alleges that he was not promoted between 2008 and 2012 due to his race. *Id.* ¶ 4; SAC ¶ 218.

Seeking a promotion to Lieutenant, Nelson sat for both the 2008 and 2010 promotional examinations. Def.'s SMF (Nelson) ¶ 26. In 2008, Nelson's composite score ranked thirty-second out of thirty-six candidates for promotion to Lieutenant, and approximately twenty-eight candidates were promoted to Lieutenant. *Id.* ¶¶ 27–28, 36. In 2010, his composite score ranked ninety-sixth out of 104 candidates, and only forty-one Sergeants were promoted to Lieutenant from the 2010 promotional list. *Id.* ¶¶ 29, 30, 56.

In addition to the modifications to the 2008 exam described above, *see supra* Part I.B.1.(a)(i), Nelson alleges that firefighters sitting for the 2010 exam were required to write their names on their exams, as opposed to only their employee identification numbers. SAC ¶ 222; Def.'s SMF (Nelson) ¶ 34. According to Nelson, this change enabled DCFEMS to identify exam takers and ensure that white firefighters would receive higher exam scores. SAC ¶ 223; Pl. Nelson's Resps. Def.'s SMF ("Nelson Resps.") at 10, ECF No. 202-13. Nelson further alleges that DCFEMS did not reveal the 2010 examination results in a timely manner. SAC ¶ 225. According to Nelson, this delay demonstrates that the 2010 promotion list was based on test takers' race, as opposed to their composite scores. Def.'s SMF (Nelson) ¶ 43; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Nelson)"), Ex. A at 40:8–42:1. Finally, Nelson alleges that DCFEMS chose not to withdraw the 2010 examination results despite violations of DCFEMS sequester procedures in order to preserve a promotion list that would permit the promotion of more white firefighters. SAC ¶ 226; Def.'s SMF (Nelson) ¶ 21. By contrast, Nelson alleges that DCFEMS canceled the 2000 promotional exam and terminated an African American firefighter

who violated the sequester procedures associated with that exam. SAC ¶ 227; Def.'s SMF (Nelson) ¶ 23.

### l) Plaintiff Robert Pearson

During the course of his service as a DCFEMS firefighter, Robert Pearson alleges that he has been subjected to racially discriminatory promotion decisions and disciplinary actions, as well as a hostile work environment. *See* SAC ¶¶ 229–253.

#### (i) Non-Promotion Allegations

Pearson sat for the DCFEMS Captain promotional examination in 2006, 2008, and 2010. Def.'s SMF (Pearson) ¶ 44. In 2006, his score ranked fifty-second out of ninety test takers, and the last Lieutenant to be promoted to Captain was ranked fortieth on the promotional list. Def.'s SMF (Pearson) ¶¶ 45, 48. In 2008, Pearson's score ranked twenty-sixth out of thirty-eight test takers, and the last promoted Lieutenant was ranked twenty-fifth. Def.'s SMF (Pearson) ¶ 46; Def.'s Resp. at 91. In 2010, Pearson's score ranked thirty-third out of fifty-test takers, and the last Sergeant to be promoted was ranked thirtieth. Def.'s SMF (Pearson) ¶¶ 47, 52–53. Citing the aforementioned violation of the DCFEMS sequester policy, *see supra* Part I.B.1.(a)(ii), Pearson alleges that the results of the 2010 promotional examination should have been withdrawn. Pl. Pearson's Resps. Def.'s SMF ("Pearson Resps.") ¶¶ 42–43.

#### (ii) Discriminatory Discipline Allegations

From 2004 to early 2011, Pearson was partially detailed to the Hazardous Materials Unit. Def.'s SMF (Pearson) ¶ 2; Pearson Resps. ¶¶ 5, 23. While serving in this unit, Pearson was responsible for checking the credentials of his subordinates at the beginning of each shift. Def.'s SMF (Pearson) ¶ 23; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Pearson)"), Ex. F (Mem. from Robert Pearson to Dennis Rubin), ECF No. 156-3. In February 2009, Pearson received a

citation charging him with allowing a subordinate to work for close to a year without a valid EMT certification.  Def.'s SMF (Pearson) ¶¶ 24–27; Def.'s Mem. (Pearson), Ex. F.  After accepting responsibility for the infraction, Pearson appeared before a Battalion Fire Chief Conference.  Def.'s SMF (Pearson) ¶¶ 29–30; Def.'s Mem. (Pearson), Ex. F.  At the Conference, Pearson accepted a reprimand to settle the disciplinary proceedings against him.  Def.'s SMF (Pearson) ¶¶ 32–33; Def.'s Mem. (Pearson), Ex. G (Ltr. of Decision/Reprimand), ECF No. 156-3.

Pearson alleges that his white superior was not disciplined in connection with this incident, SAC ¶ 239, but acknowledges that he alone was directly responsible for checking his subordinates' credentials and, in fact, inaccurately documented this information on materials available to his superiors.  Def.'s SMF (Pearson) ¶ 27; Def.'s Mem. (Pearson), Ex. I (Mem. from Robert Pearson to Dennis Rubin).  Further, relying only on his belief, Def.'s Resp. at 88, Pearson alleges that no white DCFEMS employee has been reprimanded for permitting a subordinate to work without a valid EMT card, SAC ¶¶ 240–41.

### (iii)   NREMT Training Assignment

Since October 2000, Pearson has been assigned at least partially as a recruit training instructor at the NREMT Training Academy.  Def.'s SMF (Pearson) ¶¶ 1–11.  During this time, Person has repeatedly requested to be transferred out of the Academy and into an operations role, *id.* ¶ 2, but was instead shifted in February 2011, to a full-time detail at the Training Academy, *id.* ¶ 11.  A year later, Pearson alerted DCFEMS that his detail had continued longer than six months, which Pearson asserted was in violation of DCFEMS policy.  *Id.* ¶ 12.  DCFEMS sought to remedy any procedural violation by converting his detail into a permanent assignment in February 2012.  *Id.* ¶ 13.  Although he acknowledges that he is better compensated while

assigned full-time to the Training Academy, Pearson alleges that he lost holiday and overtime pay during his extended detail. *Id.* ¶¶ 15–17; Pearson Resps. ¶¶ 15–17.

In October 2012, Pearson filed a complaint with the DCFEMS EEO office alleging that DCFEMS discriminated against him based on his family status by assigning him to the Training Academy full-time, which complaint was dismissed as meritless. Def.'s SMF (Pearson) ¶¶ 18–19; Def.'s Mem. (Pearson), Ex. A at 68:11-18. Pearson appears to contend that the assignment negatively impacted his childcare responsibilities, but the record is entirely unclear about the basis for this contention. *See* Pls.' SMF at 61. In any event, Pearson alleges that white employees were allowed to transfer away from the Training Academy due to their family obligations, citing the example of two white officers. Pearson Resps. ¶¶ 18–19; Def.'s Resp. at 88.

### m)      Plaintiff Charles Rayford

Charles Rayford served as a DCFEMS firefighter and EMT from June 1990 to November 2009. Def.'s SMF ("Def.'s SMF (Rayford)") ¶¶ 3, 30, ECF No. 163-2. Citing two instances of disciplinary action, one of which resulted in his termination, Rayford alleges that he was disparately disciplined in comparison to white firefighters for similar or more egregious infractions and that this amounted to a hostile work environment. SAC ¶¶ 269–278.

First, in November 2007, Rayford appeared at a Trial Board hearing stemming from an automobile accident caused by Rayford after he made an improper turn while driving a DCFEMS vehicle at an unsafe speed. Def.'s SMF (Rayford) ¶¶ 4–5. In addition to concluding that Rayford operated the vehicle in a manner that endangered life and property, the Trial Board found that Rayford failed to provide a valid driver's license to the investigating police officer following the accident. *Id.* ¶ 6. In light of these infractions, the Trial Board suspended Rayford

for a total of ninety-six hours.  *Id.* ¶ 7; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Rayford)"), Ex. C (Ltr. of Decision/Suspension)  at 1, ECF No. 163-6.

Later, in August 2008, a urine sample Rayford submitted in connection with an annual physical tested positive for marijuana, in violation of the DCFEMS Substance Abuse Policy. Def.'s SMF (Rayford) ¶ 10.  As a result, Rayford was placed in the DCFEMS Substance Abuse Program, which consisted of a year-long supervised rehabilitation program and regular drug tests.  *Id.* ¶ 11.  Under the Substance Abuse Policy, an "employee . . . who tests positive after testing negative, while in the rehabilitation program, will be considered to have failed to successfully complete the program, and will be recommended for termination."  *Id.* ¶ 12; Def.'s Mem. (Rayford), Ex. D (DCFEMS Substance Abuse Policy) § 13.4, ECF No. 163-7.  In February 2009, while still participating in the rehabilitation program, Rayford again tested positive for the use of marijuana and was placed on administrative leave pending an appearance before a Trial Board.  Def.'s SMF (Rayford) ¶¶ 14–15.

At the subsequent Trial Board hearing, Rayford faced charges of violating the DCFEMS substance abuse policy and submitting tampered urine samples for testing.  Def.'s SMF (Rayford) ¶¶ 18, 19; Def.'s Mem. (Rayford), Ex. E (Ltr. of Decision/Removal) at 4–6, ECF No. 163-8.  Rayford alleges that the Trial Court wrongfully refused to allow him to introduce certain evidence in his defense. In particular, the Trial Board did not allow Rayford to introduce a criminal citation received by a white DCFEMS firefighter for the theft of over-the-counter drugs and cosmetics from a pharmacy on the basis that it was irrelevant to the case.  Def.'s SMF (Rayford) ¶ 20; Def.'s Mem. (Rayford), Ex. A at 30:8–31:10.[10]   Likewise, the Trial Board did

---

[10] Rayford further contends that the white firefighter's brother, who coincidentally served as a member of the Trial Board considering the charges against Rayford, wrongfully declined to recuse himself from consideration of the charges against Rayford.  Def.'s SMF (Rayford) ¶ 21; Def.'s Mem. (Rayford), Ex. A at 31:11-17, 63:13–64:14.

not allow Rayford to introduce a negative drug test result he obtained from a laboratory that was not approved by DCFEMS. Def.'s SMF (Rayford) ¶¶ 22–23. In a unanimous decision on November 6, 2009, the Trial Board found Rayford guilty of both charges and recommended his termination. Def.'s SMF (Rayford) ¶¶ 24–26; Def.'s Mem. (Rayford), Ex. E at 1. After he was offered the opportunity to resign in lieu of termination, Rayford chose to resign and left DCFEMS in November 2009. Def.'s SMF (Rayford) ¶¶ 29–30.

Rayford alleges that white DCFEMS firefighters, who are suspected or known to abuse alcohol or drugs, have not been ordered into a drug or alcohol rehabilitation program and have not been terminated for violating the terms of that program. SAC ¶¶ 272–74. Rayford further alleges that he was subjected to a hostile workplace environment as a result of this allegedly disparate disciplinary action. *Id.* ¶ 278.

### n)   Plaintiff Tawanna Robinson

Tawanna Robinson served as a DCFEMS firefighter from October 1983 until her retirement in November 2010. Def.'s SMF (Robinson) ¶¶ 3, 33, ECF No. 165-2. During that time, Robinson alleges that she was subjected to discriminatory discipline and a hostile work environment. SAC ¶¶ 291, 293–296.

### (i)   Discriminatory Discipline Allegations

As previously described, *see supra* Part I.B.1.(a)(ii), a white firefighter chosen to serve as the subject-matter expert for the 2010 DCFEMS promotional examination violated the DCFEMS sequester policy associated with the examination. In June 2010, Robinson contacted the sequestered firefighter via telephone. Def.'s SMF (Robinson) ¶ 20; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Robinson)"), Ex. C (Dep. of Tawanna Robinson) at 65:19–67:1, 69:3–6, ECF No. 165-6. Although Robinson did not know the firefighter was sequestered, DCFEMS

issued a special order announcing the sequestration and Robinson had a duty to remain informed of firefighters under sequestration and to refrain from contacting those firefighters. Def.'s SMF (Robinson) ¶¶ 18, 19, 21; Def.'s Mem. (Robinson), Ex. C at 68:18–69:2.

In August 2010, DCFEMS alerted Robinson that she had been charged with having inappropriate contact with the sequestered firefighter. Def.'s SMF (Robinson) ¶ 20; Def.'s Mem. (Robinson), Ex. F (Notification of Charges), ECF No. 165-9. Robinson later received a Proposed Action indicating that she would be reprimanded in connection with this infraction. Def.'s SMF (Robinson) ¶ 24; Def.'s Mem. (Robinson), Ex. H (Proposed Action), ECF No. 165-11. Robinson initially challenged the proposed reprimand, and DCFEMS scheduled a Battalion Fire Chief Conference to adjudicate the challenge, but she ultimately retired prior to the scheduled Conference. Def.'s SMF (Robinson) ¶¶ 24, 34.

### (ii)      Hostile Work Environment Allegations

Robinson also alleges that she was subject to workplace harassment by several of her coworkers early in her tenure with DCFEMS. Def.'s SMF (Robinson) ¶¶ 4–5. Specifically, she alleges that she experienced negative comments and treatment from two white firefighters due to her race, as well as pranks and jokes regarding her work performance. *Id.*; Def.'s Mem. (Robinson), Ex. B (Pl.'s Answer Def.'s First Interrogs.), No. 16, ECF No. 165-5.

More recently, in 2005, the Department issued an incident report that included incorrect information regarding Robinson's actions during her company's response to a fire. Def.'s SMF (Robinson) ¶ 10; Def.'s Mem. (Robinson), Ex. C at 37:18–40:19. After Robinson notified her superiors of the incorrect information, DCFEMS corrected the report and circulated a corrected version to some—though, apparently not all—DCFEMS firehouses. Def.'s SMF (Robinson) ¶ 11.

Similarly, in July 2008, Robinson's company responded to an alarm at the U.S. Department of Energy, which prevented the company from reporting to a previously scheduled assignment at the White House. Def.'s SMF (Robinson) ¶ 12. As the officer in charge, Robinson was responsible for preparing a report explaining the company's absence. Def.'s SMF (Robinson) ¶ 13. Her supervisor endorsed the memo and corroborated her account, and Robinson was not disciplined as a result of the incident. Def.'s SMF (Robinson) ¶ 15.

Finally, in August 2010, Robinson submitted a notice of optional retirement, informing DCFEMS that she would retire at the close of business on November 20, 2010. *Id.* ¶ 28; Def.'s Mem. (Robinson), Ex. P (Mem. from Tawanna Robinson to Dennis Rubin), ECF No. 165-19. Following Robinson's notice of retirement, and consistent with DCFEMS policy, Robinson's supervisor informed her that she was no longer permitted to ride on DCFEMS vehicles. Def.'s SMF (Robinson) ¶¶ 29–31. Contending that this policy applies only to firefighters who "resign," as opposed to those who retire, Robinson continued to ride on DCFEMS vehicles until her date of retirement apparently without further incident. Pl. Robinson's Resps. Def.'s SMF at 7, ECF No. 202-16. Robinson also alleges that she was asked to retire a day earlier than she indicated in her August 2010 notice, but the parties agree that she ultimately refused to alter her retirement date. Def.'s SMF (Robinson) ¶¶ 32–33.[11]

### o) **Plaintiff Michael Sims**

Michael Sims has served as a DCFEMS firefighter since the early 1990s. Def.'s SMF ("Def.'s SMF (Sims)") ¶ 2, ECF No. 153-2. Sims alleges that he was subjected to racially

---

[11] On November 22, 2010, Robinson filed a complaint alleging racial discrimination and retaliation by DCFEMS with the D.C. Office of Human Rights. Def.'s SMF (Robinson) ¶ 35. The EEOC concluded that Robinson's discipline and retirement failed to establish a violation of Title VII and, on September 30, 2013, dismissed the complaint and issued a Notice of Right to Sue to Robinson. Def.'s SMF (Robinson) ¶¶ 36–38; Def.'s Mem. (Robinson), Ex. R (Ltr. from Bryan Douglas to Tawanna Robinson), ECF No. 165-21; Def.'s Mem. (Robinson), Ex. S (Dismissal and Notice of Rights), ECF No. 165-22.

disparate discipline stemming from his three criminal arrests, and a hostile work environment. SAC ¶¶ 312–15.[12]

On July 30, 2008, Sims was arrested by the MDP and charged with possession of marijuana. Def.'s SMF (Sims) ¶ 1; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Sims)"), Ex. A (Arrest/Prosecution Report), ECF No. 153-4. At the time of his arrest, Sims served as a DCFEMS Sergeant and was ranked highly on the 2008 Lieutenant promotional list. Def.'s SMF (Sims) ¶ 2. On the day after his arrest, Sims submitted a memorandum to the Assistant Fire Chief for Planning and Policy informing him of the arrest. Id. ¶ 3; Def.'s Mem. (Sims), Ex. C (Mem. from Michael Sims to Brian Lee), ECF No. 153-6. Sims ultimately entered into a deferred prosecution agreement whereby he admitted criminal responsibility in connection with his arrest. Def.'s SMF (Sims) ¶ 5; Def.'s Mem. (Sims), Ex. D (Deferred Prosecution Agreement), ECF No. 153-7.

After he was arrested, Sims was placed on enforced leave without pay and received a Notification of Charges alerting him to potential DCFEMS disciplinary action. Def.'s SMF (Sims) ¶ 4; Def.'s Mem. (Sims), Ex. E (Notification of Charges), ECF No. 153-7. During the

---

[12]       Two months after the parties completed briefing on the instant summary judgment motions, the plaintiffs filed, simultaneously, two motions related to Plaintiff Sims: a motion for an extension of the deadline for payment of outstanding sanctions ordered by the Court in connection with the plaintiffs' failure to abide by their discovery obligations, Pl. Michael Sims' Third Mot. Ext. Time, ECF No. 216; and plaintiffs' counsel's motion to withdraw as counsel for Sims due to an "irretrievably broken" attorney-client relationship, Mot. Withdraw, ECF No. 215. While the District did not oppose the motion for plaintiffs' counsel to withdraw as counsel to Plaintiff Sims, nor a brief extension of time for payment, see Def.'s Sec. Mot. Clarification and Contempt at 1, ECF No. 217 (seeking payment "within fourteen days"), the District sought clarification that the sanctions orders imposed joint and several liability on all plaintiffs, as well as their counsel, for any outstanding sanctions payments, id.; see infra Part IV. Upon review of both the timing and substance of the parties' submissions, the Court finds no reason to believe that any disruption in the attorney-client relationship between Sims and his counsel occurred during, or raised any conflict affecting, the preparation of the plaintiffs' joint opposition to the District's summary judgment motions. Accord Grimes v. District of Columbia, 794 F.3d 83, 91 (D.C. Cir. 2015) (finding that, where "court concludes there was a conflict or an appearance of impropriety, it will have to decide whether the effects were prejudicial or harmless" and where court "determines that there was no conflict, it will similarly need to consider how to proceed"). Accordingly, in light of Sims' failure to timely object, plaintiffs' counsel's motion to withdraw as counsel for Plaintiff Sims is granted. LCvR 83.6(c).

DCFEMS investigation into Sims' arrest, Sims acknowledged that he had been arrested on two prior occasions while employed by DCFEMS—in 1998, for possessing an unlicensed firearm and, in 2002, for possessing marijuana. Def.'s SMF (Sims) ¶¶ 7–9; Def.'s Mem. (Sims), Ex. B (Dep. of Michael Sims) at 38:16–39:2, 46:12-20, ECF No. 153-5. Sims does not contest that he failed to report either of these arrests to DCFEMS, but he claims that he informed a superior about the 1998 arrest and was advised not to report it. Pl. Sims' Resps. Def.'s SMF ("Sims Resps.") ¶ 8, ECF No. 202-17.

On March 30, 2009, a Trial Board considered charges against Sims tied both to his 2008 arrest and his failure to report his earlier arrests. Def.'s SMF (Sims) ¶ 12; Def.'s Mem. (Sims), Ex. J (Ltr. of Decision/Suspension/Demotion) at 1, ECF No. 153-13. The Trial Board found Sims guilty on these charges and recommended: (1) a demotion to Firefighter in connection with the 2008 arrest; (2) a reprimand in connection with his failure to inform DCFEMS regarding his 1998 arrest; and (3) a twelve-hour suspension in connection with his 2002 arrest. Def.'s SMF (Sims) ¶¶ 21, 37; Def.'s Mem. (Sims), Ex. J at 2. After noting that Sims remained on unpaid leave for more than 1800 hours at the time of the hearing, the Trial Board ordered that all unpaid leave in excess of the average time served by DCFEMS employees facing similar charged be converted to paid administrative leave. Def.'s SMF (Sims) ¶ 29, Def.'s Mem. (Sims), Ex. K (Ltr. from Brian Lee to Lathal Ponder), ECF No. 153-14.

Asserting that the Trial Board "impermissibly took into account unrelated [past] conduct," SAC ¶ 310, Sims alleges that he was disparately disciplined in comparison to white DCFEMS employees who engaged in similar or more egregious conduct, *id.* ¶ 312, and was thereby subjected to a hostile work environment, *id.* ¶ 316.

### p)        Plaintiff John Thomas

John Thomas has worked for DCFEMS since 1987.  Def.'s SMF ("Def.'s SMF (Thomas)") ¶ 1, ECF No. 160-2.  During that time, Thomas alleges that he was subjected to racially discriminatory non-promotion, disparate discipline, and a hostile work environment. SAC ¶¶ 339–40, 345.

### (i)        Non-Promotion Allegations

Thomas sat for the 2008 DCFEMS promotional examination and his composite score was ranked thirty-third out of thirty-six candidates for promotion to Lieutenant.  Def.'s SMF (Thomas) ¶ 62; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Thomas)"), Ex. U (Special Order – 2008 Promotion List Standings for Cpt., Lt., and Sgt.), ECF No. 152-4.  The last candidate promoted to Lieutenant from the 2008 promotional list was ranked either twenty-seventh or twenty-eighth.  Def.'s SMF (Thomas) ¶ 64; Pl. Thomas' Resps. Def.'s SMF ("Thomas Resps.") at 17, ECF No. 202-18.

Thomas alleges that more white firefighters than African-American firefighters were promoted to Lieutenant based on the 2008 promotional examination.  SAC ¶ 343.  Specifically, Thomas asserts that all but one of the firefighters denied promotion from the list were African American.  Thomas Resps. at 17.  He further alleges his belief that DCFEMS filled positions formerly held by Lieutenants with Sergeants in order to increase the number of open Sergeant positions and thereby promote more white firefighters.  SAC ¶¶ 344–45.

### (ii)       Discriminatory Discipline Allegations

On January 25, 2010, Thomas pled guilty in Fairfax County District Court to a misdemeanor charge of reckless driving after he was observed traveling 115 miles per hour in a fifty-five miles-per-hour zone.  Def.'s SMF (Thomas) ¶ 11.  As a result of this plea, Thomas's

driver's license was suspended for a period of six months and Thomas was given a jail sentence of ninety days with eighty days suspended. *Id.* ¶¶ 12–13. Thomas was detained following his sentencing and incarcerated for ten days, from January 25, 2010, to February 4, 2010. Def.'s SMF (Thomas) ¶ 14; Def.'s Mem. (Thomas), Ex. A (Dep. of John Thomas) at 25:11-15, ECF 160-3. While he was incarcerated, Thomas took annual leave, which he had requested several months earlier, and leave pursuant to the DCFEMS Minor Illness Program. Def.'s SMF (Thomas) ¶¶ 15–16. Following his release, Thomas notified DCFEMS of his incarceration on February 8, 2010, and was immediately placed on administrative leave. *Id.* ¶ 17.

Roughly a month later, DCFEMS provided Thomas with a Notice of Charges alerting him that he was being charged with misconduct in connection with his conviction and incarceration. *Id.* ¶ 22; Def.'s Mem. (Thomas), Ex. H (Notice of Charges), ECF No. 160-11. Thomas was charged with: (1) reporting inaccurate and misleading information in his February 8, 2010 report regarding his conviction; (2) failing to maintain a valid driver's license; and (3) failing to notify DCFEMS of the change in status of his driver's license. Def.'s SMF (Thomas) ¶ 24; Def.'s Mem. (Thomas), Ex. I (Mem. from Brian Lee to John Thomas) at 4–7, ECF No. 160-12. Following a hearing, a DCFEMS Trial Board found Thomas guilty of the second and third charges and recommended: (1) a 72-hour suspension and reprimand in connection with Thomas's failure to maintain a valid driver's license; and (2) a reprimand for failing to notify DCFEMS of his suspended license. Def.'s SMF (Thomas) ¶¶ 32–37; Def.'s Mem. (Thomas), Ex. J (Trial Bd. Ltr. of Decision/Suspension), ECF No. 160-13. Citing instances of disparate discipline for purportedly similar or more egregious offenses, Thomas alleges that he was subjected to discriminatory discipline by DCFEMS. SAC ¶¶ 333–36, 39.

### (iii)  Hostile Work Environment Allegations

Thomas also alleges that he has been subjected to a hostile work environment during his employment by DCFEMS.  SAC ¶ 340.  In particular, Thomas alleges that he received undesirable work details between July 2009 and March 2010 that required work below his rank and threatened his chance for future promotion.  SAC ¶¶ 319–323.  The parties agree that Thomas was told that he was being detailed in order to receive additional training, Def.'s SMF (Thomas) ¶¶ 6–7, but Thomas avers that he did not require such training, Thomas Resps. at 2. While neither Thomas' salary nor his rank changed as a result of these temporary details, Def.'s SMF (Thomas) ¶ 5, he asserts that his duties and responsibilities were substantially altered during these details such that he was "functionally demoted," SAC ¶ 322; Thomas Resps. at 2. Thomas also claims that his most recent detail to the DCFEMS Customer Service Unit was intended as punishment for his conviction for reckless driving.  Def.'s SMF (Thomas) ¶ 43.

Beyond these purportedly disparate work assignments, Thomas alleges that a supervisor in the Customer Service Unit gave preferable treatment to white firefighters.  SAC ¶¶ 324–28. Specifically, Thomas alleges that African-American firefighters were not given an opportunity to attend the DCFEMS Fallen Firefighters Ceremony and were instead ordered to clean a department vehicle.  *Id.* ¶ 328.  Thomas further alleges that the supervisor regularly placed a white firefighter in charge of the Unit while the supervisor was away.  *Id.* ¶ 326.  Finally, Thomas avers that he witnessed white firefighters using racial epithets, eating separately from African-American firefighters, and engaging in other racially insensitive behavior.  Def.'s Resp. at 106.

### q)      Plaintiff Christopher Walker

Christopher Walker is a DCFEMS firefighter.  SAC ¶ 356.  Walker alleges that he was subjected to racially discriminatory discipline after he was placed on administrative leave for failing multiple Breathalyzer tests.  *Id.* ¶¶ 361–62.

On February 5, 2010, Christopher Walker reported to the PFC for a doctor's appointment after calling in sick for his shift.  Def.'s SMF ("Def.'s SMF (Walker)") ¶ 4, ECF No. 161-2.  During the appointment, the doctor examining Walker smelled alcohol on his breath.  Def.'s SMF (Walker) ¶ 5; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Walker)"), Ex. B (Dep. of Christopher Walker) at 13:21–14:17, ECF No. 161-3.  In accordance with DCFEMS policy, Walker was required to take two Breathalyzer tests, which indicated a blood-alcohol content of .027 and .023, respectively.  Def.'s Mem. (Walker), Ex. D (Feb. 5 Breath Alcohol Testing Form), ECF No. 161-3.  Walker was ordered to enter a mandatory rehabilitation program and began the program on February 8, 2010.  Def.'s SMF (Walker) ¶ 9.  While in the program, Walker underwent eight weeks of substance abuse counseling, which included semimonthly sessions with a psychiatrist and a weekly Breathalyzer test.  *Id.* ¶ 11.

On the day that he entered the program, Walker again tested positive for alcohol.  *Id.* ¶¶ 9–10.  As a result, under the DCFEMS Substance Abuse Policy, Walker was recommended for termination and scheduled to appear before a Trial Board.  *Id.* ¶ 14.  Nonetheless, citing unspecified mitigating circumstances, the DCFEMS ultimately chose not to pursue discipline against Walker.  Def.'s Mem. (Walker), Ex. C (Mem. from Kevin Begley to Brian Lee).  On August 2, 2010, however, Walker failed two more Breathalyzer tests.  Def.'s Mem. (Walker), Ex. F (Aug. 2 Breath Alcohol Testing Form), ECF No. 161-3.  Although he was again subject to

discipline, Walker's Trial Board never occurred, and he returned to active duty in October 2011. Def.'s SMF (Walker) ¶¶ 15, 26; Def.'s Mem. (Walker), Ex. B at 61:2-3, 15-22.

Throughout his time in the Substance Abuse Program, Walker was on paid administrative leave, which resulted in no change in his salary but made him ineligible for overtime and holiday pay. Def.'s SMF (Walker) ¶ 24; Pl. Walker's Resps. Def.'s SMF ("Walker Resps.") at 6, ECF No. 202-19. Walker contends that the Breathalyzer machine was not correctly calibrated on each occasion on which he tested positive for alcohol. Walker Resps. at 3–5; SAC ¶ 357. Further, Walker alleges that similarly situated white firefighters were not ordered to attend a mandatory rehabilitation program after violating the DCFEMS Substance Abuse Policy. SAC ¶¶ 361–62.

### r)  Plaintiff Anthony Williams

Anthony Williams currently serves as a DCFEMS firefighter. Def.'s SMF ("Def.'s SMF (Anthony Williams)") ¶ 3, ECF No. 150-2. He alleges that he was subjected to discriminatory non-promotion between 2006 and 2010, disparate discipline, and a hostile work environment. SAC ¶¶ 374, 378–82.

### (i)  Non-Promotion Allegations

Williams sat for the 2006 DCFEMS promotional examination seeking to be promoted to Sergeant. Def.'s SMF (Anthony Williams) ¶ 59. Based on his composite score, Williams ranked seventy-ninth of out 300 candidates on the 2006 promotional list. *Id.* ¶ 59. The last candidate for Sergeant promoted from the 2006 list was ranked seventy-fifth. *Id.* ¶ 62. Williams alleges that he would have been promoted had the list not been allowed to expire and notes that DCFEMS promoted from the 2008 Sergeant list very soon after the 2006 list expired. SAC ¶¶ 380–82. He was never told, however, that the 2006 promotional list was allowed to expire to ensure that more white firefighters would be promoted. Def.'s SMF (Anthony Williams) ¶ 64.

Williams also sat for the 2008 promotional exam, but he did not achieve the cut-off score necessary to receive credit for his seniority. *Id.* ¶ 65. Williams avers that DCFEMS instituted the cut-off score in order to make it more difficult for African-American test takers to use their education and seniority to boost their composite scores. *Id.* ¶ 68; Pl. Anthony Williams' Resps. Def.'s SMF ("Anthony Williams Resps.") ¶¶ 65–66, 68, ECF No. 202-20. Nonetheless, he asserts no direct evidence of this alleged discriminatory purpose. Def.'s SMF (Anthony Williams) ¶ 69.

### (ii)   Discriminatory Discipline Allegations

On November 16, 2007, a white firefighter complained that Williams cursed at, threatened, and tried to intimidate him. SAC ¶ 370; Def.'s SMF (Anthony Williams) ¶ 4. Williams denies this allegation, SAC ¶ 371; Def.'s SMF (Anthony Williams) ¶ 4, and contends that a supervisor found nothing to substantiate the allegation, Def.'s SMF (Anthony Williams) ¶ 5. Nonetheless, the charges against Williams were referred to a Battalion Fire Chief Conference, which recommended a 48-hour suspension. *Id.* ¶ 8. After Williams successfully appealed the decision, the Trial Board ultimately did not suspend Williams in connection with the incident. *Id.* ¶¶ 10, 22.[13]

Williams alleges that white firefighters were not referred to a Trial Board based on more egregious conduct and claims that he was disproportionately disciplined as compared to his white coworkers. SAC ¶¶ 373–74.

---

[13]     In 2008, Williams filed an EEOC complaint alleging that the Battalion Fire Chief who initially recommended his suspension did so out of retaliation for Williams having previously submitted a complaint to the Battalion Fire Chief. Def.'s SMF (Anthony Williams) ¶ 25. The EEOC dismissed the plaintiff's complaint citing an inability to substantiate Williams' claims of retaliation. *Id.* ¶ 26; Pl. Anthony Williams' Resps. ¶ 26.

### s)       Plaintiff Antoine Williams

Antoine Williams has served as a DCFEMS firefighter since 2003. Def.'s SMF ("Def.'s SMF (Antoine Williams)") ¶ 2, ECF No. 154-2. Williams alleges that he was subjected to racially disparate discipline and a hostile work environment. SAC ¶¶ 392–93, 395–96.

### (i)       Discriminatory Discipline Allegations

Williams asserts two instances of alleged discriminatory discipline. First, after receiving a six-month extension, Williams allowed his EMT card to expire in February 2010 after failing to complete the required NREMT recertification exam. Def.'s SMF (Antoine Williams) ¶¶ 24–25. In May 2010, a Battalion Fire Chief Conference recommended a 24-hour suspension for Williams' failure to maintain current EMS credentials. *Id.* at ¶¶ 28–29; Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem. (Antoine Williams)"), Ex. K (Proposed Action), ECF No. 154-14. Williams waived his right to appeal this decision. Def.'s SMF (Antoine Williams) ¶ 29.

Later, in April 2010, Williams failed to report to the PFC for his annual physical. Def.'s SMF (Antoine Williams) ¶ 30; Def.'s Mem. (Antoine Williams), Ex. L (Notification of a Missed Medical Appointment), ECF No. 154-15. Williams contends that he missed this appointment because he was required to attend mandatory NREMT certification courses to obtain a new EMT card. SAC ¶¶ 385–86; Pl. Anthony Williams' Resps. Def.'s SMF ("Antoine Williams Resps.") ¶ 30, ECF No. 202-21. In light of Williams' failure to report to the scheduled appointment, DCFEMS proposed a 36-hour suspension, which Williams accepted without appeal. Def.'s SMF (Antoine Williams) ¶¶ 32–35.

Williams alleges that this punishment was disproportionate in comparison to discipline received by white firefighters for comparable infractions. SAC ¶ 390.

### (ii)   Hostile Work Environment Allegations

Williams also alleges that he was subjected to a hostile work environment when

DCFEMS physicians allegedly misclassified a work-related injury Williams suffered while on

duty. In October 2009, Williams submitted a report in which he stated that he became weak and

experienced numbness in the left arm and shoulder while on duty. Def.'s SMF (Antoine

Williams) ¶ 5. Williams alleges that he informed his supervisor that he may be having a heart

attack, and was transferred to Washington Hospital Center, where he was diagnosed with having

a possible transient ischemic attack. *Id.* at ¶¶ 5–6. Upon reviewing the resulting medical report,

however, the DCFEMS Medical Services Officer determined that Williams' illness was not a

"Performance of Duty Injury/Illness." *Id.* ¶¶ 9–10. After William's requested an appeal, the

Director of the MPD Medical Services Branch upheld the initial decision. *Id.* ¶¶ 11–12.

Williams contends that his request for on-duty injury classification was denied due to his race.

*Id.* ¶ 16.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is properly

granted against a party who, "after adequate time for discovery and upon motion, . . . fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986). The moving party bears the burden to demonstrate the "absence of a genuine

issue of material fact" in dispute, *id.* at 323, while the nonmoving party must present specific

facts supported by materials in the record that could enable a reasonable jury to find in its favor,

*see Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party") (internal quotations and citation omitted).   "While a nonmovant is not required to produce evidence in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign Comm.*, Inc., 199 F.3d 1365, 1369 (D.C. Cir. 2000).   Thus, "sheer hearsay . . . counts for nothing on summary judgment." *Greer v. Paulson,* 505 F.3d 1306, 1315 (D.C. Cir. 2007) (quoting *Gleklen*, 199 F.3d at 1369 (internal quotation marks omitted); FED. R. CIV. P. 56(c) and (e)(2), (3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury," is "as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011).   This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (quoting *Liberty Lobby,* at 255).   Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150-51 (2000); *see also Burley*, 2015 WL 5474078 at *6.

Nonetheless, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see*

*Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* FED. R. CIV. P. 56(e). If "'opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

## III.   DISCUSSION

The District's nineteen pending summary judgment motions assert numerous common grounds for granting summary judgment as to the plaintiffs' remaining claims and, in fact, deploy markedly similar language in arguing that each plaintiff has failed to raise a material issue of fact requiring resolution at a trial. The Court first addresses two preliminary issues that together dispose of three of the District's dispositive motions before turning to a summary of the general legal framework applicable to employment discrimination claims brought by municipal employees. Set against that background, the Court then discusses, in the following sequence: (1) the non-promotion claims, which are asserted by six plaintiffs and rely on materially similar factual allegations regarding the administration and scoring of the 2006, 2008, and 2010 DCFEMS promotional exams; (2) the claims stemming from the assignment of three plaintiffs to the NREMT certification course; (3) the discriminatory discipline claims, asserted by twelve plaintiffs, with a particular focus on the comparator evidence proffered by each plaintiff; and (4) finally, the remaining hostile work environment claims.

## A.   PRELIMINARY ISSUES

Before addressing the corpus of the plaintiffs' claims, two threshold issues raised by the District are considered: the availability of a private right of action under 42 U.S.C. § 1981 in the circumstances of this case; and Plaintiff Clark's failure to report his claims against the District in a bankruptcy proceeding initiated after Clark joined the instant action. As discussed below, in light of recent D.C. Circuit precedent, and the plaintiffs' voluntary dismissal of their claims under § 1981, the District's motion for summary judgment as to all plaintiffs' § 1981 claims is granted as conceded. In addition, consistent with controlling precedent, the Court concludes that Clark's discrimination claims are barred under the doctrine of judicial estoppel and therefore grants the District's motion for summary judgment as to the claims of this plaintiff.

### 1.   *Section 1981 Provides No Independent Private Right of Action*

Seeking summary judgment, the District first contends that the plaintiffs' claims arising under 42 U.S.C. § 1981 must be dismissed because § 1981 provides no independent private right of action against state entities. Def.'s Mem. Supp. Renewed Mot. Dismiss at 2, ECF No. 143-1.[14]

Section 1981 protects the equal right of all persons within the jurisdiction of the United States to make and enforce contracts without respect to race. *Domino's Pizza v. McDonald*, 546 U.S. 470, 474 (2006). The Supreme Court has long recognized, however, that "Congress intended that the explicit remedial provisions of § 1983 be controlling in the context of damages

---

[14]   The District's initial motion to dismiss the plaintiffs' § 1981 claims, *see* Def.'s Partial Mot. Dismiss SAC at 1, ECF No. 97, was denied without prejudice. Tr. Mar. 7, 2014 Status Conference, at 10–12. Though noting this Court's prior holding in *Peters v. District of Columbia*, 873 F. Supp. 2d 158 (D.D.C. 2012), that "a violation of rights guaranteed by Section 1981 by state entities can be remedied exclusively through a cause of action for damages created by Section 1983," the Court provided the parties with an opportunity to address the issue more fully with additional briefing. *Id.* Since then, the D.C. Circuit has made clear that § 1981 provides no independent cause of action for plaintiffs seeking to remedy state action implicating a private party's contractual rights. *Brown v. Sessoms*, 774 F.3d 1016, 1022–23 (D.C. Cir. 2014).

actions brought against state actors alleging violation of the rights declared in § 1981." *Jett v. Dallas Independent School District*, 491 U.S. 701, 731 (1989). Consequently, the D.C. Circuit recently clarified that § 1981 provides no independent federal cause of action for plaintiffs seeking to remedy state action implicating a party's contractual rights. *Brown v. Sessoms*, 774 F.3d 1016, 1022–23 (D.C. Cir. 2014).

In Count II of the Second Amended Complaint, the plaintiffs allege that the District subjected them "based on their race to unequal punishment and promotions thus depriving them of rights enjoyed by White persons, including but not limited to equal punishment, contractual rights, and Constitutional rights to equal protection and due process" in violation of 42 U.S.C. § 1981. SAC ¶ 418. In opposition to the pending motions, the plaintiffs agreed to voluntary dismiss these claims "in light of the holding in *Brown v. Sessoms*." Pls.' Mem. Opp'n Def.'s Mem. Supp. Mot. Summ. J. ("Pls.' Opp'n") at 6, ECF No. 202. Accordingly, the District's Renewed Motion to Dismiss Plaintiffs' Claims under § 1981 or, in the Alternative, for Judgment on the Pleadings, ECF No. 143, is granted as conceded.

In addition, in light of the Court's March 7, 2014 Order dismissing as untimely the § 1983 claims of Plaintiff Kwame Agyeman, *see* Minute Order, dated March 7, 2014, the dismissal of all of the plaintiffs' § 1981 claims leaves Plaintiff Agyeman with no live claims. As such, the District's Motion for Summary Judgment as to the Claims of Plaintiff Kwame Agyeman, ECF No. 162, is granted, and the discussion that follows does not address the merits of Agyeman's claims against the District.

## 2. Plaintiff Clark's Claims are Barred by Judicial Estoppel

The District argues that Plaintiff Clark's claims against DCFEMS are barred under the doctrine of judicial estoppel because he failed to disclose them in a bankruptcy proceeding

initiated after the date on which the instant action was filed.  Def.'s Omnibus Reply Supp. Mot. Summ. J. ("Def.'s Reply") at 2–6, ECF No. 212.

Clark and his wife filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the District of Maryland on December 5, 2012.  Def.'s SMF (Clark) ¶ 37. Under § 521 of the Bankruptcy Code, the Clarks were required to file, *inter alia*, "a schedule of all assets and liabilities; . . . [and] a statement of [their] financial affairs."  11 U.S.C. § 521(a)(1)(B).  This duty to disclose continued throughout the bankruptcy proceeding such that the Clarks were "under a duty both to disclose the existence of pending lawsuits when [they filed their] petition in bankruptcy and to amend [their] petition if circumstances change[d] during the course of the bankruptcy."  *Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 793 (D.C. Cir. 2010) (citations omitted).

Despite preparing and filing their petition with the assistance of counsel, the Clarks failed to include Clark's claims against the District either among their personal assets (including any "contingent and unliquidated claims of every nature") or a required list of "all suits . . . to which [the Clarks are or were parties] within one year immediately preceding the filing of [the petition]."  Def.'s SMF (Clark) ¶¶ 38–40.  The Clarks' bankruptcy proceeding concluded in May 2014, with more than $250,000 in total claims against the Clarks discharged without payment. *Id.* ¶¶ 41–42.

In light of the Clarks' omission of Clark's claims against the District in the now-concluded bankruptcy proceeding, the District contends that these claims are barred under the doctrine of judicial estoppel.  Def.'s Mem. (Clark) at 9–12.  The plaintiffs counter that the Clarks' failure to disclose Clark's claims against the District was inadvertent and aver that the Clarks alerted their bankruptcy attorney to these claims in preparation for filing their bankruptcy

petition. Pls.' Opp'n at 81.[15] The Clarks moved in February 2015 to reopen the bankruptcy proceeding in order to amend their initial petition to include Clark's claims against the District among the Clarks' assets. Pls.' SMF at 38; Pls.' Opp'n, Ex. 34 (Mot. Reopen Chapter 7 Bankruptcy Case No. 12-31743), ECF No. 202-56.

The doctrine of judicial estoppel "'prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.'" *Moses*, 606 F.3d at 798 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)). "Because the purpose of judicial estoppel is to protect the integrity of the judicial process and to prevent improper use of judicial machinery it may be invoked by a court at its discretion." *Rogler v. Gallin*, 402 F. App'x 530 (D.C. Cir. 2010) (quoting *New Hampshire*, 532 U.S. at 750) (internal quotations and alterations omitted) (per curiam). In exercising this discretion, however, the D.C. Circuit has identified "at least three questions that a court should answer in deciding whether to apply judicial estoppel: (1) Is a party's later position clearly inconsistent with its earlier position? (2) Has the party succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled? (3) Will the party seeking to assert an inconsistent position derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped?" *Moses*, 606 F.3d at 798 (citing *New Hampshire*, 532 U.S. at 750–51).

With regard to bankruptcy proceedings, the D.C. Circuit has joined other circuits in approving the application of judicial estoppel "to bar a debtor from pursuing a cause of action in

---

[15] The Clarks have submitted affidavits to this effect. *See* Aff. Nicole Clark (March 1, 2015), ECF No. 202-106; Aff. Lawrence Clark (March 1, 2015), ECF No. 202-107. The Court notes, however, that they have provided no corroborating affidavit from their bankruptcy counsel. This absence is particularly apparent given that the Clarks have retained the same attorney to move to reopen their bankruptcy proceeding to amend their initial petition. *See* Pls.' Opp'n, Ex. 34 (Mot. Reopen Chapter 7 Bankruptcy Case No. 12-31743) at 3.

district court where that debtor deliberately fails to disclose the pending suit in a bankruptcy case." *Moses*, 606 F.3d at 798.  In this context, judicial estoppel "protects the integrity of the bankruptcy system and is meant to prevent parties from hiding causes of actions during bankruptcy proceedings, thereby obtaining a valuable benefit in the discharge of debts and then asserting the causes of action in order to win a second time." *Robinson v. District of Columbia*, 10 F. Supp. 3d 181, 185 (D.D.C. 2014) (internal citations, quotations, and alterations omitted).

Thus, failure to disclose pending claims in a bankruptcy filing generally have been excused only where a party in unaware of such claims or has no motive to conceal them. *See id.* at 187 (citing authorities); *see also Marshall v. Honeywell Tech. Sys., Inc.*, 73 F. Supp. 3d 5, 9 (D.D.C. 2014) ("Claims of inadvertence or mistake do not excuse the failure to disclose pending claims, especially when a plaintiff discloses claims that would reduce the overall value of her assets.") (citing *Moses*, 606 F.3d at 800).  Neither of these excuses apply here.  Moreover, the D.C. Circuit has rejected as "wholly unpersuasive" an effort to cure a failure to disclose by reopening a completed bankruptcy proceeding in order to amend an initial petition.  *Moses*, 606 F.3d at 800.  Allowing for such retroactive amendment "only after [the debtor's] omission has been challenged by an adversary, suggests that a debtor should consider disclosing potential assets only if he is caught concealing them," thereby diminishing the incentive for debtors to provide a full account of their assets upon seeking bankruptcy protection.  *Id.*

With these principles in mind, judicial estoppel is clearly warranted in the present case. As an initial matter, the plaintiffs do not contest the District's assertion that Clark's discrimination claims are sufficiently related to, and inconsistent with, the Clarks' representations in their bankruptcy proceeding to raise the possibility of judicial estoppel. Instead, the plaintiffs merely assert that the Clarks gained no unfair advantage in failing to

disclose Clark's claims because the amount of any damages stemming from the instant action is "unknown," such that the trustee overseeing the Clarks' bankruptcy estate "would likely have . . . declare[d] a 'no asset' case." Pls.' Opp'n at 81.[16] This purported uncertainty notwithstanding, however, a debtor's undisclosed claims may be judicially estopped following the conclusion of a bankruptcy proceeding. *Moses*, 606 F.3d at 799–800; *Marshall*, 73 F. Supp. 3d at 11; *Robinson*, 10 F. Supp. 3d at 186. Likewise, the plaintiffs' contention that the judicial estoppel may not bar claims pursued by a bankruptcy trustee is foreclosed by the D.C. Circuit's clear rejection of debtor-plaintiffs' efforts to cure non-disclosure through reopening their completed bankruptcy proceedings. *See Moses*, 606 F.3d at 800.

The plaintiffs also seek to excuse the Clarks' failure to disclose the instant discrimination claims as "result[ing] solely from how his bankruptcy petition was processed by his then bankruptcy attorney and not from any 'intent' by Plaintiff Clark's [sic] to conceal or deceive." Pls.' Opp'n at 81 (emphasis in original). The plaintiffs suggest that the Clarks intend to claim that "the bulk of his damages in this lawsuit would be relief exempt from his bankruptcy estate," Pls.' Opp'n at 82, and, consequently, they lacked any motive to conceal the instant claims because any damage award would be exempt anyway, *id.* This suggestion is unavailing for at least two reasons. First, the Clarks' position that damages in this case are exempt from his bankruptcy estate is inconsistent with the Clarks' representations in their petition to reopen their bankruptcy proceeding, which expressly states, "If the debtor recovers any funds from this suit,

---

[16]     While the exact value of Clark's instant claims was unknown at the time the Clarks filed for bankruptcy, the plaintiffs' *post hoc* speculation as to the "likely" actions of the Clarks' bankruptcy trustee appears to strain common sense. Clark seeks $250,000 in compensatory damages from the District, *see* Def.'s Mem. (Clark), Ex. C at 28, which amount neatly corresponds to the roughly $250,000 discharged by the Clarks in bankruptcy, Def.'s SMF (Clark) ¶¶ 41–42. Thus, the plaintiffs' speculation appears predicated on the assumption that the Clarks' bankruptcy trustee—to say nothing of their creditors—would have wholly disregarded the instant claims, despite this potential asset being valued by the plaintiffs at nearly the exact amount the Clarks successfully avoided paying through their bankruptcy.

the funds may an [sic] asset of the bankruptcy estate as the suit relates to events which occurred prior to the filing of the bankruptcy petition." *See* Pls.' Opp'n, Ex. 34 ¶ 5. Second, more significantly, the proper forum in which to litigate this argument is before the Bankruptcy Court. Indeed, debtors are required to disclose all outstanding claims at the outset of their initial bankruptcy proceeding precisely to ensure that questions of this kind are resolved before the final administration of the debtor's estate.

The Clarks, as debtors, have an obvious financial interest in shielding contingent assets from creditors and, thus, their motivation to conceal potential claims during a bankruptcy proceeding is self-evident. *Marshall*, 73 F. Supp. 3d at 11. The plaintiffs have provided no reasonable basis upon which to infer that Clark lacked such a motive, and the Court therefore concludes that he is judicially estopped from pursuing the instant, undisclosed claims against the District. *Accord* Marshall, 73 F. Supp. 3d at 11; *Robinson*, 10 F. Supp. 3d at 190. Accordingly, the defendant's motion to dismiss Clark's claims, ECF No. 157, is granted.

## B.   EMPLOYMENT DISCRIMINATION BY MUNICIPAL EMPLOYERS

With these preliminary issues resolved, the Court next considers the remaining plaintiffs' employment discrimination claims against the District. Following a summary of the relevant law governing claims of workplace discrimination by municipal employers, the Court considers each category of claim advanced by the plaintiffs *seriatim*.

The plaintiffs allege that they were victims of racial discrimination and subjected to a hostile work environment due to their allegedly disparate treatment, including disparity in discipline and promotions, in violation of 42 U.S.C. § 1983. In addition, three plaintiffs (Burton, Fuller, and Robinson) bring employment discrimination claims under Title VII. These differing causes of action notwithstanding, the D.C. Circuit has observed that courts considering

employment discrimination claims pursued under § 1983 "generally have borrowed the analytical framework" applicable to Title VII claims. *Oates v. D.C.*, 824 F.2d 87, 90 (D.C. Cir. 1987) (citing authorities); *see also Jo v. District of Columbia*, 582 F. Supp. 2d 51, 60 (D.D.C. 2008) (noting that Title VII case law is often applied "to review claims of discrimination under § 1983 to determine whether a plaintiff has established a predicate constitutional violation") (collecting cases); *Elam v. Bd. of Trustees of Univ. of D.C.*, 530 F. Supp. 2d 4, 10 (D.D.C. 2007). With this guidance in mind, the discussion that follows focuses on the legal framework applicable to employment discrimination claims pursued under Title VII.

Unlike Title VII, however, where, as here, the employer is a municipality, § 1983 provides for no *respondeat superior* liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (finding that, under § 1983, a municipality "cannot be held liable *solely* because it employs a tortfeasor") (emphasis in original); *Doe v. District of Columbia*, 796 F.3d 96, 105 (D.C. Cir. 2015) ("[U]nder § 1983, local governments are responsible only for their *own* illegal acts. They are not vicariously liable under § 1983 for their employees' actions.") (quoting *Connick v. Thompson*, 563 U.S. 51 (2011)) (internal quotations omitted) (emphasis in original). Instead, to succeed on such a claim against a municipality, the plaintiff must show both: (1) a predicate violation of some protected right, privilege or immunity; and (2) "that the municipality's custom or policy caused the violation." *Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004) (citing authorities). Such causation "can be shown in several ways," including by showing that the municipality or one of its policymakers (1) explicitly adopted the policy that was the moving force of the constitutional violation; (2) knowingly ignored a practice that was consistent enough to constitute custom; or (3) failed to respond to a need in such a manner as to show deliberate indifference to the risk that not addressing the need will result in

constitutional violations.  *Jones v. Horne*, 634 F.3d 588, 601 (D.C. Cir. 2011).  With respect to

the last method of showing that a municipality caused and is liable for a constitutional violation,

"[d]eliberate indifference 'is determined by analyzing whether the municipality knew or should

have known of the risk of constitutional violations,' but did not act."  *Id.* (quoting *Baker v.

District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003)).

    The parties dispute whether the plaintiffs have demonstrated a genuine factual issue as to

whether a District custom or policy caused the various instances of racial discrimination alleged

by the plaintiffs.  The plaintiffs contend that District policymakers became aware of racially

discriminatory disciplinary actions within DCFEMS due to two evidentiary items: (1) excerpts

from a letter, dated February 8, 2008, from DCFEMS to a District Councilman that summarizes

DCFEMS disciplinary actions between fiscal years 2005 and 2007, broken down by the

disciplined imposed, the race of the firefighter disciplined, and the number of cases appealed to

the D.C. Office of Employee Appeals, *see* Pls.' Opp'n at 26 (citing Pls.' Opp'n, Ex. 31 ("2008

Letter"), ECF No. 202-53);[17] and (2) portions of the DCFEMS database of disciplinary actions

from 2007, 2008, and 2010, *id.* (citing Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.

(Anthony Williams)"), Exs. L, M, ECF Nos. 150-15, 150-16; Def.'s Mem. (Antoine Williams),

Ex. O, ECF No. 154-18).  The Court need not reach the question of whether the plaintiffs

"raise[d] a genuine dispute at to whether a District custom or policy caused the violation of the

Plaintiffs' constitutional rights," Pl.'s Opp'n at 26, since, as discussed below, each remaining

plaintiff has failed to demonstrate the existence of a genuine issue of material fact as to a

---

[17]    While the plaintiffs contend that this statistical report was prepared by DCFEMS, Pls.' Opp'n at 23, the
District correctly notes that the plaintiffs have failed to properly authenticate the document.  *See* Def.'s Resp. at 2
(citing deposition testimony from a former Fire Chief who indicated that he did not recognize the report).  The
plaintiffs likewise have failed to produce a complete copy of the report and the associated correspondence between
the D.C. Councilmember and DCFEMS leadership.  *See* Pls.' SMF, Ex. 31.

predicate constitutional or statutory violation. Thus, in evaluating the pending motions, the only issue addressed is whether any plaintiff has raised a triable issue of fact about being subjected to employment discrimination that would be prohibited under Title VII.

### 1.   *Employment Discrimination Based on Race Under Title VII*

Title VII makes it unlawful for an employer to discriminate against any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Under Title VII, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *accord Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).

An "adverse employment action" is "'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Baird v. Gotbaum* (*Baird I*), 662 F.3d 1246, 1248 (D.C. Cir. 2011) (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)); *see also Stewart v. Ashcroft*, 352 F.3d 422, 426 (D.C. Cir. 2003). Thus, an adverse employment action occurs if an employee "experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (citing *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)).

Certain types of employment actions are insufficient to support a *prima facie* claim of discrimination under Title VII. Most relevant here, "formal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions." *Stewart v. Evans*, 275 F.3d 1126, 1136 (D.C. Cir.

2002).  Further, this Court has consistently held that "[p]lacement on administrative leave for a short period of time without loss in pay or benefits in order to investigate an allegation of wrongdoing generally does not constitute an adverse employment action."  *Akosile v. Armed Forces Ret. Home*, 938 F. Supp. 2d 76, 91 (D.D.C. 2013) (collecting cases); *see also Brown v. Georgetown Univ. Hosp. Medstar Health*, 828 F. Supp. 2d 1, 9 (D.D.C. 2011) (same).  On the other hand, while the D.C. Circuit has not directly considered the issue, judges in this Circuit have held that the denial of overtime can constitute an adverse employment action, at least where the "the trier of fact could reasonably conclude that the plaintiff in the past sought opportunities for overtime pay or it was otherwise known to defendant that plaintiff desired such opportunities."  *Sims v. District of Columbia*, 33 F. Supp. 3d 1, 7 (D.D.C. 2014) (citing *Bell v. Gonzalez*, 398 F. Supp. 2d 78, 97 (D.D.C. 2005)).

## 2.    *McDonnell Douglas Burden–Shifting Framework*

In a case where there is no direct evidence of discrimination, the Court is guided in its analysis of circumstantial evidence by the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–804 (1973).  Under the *McDonnell Douglas* framework, the plaintiff has the burden to establish a *prima facie* case of discrimination by showing that (1) he or she "is a member of a protected class;" (2) he or she "suffered an adverse employment action;" and (3) "the unfavorable action gives rise to an inference of discrimination."  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (citing *Brown*, 199 F.3d at 452).  If the plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for its actions.  *McDonnell Douglas,* 411 U.S. at 802.  If the employer establishes a legitimate, nondiscriminatory reason, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to

whether a reasonable jury could infer intentional discrimination . . . from all the evidence." *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004). Thus, courts "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*," where (1) "an employee has suffered an adverse employment action," and (2) "an employer has asserted a legitimate, non-discriminatory reason for the decision." *Brady v. Office of the Sergeant at Arms, U.S. House of Reps.*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original).

Instead, in such a case, the Court "must resolve one central question," namely "[h]as the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . ?" *Id.* at 494 (citing authorities). Focus on this central inquiry is appropriate because a legitimate non-discriminatory reason for the employer's actions breaks the necessary "but-for causation" link between the protected activity and the adverse employment action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528, 2533 (2013).

In resolving this central question, the court looks to *inter alia* (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanations for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)." *Hampton v. Vilsack,* 685 F.3d 1096, 1100 (D.C. Cir. 2012) (citations and internal quotation marks omitted). While the plaintiff need not "submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment," *Hamilton v. Geithner,* 666 F.3d 1344, 1351 (D.C. Cir. 2012) (internal quotation marks and citations omitted),

the plaintiff must do more than merely state a disagreement with, or disbelief of, the explanation to satisfy the burden of showing that a reasonable jury could find that the employer's asserted reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.

To "support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation, [a plaintiff may cite] the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (citing *Brady*, 520 F.3d at 495 & n.3). To survive summary judgment based solely on evidence of pretext, however, a plaintiff must demonstrate that a "reasonable jury not only could disbelieve the employer's reasons, but also could conclude that the employer acted, at least in part, for a prohibited reason." *Id.* at 1096.

Set against these legal principles, the Court now turns to consideration of the plaintiffs' discrimination claims.

### C.     THE PLAINTIFFS' DISCRIMINATORY NON-PROMOTION CLAIMS

Six of the remaining plaintiffs (Addo, Morris, Nelson, Pearson, Thomas and Anthony Williams) allege they were not promoted by DCFEMS due to their race. As discussed below, because the District has asserted a legitimate, non-discriminatory reason for each plaintiff's non-selection for promotion, the Court must consider whether the plaintiffs have produced sufficient evidence for a reasonable jury to find that District's asserted reasons are mere pretext for illegal

discrimination.  *Brady*, 520 F.3d at 495.  Failing  to do so, the plaintiffs  have not demonstrated a

genuine  issue  of material  fact sufficient  to overcome  the instant  motions  for summary judgment.

1.     ***Legal Principles Applicable to Discriminatory Non-Promotion  Claims***

In considering  claims  of discriminatory  non-promotion,  the D.C. Circuit  has "consistently

declined  to serve  as a super-personnel  department  that reexamines  an entity's  business

decisions."  *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)  (internal  quotation  marks

and citation  omitted).  A plaintiff  alleging  discriminatory  non-promotion  may survive  a motion

for summary judgment  by pointing  to evidence  that a reasonable  employer  would  have found  the

plaintiff  to be "significantly  better qualified"  than the employee  granted  the sought-after

promotion.  *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) ("If a

factfinder  can conclude  that a reasonable  employer  would  have found  the plaintiff  to be

significantly  better qualified  for the job, but this employer  did not, the factfinder  can legitimately

infer that the employer  consciously  selected  a less-qualified  candidate—something  that

employers  do not usually  do, unless  some other strong  consideration,  such as discrimination,

enters into the picture.").  A disparity  in qualifications,  standing  alone, however,  "can support  an

inference of discrimination  only when the qualifications  gap is 'great enough  to be inherently

indicative  of discrimination'—that  is, when the plaintiff  is 'markedly  more qualified,'

'substantially  more qualified,'  or 'significantly  better qualified'  than the successful candidate."

*Hamilton*, 666 F.3d at 1352 (quoting  *Holcomb*, 433 F.3d at 897).  In addition  to evidence  of

superior  qualifications,  a plaintiff  may also point  to evidence  sufficient  to show that the

defendant's  stated reason for choosing  another applicant  is merely pretext for illegal

discrimination.  *Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19, 25 (D.C. Cir.

2013) *cert. denied sub nom. Grosdidier v. Isaacson*, 134 S. Ct. 899 (2014).

70

### 2.    *Analysis*

As previously described, *supra* Part I.B.1.(b), the CBA between DCFEMS and the D.C. Fire Fighters Association provides for a biannual examination process used to guide the selection of DCFEMS employees for promotion.   During the relevant time period, the six plaintiffs alleging discriminatory non-promotion sat for the following promotional examinations:

| Promotion Sought | 2006 | 2008 | 2010 |
|---|---|---|---|
| **Sergeant** | ▪ Morris<br>▪ Anthony Williams | N/A | ▪ Anthony Williams |
| **Lieutenant** | N/A | ▪ Nelson<br>▪ Thomas | ▪ Nelson<br>▪ Thomas |
| **Captain** | ▪ Pearson | ▪ Addo<br>▪ Pearson | ▪ Addo<br>▪ Pearson |

The plaintiffs do not allege that they were significantly more qualified than their white coworkers who were promoted on the basis of these examinations.   Instead, the plaintiffs allege that DCFEMS leadership manipulated the examination and promotion process in various ways to ensure that a higher proportion of white employees would be promoted based on these examinations.   Broadly speaking, the plaintiffs contend that they have demonstrated a triable issue of fact about the discriminatory impact of three aspects of the promotion process: (1) the timing of promotions from the eligible candidates on the promotions lists; (2) the 2008 implementation of a cut-off score; and (3) the DCFEMS' handling of irregularities associated with the 2010 promotional examinations.   *See generally* Pls.' Opp'n at 76–80.   As discussed below, these allegations are simply not supported with sufficient admissible evidence to survive summary judgment.

### (a) *Timing of Promotions from Promotion Lists*

The plaintiffs assert that DCFEMS leadership maintained a "promotional strategy" designed to delay the timing of promotions near the expiration of the 2006 and 2008 promotional

lists in order to promote white firefighters ranked at the top of the following lists. *Id*. at 76–77. Specifically, Plaintiffs Morris and Anthony Williams assert that they would have been promoted in the fall of 2008 had DCFEMS not waited until soon after the 2006 promotional list expired to promote additional firefighters to Sergeant. *Id*. at 76–77. Likewise, Plaintiffs Thomas, Nelson, Addo, and Pearson argue that DCFEMS leadership strategically timed promotions from the 2008 promotional lists to maximize opportunities for white firefighters. *Id*. at 77. Finally, the plaintiffs argue that DCFEMS filled four Fire Liaison positions with Sergeants, rather than Lieutenants, in order to avoid promoting African-American employees who were next in line for promotion from the 2008 Lieutenant promotional list. *Id*. at 78.

In response, the District contends that the challenged promotion decisions are dictated by the legitimate, non-discriminatory terms of the CBA and applicable federal law. In particular, the District asserts—and the plaintiffs agree—that the duration of each promotional list is determined by the CBA. *See, e.g.*, Def.'s SMF (Morris) ¶ 6. As to the timing of promotions, according to an affidavit submitted by DCFEMS Deputy Fire Chief Brian Lee, DCFEMS maintains a practice of filling all vacancies as early as possible in accordance with the promotion procedures outlined in the CBA. Def.'s Mem. (Morris), Ex. D (Second Decl. of Brian K. Lee) ¶ 12, ECF No. 166-7. The District also points to the District of Columbia Home Rule Act, Pub. L. 93–198, which allows DCFEMS to expend funds only in the fiscal year in which they are provided, thereby barring DCFEMS from retrospectively creating vacancies in order to promote additional candidates from expired promotional lists. Def.'s Mem. (Morris) at 14, Ex. D ¶ 14.

Notwithstanding these ostensibly non-discriminatory promotion policies, the plaintiffs contend that DCFEMS leadership has successfully manipulated the timing of firefighter promotions in order to "change the racial make-up of the Department." Pls.' Opp'n at 76–77. In

an effort to demonstrate such manipulation, the plaintiffs rely on their own deposition testimony to assert: (1) that an unidentified white employee told Plaintiff Morris that DCFEMS leadership wanted to promote more white candidates; and (2) that an unidentified union member told Morris that DCFEMS maintained budgetary authority to promote additional candidates from the 2006 lists. Pls.' Opp'n at 77–78; Morris Resps. ¶ 10; Anthony Williams Resps. ¶ 55. Reliance on these statements to prove that their non-promotion resulted from racial animus among DCFEMS policymakers is misplaced. These out-of-court statements by unidentified third-party declarants clearly constitute hearsay under Federal Rule of Evidence 801, and such "sheer hearsay . . . counts for nothing" on summary judgment to create a triable issue of fact. *Greer*, 505 F.3d at 1315; *see also* 10B C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2738 at 375-76 (1998) ("Where the affidavit includes both competent and incompetent evidence, the Court should disregard the incompetent evidence but give full consideration to that which is competent," in considering a motion for summary judgment) (internal quotation and citation omitted).

Moreover, even crediting the plaintiffs' volunteered deposition evidence, the undisputed facts flatly contradict the plaintiffs' allegations of pretext. As just one example, the parties agree that eleven Lieutenants were promoted to Captain from the 2008 promotional list that included Plaintiff Pearson.[18] Def.'s SMF (Addo) ¶ 77. Of those promoted, nine were African-American. *Id*. Similarly, although the plaintiffs assert that the decision to fill open Fire Liaison positions

---

[18] The Court notes apparent inconsistencies across the parties' various filings addressing the purportedly undisputed facts regarding the 2008 Captain list. On one hand, the District asserts, and Plaintiff Addo does not dispute, that nine of eleven Lieutenants promoted off of the 2008 list were African-American. *See* Addo Resps. ¶ 77; Pls.' Opp'n at 77. On the other hand, Plaintiff Pearson asserts, and the District does not dispute, that he was ranked twenty-sixth on the 2008 list and was next in line to receive a promotion upon expiration of the list. Def.'s Resp. at 90–91. Such apparent discrepancies may be readily explained (for example, perhaps more than a dozen eligible candidates on the 2008 list ranked ahead of Pearson retired or were otherwise rendered ineligible for promotion). Unfortunately, the parties do little to assist the Court in comprehending the evidence they have presented.

with Sergeants instead of Lieutenants led to their non-promotion to Lieutenant, they point to no evidence that the firefighters ultimately filling the Fire Liaison positions were not themselves African-American. Def.'s Reply at 37. Absent corroborating record evidence to support the plaintiffs' allegations regarding the ulterior discriminatory motives of DCFEMS leadership, the plaintiffs' reliance on "mere speculation . . . to refute [their] employer's proffered legitimate, non-discriminatory reason . . . fails to create a genuine issue of material fact to avoid summary judgment." *McKenzie v. Principi*, 54 F. App'x 1, 4 (D.C. Cir. 2002); *see also Colbert v. Chao*, 53 F. App'x 121, 121–22 (D.C. Cir. 2002); *Harris v. Wackenhut Servs., Inc.*, 648 F. Supp. 2d 53, 67 (D.D.C. 2009) *aff'd*, 419 F. App'x 1 (D.C. Cir. 2011) (plaintiff's "own speculation that race was the underlying reason why [decisions] that appear race neutral were nonetheless done . . . for racial reasons [are] of no value" at summary judgment stage).

### (b) Implementation of Cut-Off Score

The plaintiffs also assert that a reasonable jury could conclude that the 2008 implementation of a cut-off score, below which education and seniority would not be credited in scoring applicants' promotional examinations, disadvantaged African-American test takers. Pls.' Opp'n at 77–78. Importantly, the plaintiffs do not dispute that the cut-off score instituted in 2008 applied equally to all test takers, but assert only that the new scoring methodology was "detrimental" to African-American applicants for promotion. *Id.* at 78. The plaintiffs proffer virtually no evidence to show discriminatory purpose in implementation of the challenged cut-off score by the District, as required for a § 1983 claim, and their assertion of detrimental impact on African-American candidates is, in fact, belied by the plaintiffs' own allegations and other record evidence.

In certain circumstances, alleged disparate impact alone may be sufficient to support a plaintiffs' claim of employment discrimination arising under Title VII. *See Ricci v. DeStefano*, 557 U.S. 557, 557–58 (2009). By contrast, here, the plaintiffs' discriminatory non-promotion claims arise under § 1983, which requires the plaintiffs to demonstrate that the District instituted the cut-off score with a discriminatory purpose. *See Washington v. Davis*, 426 U.S. 229, 238–239 (1976); *see also 2922 Sherman Ave. Tenants' Ass'n v. District of Columbia*, 444 F.3d 673, 679 (D.C. Cir. 2006) ("[T]he Supreme Court has barred constitutional disparate impact claims") (citing *Davis*, 426 U.S. at 238-39). With this in mind, the plaintiffs' theory of discriminatory intent is difficult to discern. At best, the plaintiffs appear to suggest that DCFEMS leadership, knowing that the cut-off score would have a discriminatory impact, implemented the new scoring methodology *in order* to disadvantage African-American firefighters. *See* Pls.' Opp'n at 77–78. Without more, such speculation as to the District's underlying motive in instituting an apparently race-neutral policy is insufficient to demonstrate a disputed issue of material fact requiring resolution at trial. *McKenzie*, 54 F. App'x at *4; *see also Harris*, 648 F. Supp. 2d at 67–69.

Moreover, while one plaintiff (Addo) claims that he failed to be promoted as a result of the newly imposed cut-off score, three other plaintiffs (Nelson, Pearson, and Thomas) exceeded the cut-off score in 2008. *See* Def.'s Reply at 34 n.31, 36. Thus, contrary to the plaintiffs' assertion that the cut-off score generally undermined the promotion prospects of African-American firefighters, three of the four plaintiffs who sat for the 2008 examinations in fact *benefited* from the new policy. *Id.* Also, significantly, the undisputed record evidence demonstrates that the cut-off score prevented a higher percentage of white firefighters than African-American firefighters from receiving seniority and education credits. *Id.* at 36 (citing Def.'s SMF (Addo) ¶ 78). For example, 73.9% of white firefighters who sat for the 2008

examination seeking promotion to Captain, failed to meet the cut-off score, while only 53.3% of African-American test takers did not meet the applicable score on the same examination. *Id.*

Attempting to rebut the District's asserted non-discriminatory explanation for Plaintiff Addo's failure to achieve promotion, the plaintiffs point to no record evidence beyond their own deposition testimony that this plaintiff would have been promoted absent the cut-off score. *See* Pls. Opp'n at 77–78. In the face of documentary record evidence to the contrary, such uncorroborated, conclusory allegations are insufficient to establish a triable issue of fact. *Burley*, 2015 WL 5474078 at *6; *see also Akridge*, 729 F. Supp. 2d at 183; *GE*, 595 F. Supp. 2d at 36.

### *(c)   Alleged Irregularities With 2010 Promotional Examinations*

Lastly, the plaintiffs assert that they have presented sufficient evidence to allow a reasonable jury to conclude that DCFEMS ignored irregularities associated with the 2010 promotional examinations in order to conceal an effort to promote more white firefighters. Pls.' Opp'n at 78–79. Again, the plaintiffs assert in opposition to the present motions that these alleged irregularities "were detrimental" to African-American firefighters taking the 2010 examinations, *id.* at 78, and appear to propose the following theory of discriminatory intent: (1) DCFEMS required test takers to print their names (as opposed to employee numbers) on their examinations in order to enable DCFEMS leadership to identify and advantage white test takers; and (2) DCFEMS leadership refused to cancel the examination following the breach of the DCFEMS sequester policy in order to preserve their ability to advantage white testers. *See* Def.'s SMF (Nelson) ¶¶ 43, 46–49.

At the outset, the plaintiffs do not explain how requiring names, rather than employee numbers, makes a difference in ensuring the fairness of the tests since both means of documenting the identity of the test-taker could presumably be used to trace the test-takers' race.

In any event, what is missing is any evidence whatsoever that such tracing occurred in order to advantage only white test-takers. The plaintiffs have failed to support their theory with any evidence that the original, correct scores on the tests bearing applicants' names were altered in any way to produce the final rankings. The complete absence of such corroborative documentary evidence is particularly noteworthy in light of the extensive opportunity for discovery provided to the plaintiffs, which included the production by the District of "all examination files for employees who sat for the 2006, 2008, and 2010 promotional examinations." *See* Def.'s Opp'n Pls.' Mot. Compel & Extend Discovery Deadline at 4. Without such evidence, the plaintiffs again rely on bare speculation as to the discriminatory motives of DCFEMS leadership to contend that the ostensibly non-discriminatory testing procedures in fact masked intentional discrimination. Such bald speculation as to discriminatory motives of DCFEMS policymakers cannot raise a genuinely disputed issue sufficient to survive summary judgment. *McKenzie*, 54 F. App'x at *4.

The plaintiffs likewise assert that the failure to cancel the 2010 examination following revelations that a sequestered employee assisting in the preparation of the examination contacted potential test-takers raises an inference that DCFEMS intended to use the exam to advantage white applicants. Pls.' Opp'n at 79. Setting aside the fact that one of the potential test-takers who communicated with the sequestered employee is in fact a *co-plaintiff* in this action, *see supra* Part I.B.2.(n), the plaintiffs have failed to identify competent evidence to support such an inference. In particular, the plaintiffs cite only their unsubstantiated belief relayed in their deposition testimony to assert that the sequestered employee had any access to the content of the 2010 examination, s*ee* Def.'s Resp. at 86, in the face of unrefuted sworn testimony from a senior DCFEMS manager with personal knowledge of what occurred that the sequestered officer was

removed "significantly before the 2010 promotional exam material was written and finalized by the independent contractor[, I/O Solutions,] hired to create the exam," Def.'s Mem. (Johnson), Ex. J ¶ 8. As a result, the plaintiffs have, again, failed to raise a genuine issue of material fact as to this aspect of their discriminatory non-promotion claims.

As further support of their theory, the plaintiffs also point to evidence purportedly demonstrating that the 2010 promotional lists included a disproportionate number of high-ranked white firefighters and low-ranked African American firefighters. Pls.' Opp'n at 79 (citing Plaintiff Nelson's deposition testimony describing the 2010 promotional lists as "top-heavy" since white applicants "made up the top 18 ranked [applicants] and only African American [applicants] made up the bottom 16 of [the 2010 Lieutenant] list"). At best, however, the plaintiffs' characterization of these lists is incomplete. In fact, the 2010 Lieutenant list contained 104 eligible candidates, of whom fifty-three, or fifty-one percent, were African American, with white candidates making up the first thirteen listed candidates. *See* Def.'s Mem. (Nelson), Ex. A at 58–60 (2010 Promotion List Standings for Lieutenant), ECF No. 152-4; Pls.' Opp'n, Ex. 62, ECF No. 202-84 (DCFEMS Employee List, as of Oct. 16, 2007). A broader review of other 2010 promotion lists indicates that African-American members were well represented among highly-ranked candidates. For example, of fifty-one eligible candidates on the 2010 Captain list, twenty-one, or forty-one percent, were African American, including three African-Americans among the top ten candidates for promotion to Captain. *See* Def.'s Mem. (Nelson), Ex. A at 55–56 (2010 Promotion List Standings for Captain); Pls.' Opp'n, Ex. 62, ECF No. 156-3.

Even granting the plaintiffs' contention that the 2010 promotional lists were skewed in favor of white applicants, however, this evidence of a statistical disparity in applicant scores is insufficient to support their asserted inference that the lists were the product of intentional

discrimination.   The Supreme Court recently addressed the interaction between racially disparate statistical evidence and intentional discrimination in a reverse discrimination case that the parties fail to address, despite their voluminous briefing.   In *Ricci v. DeStefano*, 557 U.S. 557 (2009), white and Hispanic firefighters challenged, under both Title VII and § 1983, a municipal fire department's refusal to certify the results of promotional examinations, for which white candidates significantly outperformed minority candidates, after minority firefighters threatened to challenge the examination results under Title VII.   *Id.* at 562-63, 565.[19]   The Supreme Court held that employers may engage in intentional discrimination for the asserted purpose of avoiding or remedying an unintentional disparate impact only where the employer has a "strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action."   *Id.* at 585.   In reviewing the statistical evidence presented by the municipality, the Court concluded that this evidence alone was insufficient to serve as a basis for discarding the challenged examinations and found for the plaintiffs.   *Id.*

Mindful of this Supreme Court guidance on the use of statistical evidence involving promotion examinations and rankings for firefighters—albeit in another municipality—the plaintiffs' reliance on the 2010 promotional lists is misplaced.   The examination results at issue in *Ricci* were more heavily skewed towards white applicants than the results at issue here.   In *Ricci*, only nine of the thirty-four candidates passing the Lieutenant examination, and only six of the twenty-two candidates passing the Captain examination, were African-American or Hispanic, *id.* at 566, with the consequence that "certifying the examinations would have meant that the City could not have considered black candidates for any of the then-vacant lieutenant or captain

---

[19]    Since summary judgment was granted under Title VII, the Court did not reach the plaintiffs' claims under § 1983.   *Id.* at 563.

positions," *id.* at 587.[20]  Thus, the consequence of using the examinations at issue in *Ricci* stands in stark contrast to the District's promotion examinations since some African-American candidates were selected.  Noting that this "racial[ly] adverse impact . . . was significant, and [the parties] do not dispute that the City was faced with a *prima facie* case of disparate-impact liability," the *Ricci* Court nonetheless concluded that this evidence alone was "far from a strong basis . . . that the City would have been liable under Title VII had it certified the results." *Id.* Instead, to demonstrate disparate-impact discrimination, the minority applicants also would have been required to demonstrate that the "examinations were not job related and consistent with business necessity, or . . . there existed an equally valid, less-discriminatory alternative that served the City's needs but that the City refused to adopt." *Id.* (citing Title VII).

The Supreme Court's treatment of troubling statistical evidence at issue in *Ricci* is instructive.  Just as such evidence alone cannot support a disparate-impact claim under Title VII, this evidence cannot, without more, support an inference of intentional discrimination necessary to succeed under § 1983.  Yet, the plaintiffs have pointed to no evidence beyond Plaintiff Nelson's speculation, as well as their relatively low rankings on the 2010 Lieutenant promotional list as compared to the 2012 promotional list, to demonstrate that their non-promotion resulted from an elaborate scheme to alter the 2010 test results.  *See* Pls.' Opp'n at 78–79; Pls.' SMF ¶ 43 (quoting Plaintiff Nelson's deposition testimony, including the following exchange: "Q: . . . Is it your contention that [the scores associated with the 2010 Lieutenant promotional list] are not accurate and that [white] people were placed at the top by the administration, thus asserting that they had changed the scores? A: Yes").  This is insufficient to demonstrate the existence of a triable issue of fact as to any of their claims arising from the DCFEMS promotional examination

---

[20]     Coincidentally, the defendant municipality in *Ricci* engaged the same consultant, I/O Solutions, also used by the District, to develop and administer their examinations. *Id.* at 564.

Case 1:10-cv-01750-BAH   Document 224   Filed 10/09/15   Page 81 of 132

process. Accordingly, the District's motions for summary judgment are granted as to each of these non-promotion claims.

### D.    THE PLAINTIFFS' NREMT TRAINING ACADEMY CLAIMS

Three plaintiffs (Botts, Johnson, and Montgomery) allege that they were required to attend the NREMT Training Academy and obtain EMT certification due to their race. SAC ¶¶ 76, 80-83, 162–68; 174–78. Alleging that they were exempted from obtaining EMT credentials based on their date of hire, each of these plaintiffs contends that they were wrongly assigned to the Training Academy and forced to remain in this assignment until they obtained NREMT certification. The plaintiffs alternatively describe these assignments as disparate discipline, *see, e.g.*, Pls.' SMF at 67, or merely "disparate treatment," *see, e.g.*, Pls.' Opp'n at 12. In all instances, however, the plaintiffs allege that similarly situated white firefighters were not required to attend the Training Academy or obtain EMT credentials. *See id.* Further, while assigned to the Training Academy, the plaintiffs allege that they were not eligible to receive overtime and holiday pay. *See* Pls.' Opp. at 31, 33; Pls.' SMF ¶ 395.

In response, the District contends, first, that the plaintiffs have failed to allege or otherwise point to sufficient evidence that their assignment to the Training Academy constituted an adverse employment action sufficient to support their claims under Title VII. Specifically, the District argues that the plaintiffs present no evidence that they would have had, and taken advantage of, opportunities to earn overtime and holiday pay but for their assignment to the Academy. Def.'s Reply at 43. The District is correct that the plaintiffs have offered only minimal evidence to demonstrate that they experienced tangible harm while required to remain at the Academy. For example, the plaintiffs summarily assert that holiday and overtime pay "was 'pretty much' guaranteed under the CBA." Pls.' Opp'n at 12 (citing Plaintiff Johnson's

deposition testimony).  Even assuming such broad assertions amount to more than merely anecdotal speculation, it remains difficult to comprehend how requiring public safety officials in the role of firefighters to obtain certification in basic life-saving skills constitutes an adverse employment action.  Nonetheless, because the plaintiffs have failed to present sufficient evidence that their assignments were the result of racial discrimination, the Court need not determine whether such bare assertions raise a triable issue of fact as to the plaintiffs' alleged harm.

Second, the District contends that the undisputed facts demonstrate that the plaintiffs were neither exempt from the requirement to obtain EMT certification nor wrongfully detailed to the Training Academy to obtain such certification.  As described above, *see supra* Part I.B.1.(c), the parties do not dispute that DCFEMS instituted the EMT certification requirement in 1987.  While no DCFEMS EMS providers were exempted from this requirement, employees hired before 1987 could not be terminated for failing to obtain certification.  *Id.*  As of 2009, however, all EMT providers in the District are required to obtain NREMT certification before performing emergency medical services.  *Id.*  Thus, though the plaintiffs repeatedly contend that they are not *required* to obtain EMT certification in order to remain employed, *see*, *e.g.* Pls.' Opp'n at 12, 33, they have failed to identify competent record evidence upon which a reasonable jury could conclude that they were *exempt* from either the generally applicable DCFEMS policy or D.C. law.  Botts Resps. ¶¶ 25–26.

Confronted with this undisputed record evidence, the plaintiffs broadly allege that similarly situated white firefighters were not required to attend the Training Academy or otherwise obtain EMT certification.  This assertion cannot be reconciled with the documentary record evidence that nearly all DCFEMS firefighters—of all races—had obtained NREMT certification by December 2010.  *See supra* Part I.B.1.(c).  Nevertheless, the plaintiffs rely on

their deposition testimony to assert that: (1) certain white officers were "conspicuously absent" from the Academy, Pls.' Opp'n at 67; (2) 90% of Academy attendees were African-American, *id.* at 41, 66; and (3) the plaintiffs did not see their white coworkers at the Academy, *id.* at 69. Again, however, the plaintiffs' own impressions and beliefs, often based upon what other DCFEMS employees told them, *see, e.g.*, Def.'s SMF (Botts) ¶¶ 37–38—particularly where contradicted by undisputed documentary evidence in the record—are insufficient to raise a genuine factual dispute to avoid summary judgment. *Burley*, 2015 WL 5474078 at *6. In short, the plaintiffs have pointed to no admissible evidence to support their views, nor have they attempted to demonstrate that the cited out-of-court statements are capable of being converted into admissible evidence at trial. Such "sheer hearsay" does create a genuine factual dispute. *Greer,* 505 F.3d at 1315.

Having failed to present competent record evidence regarding their allegation that white firefighters hired before 1987 were not required to attend the Training Academy and obtain NREMT certification, the plaintiffs' have failed to demonstrate a triable issue of fact as to these discrimination claims.

### E.    THE PLAINTIFFS' DISCRIMINATORY DISCIPLINE CLAIMS

Following dismissal of the claims of Plaintiffs Agyeman and Clark, *see supra* Part III.A., twelve of the remaining plaintiffs allege that they were disparately disciplined in comparison to white firefighters who committed similar or more egregious misconduct.[21] In opposing summary judgment, the plaintiffs generally do not contest that they committed the infractions for which they were disciplined, and that they cannot identify any direct evidence of racial animus

---

[21] Plaintiff Pearson concedes that his 2009 reprimand for allegedly failing to check the EMT credentials of his subordinates does not constitute an adverse employment action and therefore abandons his disparate discipline allegation. Pls.' Opp'n at 33 n.2.

motivating the discipline imposed. *See generally* Pls.' Opp'n at 39–60. Instead, the plaintiffs rely on circumstantial evidence of discrimination, with each plaintiff pointing to purportedly similarly situated white firefighters, who were subjected to less severe discipline after committing comparable or more serious offenses. *Id.* at 37–39. For the reasons outlined below, the plaintiffs proffer of comparators fails to establish a genuine issue of material fact sufficient to overcome summary judgment.

### 1. *Legal Principles Applicable to Discriminatory Discipline Claims*

Absent direct evidence of racial animus, a plaintiff alleging discriminatory discipline may "establish pretext masking a discriminatory motive by presenting evidence suggesting that the employer treated other employees of a different race more favorably in the same factual circumstances." *Burley*, 2015 WL 5474078 at *9 (quoting *Brady*, 520 F.3d at 495) (internal quotations and alterations omitted). To raise an inference of discrimination based on such comparator evidence, the plaintiff must demonstrate: (1) that "all of the relevant aspects of [his] employment situation were *nearly identical* to those of the [other] employee"; and (2) that the comparator was "charged with offenses of comparable seriousness" but disciplined less harshly. *Burley*, 2015 WL 5474078 at *9 (citing *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)) (emphasis added).

"Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses." *Burley*, 2015 WL 5474078 at *9 (citing *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012)); *see also Montgomery v. Chao*, 546 F.3d 703, 707 (D.C. Cir. 2008) (noting that no inference of discrimination can reasonably be drawn from comparators who were promoted but

did not have same position or work in same branch as plaintiff and were, therefore, not similarly situated); *Barbour v. Browner*, 181 F.3d 1342, 1345 (D.C. Cir. 1999) (federal employees with similar job descriptions but differing duties not similarly situated for purposes of comparator evidence); *Ey v. Office of Chief Admin. Officer of U.S. House of Representatives*, 967 F. Supp. 2d 337, 345 (D.D.C. 2013) (citing *Wilson v. LaHood*, 815 F. Supp. 2d 333, 338–39 (D.D.C. 2011)) ("The identified employee must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them."). Consequently, for example, employees at higher levels in a plaintiff's chain of command are generally not appropriate comparators to show discriminatory discipline. *See Prater v. FedEx Corporate Servs., Inc.*, No. 1:07-CV-00022, 2009 WL 1725978 at *11 (D.D.C. June 18, 2009) (collecting cases).

As the Seventh Circuit has indicated, "the similarly situated inquiry is not a mechanical comparison," but "requires enough common factors to determine if intentional discrimination was at play" by "eliminating confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination." *Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504–505 (7th Cir. 2014) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007)) (internal quotations omitted). While no "numerosity" requirement applies to comparators, such that a "single comparator" may suffice to support an inference of discrimination, "the degree of similarity necessary may vary in accordance with the size of the potential comparator pool, as well as to the extent to which the plaintiff cherry-picks would-be comparators . . . ." *Humphries*, 474 F.3d at 405, 406-7.

At the summary judgment stage, the Court "must rely on evidence substantiated by the record" to conclude that the plaintiff and an asserted comparator are similarly situated. *Anyaso v. United States Capitol Police*, 39 F. Supp. 3d 34, 43 (D.D.C.). While the question of "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury," *George*, 407 F.3d 405, 414–15 (D.C. Cir. 2005) (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)), if a reasonable jury would be unable to find that the plaintiff and the comparator were similarly situated, the court may decide, as a matter of law, that the two are not similarly situated, *see id.* at 414–15 (citing authorities and explaining that the D.C. Circuit has held that probationary and permanent federal employees are not similarly situated as a matter of law). While a "dearth of comparator evidence . . . does not necessarily doom [a plaintiff's] claim, . . . it may well make it more difficult to raise an inference 'strong enough to let a reasonable factfinder conclude that discrimination has occurred at all.'" *Walker*, 2015 WL 4909957, at *4 (quoting *Aka*, 156 F.3d at 1291).

## 2. *Analysis*

In opposing the instant motions, the plaintiffs rely on two forms of evidence to support their allegations of discriminatory discipline: (1) a statistical summary contained in the 2008 Letter of DCFEMS disciplinary actions between fiscal years 2005 and 2007,[22] as well as print-outs from the DCFEMS database showing disciplinary actions in fiscal years 2007, 2008, and 2010, Pls.' Opp'n at 23–26 (citing Def.'s Mem. (Anthony Williams), Exs. L, M; Def.'s Mem. (Antoine Williams), Ex. O); and (2) comparator evidence intended to demonstrate that similarly situated white firefighters were disciplined less harshly than the plaintiffs for similar or more egregious conduct, Pls.' Opp'n at 37–39.

---

[22]   *See supra* n.18, noting incompleteness of this document and information about it.

With regard to the statistical reports, as this Court has recently emphasized, "since the ultimate issue in an individual's disparate treatment discrimination case is 'whether the particular plaintiff was the victim of an illegitimately motivated employment decision,' evidence of a statistical disparity is 'ordinarily not dispositive.'" *Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 159 (D.D.C. 2013) (quoting *Krodel v. Young*, 748 F.2d 701, 710 (D.C. Cir. 1984)). As such, "[i]n order to be useful, the plaintiff must focus the statistics on proving discrimination in [his or] her particular case." *Id.*[23] This report is insufficient, however, to demonstrate that any individual plaintiff was subjected to disparate disciplinary action. Instead, to survive summary judgment, the plaintiffs must each point to competent record evidence that would allow a reasonable jury to conclude that he or she *in particular* was subjected to discrimination.

With regard to the proffered comparator evidence relied upon by the plaintiffs, the plaintiffs initially contend that "[b]y virtue of the fact that all DCFEMS members are subject to the same discipline procedures, each member is nearly identical." Pls.' Opp'n at 38. To bolster this broad claim, the plaintiffs note that "there is no distinction between from [sic] Firefighter through Fire Chief in terms of discipline," *id.*, and that DCFEMS disciplinary actions must "take into consideration previous discipline imposed upon other members for the same or similar offense," *id.* The plaintiffs strain to stretch the fact that the CBA disciplinary procedures apply equally to all employees as a basis for treating all DCFEMS employees as similarly situated, and that is stretch too far. Simply put, "similarly situated" in terms of being subject to discipline generally, does not mean "similarly situated" for purposes of comparing disciplinary actions applied to wrongful conduct in order to identify situations where the employer's actions are more

---

[23]     To the extent that the plaintiffs rely on the 2008 Letter, as well as the associated lists from the DCFEMS database, to support an inference that District policymakers were aware of alleged discrimination within DCFEMS, as noted, *supra* Part III.B., this issue need not be reached in light of the plaintiffs' failure to present a predicate constitutional violation.

likely than not based on impermissible discrimination. The latter comparison requires evaluation of the degree to which the plaintiffs and their putative comparators maintained similar roles and responsibilities and engaged in similar wrongful conduct. *See Burley*, 2015 WL 5474078 at *9.

At the same time, given the fact that a single person, the Fire Chief, is ultimately responsible for adopting, modifying (but not increasing), or dismissing penalties recommended by DCFEMS disciplinary bodies, Pls.' Opp'n 38–39, the involvement of different supervisors among the plaintiffs claiming discriminatory discipline is a factor that does not weigh as heavily as in other employment discrimination cases. In this regard, notably, the plaintiffs have offered no evidence to suggest that past DCFEMS Fire Chiefs selectively reduced or otherwise modified recommended penalties to advantage white employees. *See generally* Pls.' Opp'n.

Before turning to the plaintiffs proffered comparators for each plaintiff, two related preliminary issues must be addressed. First, in its Omnibus Reply, the District challenges the use of a number of proffered comparators because the plaintiffs failed to disclose them prior to the close of discovery and, in fact, only identified these comparators for the first time in their opposition to the instant motions. Def.'s Reply at 8–9. Though courts have been reluctant to consider such belated comparator evidence, *see, e.g.*, *Cargo v. Kansas City S. Ry. Co.*, No. CIV.A. 05-2010, 2011 WL 1304741, at *3 n.4 (W.D. La. Apr. 1, 2011), the Court need not opine on the general propriety of such late disclosure here since, even considering these belated comparators, the second preliminary issue is that plaintiffs have presented far too little information about most comparators to satisfy the standard for similarity outlined by the D.C. Circuit.

With respect to this second preliminary issue, the Court notes that the plaintiffs have been afforded ample discovery of nearly two years of discovery and provided with complete reports

for all DCFEMS disciplinary incidents between 2007 and 2010. *See supra* n.2. Yet, the only evidence about the belated comparators described by the plaintiffs is the comparators' race, rank, a brief, generic description of the offense for which the employee was disciplined (*e.g.*, "Minor motor vehicle accident," "Failure to obey orders," "Missed clinic appointment"), shorthand and often incomplete notes (*e.g.*, "Dismissed – Time Frame", "Can't find folder", "Member exonerated. No pape-"), and sparse references to prior discipline (*e.g.*, "Reprimand," "12 H/S and 36 H"). *See, e.g.*, Pls.' SMF at 8 (citing Def.'s Mem. (Rayford), Ex. B and Def.'s Mem. (Antoine Williams), Ex. O). These documents do not include, and the plaintiffs do not otherwise provide, *inter alia,* a detailed account of each infraction in order to ensure that the comparators were charged with offenses of comparable seriousness and a comprehensive description of prior disciplinary actions initiated against the disciplined employee to ensure close similarity in prior disciplinary history. *See id.* Without a more fulsome account of these disciplinary actions, the plaintiffs cannot demonstrate that "all of the relevant aspects of [their] employment situation[s] were nearly identical to those of the [proffered] employee[s]." *Burley*, 2015 WL 5474078 at *9 (quoting *Holbrook*, 196 F.3d at 261) (internal quotations omitted); *see also Ey*, 967 F. Supp. 2d at 345.

In addition to the extensive discovery described above, *see supra* n.2, the District also provided plaintiffs "the opportunity to conduct an in person inspection of disciplinary files maintained by the DCFEMS Office of Compliance in order to identify any additional records concerning purported non-party 'comparator' employees." Def.'s Opp'n Pls.' Mot. Compel & Extend Discovery Deadline at 6 n.6. Even with the generous time provided to the plaintiffs to

complete discovery and the ample discovery produced, the plaintiffs have provided only minimal information about most of the proffered comparators.[24]

With this as background, the Court will address each plaintiff's proposed comparators in turn, proceeding alphabetically. As this discussion illustrates, despite extensive discovery—during which the plaintiffs obtained access to a database compiling more than ten years of DCFEMS disciplinary cases—the plaintiffs have failed to identify a single comparator sufficient to raise an inference that the plaintiffs were subjected to racially discriminatory discipline.[25]

### a)   Plaintiff Addo

Addo alleges that he was disparately disciplined, as a Lieutenant, upon receiving two suspensions (one for twelve hours and a second for twenty-four hours) after missing three required medical appointments at the DCFEMS PFC.[26] Def.'s SMF (Addo) ¶¶ 50–55.

In support, the plaintiffs proffer as comparators four white employees who the plaintiffs contend received only a reprimand for missing required clinic appointments, *see supra* n.27, as well as two higher-ranked Captains, who each received 300-hour suspensions after failing to schedule annual physicals for more than five years. Pls.' Opp'n at 39–40; Addo SMF ¶¶ 83–84. With regard to the employees who received only reprimands for failing to attend required PFC appointments, the plaintiffs have failed to present evidence that these comparators were

---

[24]     The plaintiffs also provide little to no information about the supervisors responsible for overseeing each disciplinary action, but, as noted, this silence is not fatal in light of the unified disciplinary regime employed within the DCFEMS.

[25]     As discussed at various points below, a full review of the limited information provided in the parties' exhibits also shows that the plaintiffs have cherry-picked discrete instances of disciplinary actions taken within DCFEMS to bolster their claim of racially discriminatory discipline, but that the evidence paints a more complicated picture. For example, in support of Plaintiff Addo's allegations of discriminatory discipline, the plaintiffs point to four examples of white firefighters who received reprimands (as opposed to suspensions) after missing required PFC appointments. *See* Pls.' SMF at 8. In one of the underlying reports, however, four lines above the entry cited by the plaintiffs are two entries indicating that African-American firefighters also received reprimands for missing such appointments. *See* Def.'s Antoine Williams Mem., Ex. O at 9.

[26]     Plaintiff Addo concedes that his September 2010 reprimand for allegedly failing to provide timely reports of his supervision of another firefighter's training does not constitute an adverse employment action. Pls.' Opp'n at 31 n.1.

disciplined for missing multiple appointments, as was Addo. *See id.* Likewise, the plaintiffs' asserted evidence in fact demonstrates that African-American employees also received reprimands for failing to attend PFC appointments soon before the plaintiffs' comparators received the same discipline. As such, the plaintiffs have failed to present evidence that Addo was disciplined more harshly than these purported comparators on account of his race.

By comparison, given the much more serious penalties meted out to the comparator Captains, the gravamen of Addo's allegation is not about the relative severity, but the relative timeliness, of the penalty. Specifically, Addo alleges that the Captains, unlike Addo, were not promptly disciplined for failing to attend required PFC appointments. Pls.' Opp'n at 40 ("[DCFEMS] disciplined Plaintiff Addo for missing his clinic appointments in the same year of the violations. However, with White employees . . ., [DCFEMS] took seven years before instituting disciplinary action against them.").

These proposed comparators present a number of differences that significantly undermine their probative value, including *inter alia*: (1) as higher-ranking firefighters in the DCFEMS chain of command, these Captains are not similarly situated to Addo, who was not promoted to Captain prior to the expiration of the 2008 Captain list in October 2010, *see supra* Part I.B.2.(a); (2) the Captains committed different—and apparently more serious—infractions than Addo; and (3) the Captains in fact received *far harsher* discipline than Addo. Moreover, the plaintiffs have failed to point to competent record evidence to demonstrate that these firefighters were not promptly disciplined due to their race since no information is provided about the amount of time that elapsed between DCFEMS's awareness of the infraction and the Captains' ultimate discipline. The plaintiffs cite a document that simply notes the annual physical requirement and describes the elements of the required examination, but provides no information as to the

mechanism by which DCFEMS leadership are alerted of an employee's failure to abide by this requirement. *See* Pls.' SMF at 9 (citing Def.'s Mem. (Addo), Ex. E. As a result, the plaintiffs have failed to establish a genuine issue of fact that Addo received less severe discipline for similar or comparable offenses.

### b)    Plaintiff Burton

Burton received a 72-hour suspension, as a Firefighter, for disobeying orders and failing to adhere to proper firefighting protocols, "creat[ing] an unnecessarily dangerous situation" at the scene of a fire. Def.'s SMF (Burton) ¶ 23. As support for this allegation that he was subjected to disparate discipline, the plaintiffs initially proposed three comparators: (1) a former Fire Chief whom the plaintiffs allege was not disciplined after causing an accident during a fire prevention demonstration; and (2) a Sergeant and a Lieutenant whom the plaintiffs allege were not disciplined after responding to a fire to which they were not dispatched. SAC ¶¶ 94–97. In opposition to the District's summary judgment motion, however, the plaintiffs advance only the Sergeant as a potential comparator. Pls.' Opp'n at 42–43.

Although the plaintiffs' use of unexplained jargon is difficult to decipher, they appear to contend that the Sergeant in question was "simply counseled" after responding to a different fire scene than the one to which he had been dispatched. *See id.* at 42–43. Despite the plaintiffs' effort to use this Sergeant as a comparator, however, the record reveals significant differences from Plaintiff Burton, including: (1) the Sergeant did not defy a supervisor's direct order; and (2) no evidence suggests that the Sergeant created a dangerous situation as a result of his actions. *See* Pls.' Opp'n, Ex. 33 (Mem. from Kevin Anderson to Michael Reilley), ECF No. 203-25. For this reason, and because Burton was not a Sergeant at the time of his infraction, *see Prater*, 2009

WL 1725978 at *11, the plaintiffs have failed to demonstrate a triable issue of fact as to whether the Sergeant and Burton were similarly situated and disciplined for comparable conduct.

In addition to this proffered comparator, the plaintiffs rely on a one-page document, purporting to list six "Audio Trial Board tapes provided in Plaintiff Burton's Production of Documents to Defendant," with each entry on the list consisting merely of an address and incident number, without any names of employees involved or any information about whether an employee was subject to discipline, the nature of the infraction or their rank that might be probative of a similarly situated comparator. Pls.' Opp'n at 43 (citing Pls.' Opp'n, Ex. 76). Nevertheless, according to the plaintiffs, the listed audio tapes reflect instances "where White members acted in similar ways as Plaintiff Burton did on November 21, 2007, however, those members were not disciplined as harshly as Plaintiff Burton." *Id*. This conclusory description of the listed audio tapes, without any other information as to the contents of these recordings, is puzzling, if the audio tapes truly lived up to the single-line description. The plaintiffs have failed, therefore, to present sufficient evidence upon which to conclude that these recordings address similarly situated white firefighters who may serve as valid comparators. *Ey*, 967 F. Supp. 2d at 345.

Lastly, Burton alleges that a white firefighter who was suspended at the same time as Burton was allowed to work overtime while Burton was prohibited from doing so. SAC ¶¶ 92–93. In support of this allegation, the plaintiffs point to Burton's own deposition testimony in which he described his belief that this alleged disparity was due to DCFEMS employees "tak[ing] care of [their] own" and noted that the other firefighter's father was a senior DCFEMS firefighter. Pls.' Opp'n at 43. The plaintiffs assert that payroll documents would support Burton's contention that the white firefighter was permitted to work overtime, Pls.' Resps. at 25,

31, but the evidence they have presented indicates instead that this purported comparator did not work overtime hours while serving his suspension, *see* Pls.' Opp'n, Ex. 28 (Weekly Time Sheets), ECF No. 202-50. They likewise present no evidence suggesting that Burton previously sought opportunities for overtime pay or the District otherwise knew that he desired to work overtime. *See generally* Pls.' Opp'n 42–43. Further, Burton's testimony regarding alleged cronyism within DCFEMS does not alone support a racial discrimination claim. *See Am. Fed'n of State, Cnty., & Mun. Employees Local 2401 v. District of Columbia*, 31 F. Supp. 3d 149, 158 (D.D.C. 2014) ("Cronyism, while disfavored, is not illegal.") (citing *Barry v. Moran*, 661 F.3d 696, 708 (1st Cir. 2011)); *Hunter v. District of* Columbia, 905 F. Supp. 2d 364, 379 (D.D.C. 2012) *aff'd sub nom. Hunter v. D.C. Gov't*, No. 13-7003, 2013 WL 5610262 (D.C. Cir. Sept. 27, 2013). As a result, the plaintiffs have not adduced sufficient competent evidence to allow a reasonable jury to conclude that Burton was subjected to disparate discipline due to his race.

### c)   Plaintiff Florence

Plaintiff Florence retired from DCFEMS service after a Trial Board recommended that he be demoted and suspended for 168 hours due to his sexually inappropriate conduct towards multiple DCFEMS female employees while on duty and serving as a Lieutenant. Def.'s SMF (Florence) ¶ 23.

The District first argues that Florence has failed to demonstrate that his voluntary retirement constituted an adverse employment action sufficient to support Florence's claim of racial discrimination. *See* Def's Mem. (Florence) at 12–15. While failing to respond directly to this argument, the plaintiffs appear to assert that Florence was subjected to constructive discharge upon receiving notification of the Trial Board's recommended punishment. *See, e.g.*,

Pls.' Opp'n at 11 ("Plaintiff Florence would not have retired until the year 2017 had it not been for the discipline that he was going to face.").

As previously described, *supra* Part I.B.2.(f), Florence's precise motivations for retiring are in dispute. In general, however, "resignations or retirements are presumed to be voluntary," and a plaintiff alleging constructive discharge must therefore show that "a reasonable person in the [plaintiff]'s position would have felt compelled to resign under the circumstances." *Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010). "For a resignation to be rendered involuntary on account of duress, three criteria must be met: [1] an agency imposes the terms of an employee's resignation, [2] the employee's circumstances permit no alternative but to accept, and [3] those circumstances were the result of improper acts of the agency." *Keyes v. District of Columbia*, 372 F.3d 434, 439 (D.C. Cir. 2004) (quoting *Schultz v. U.S. Navy*, 810 F.2d 1133, 1136 (Fed. Cir. 1987)) (internal quotations omitted). Thus, "'where an employee is faced merely with the unpleasant alternatives of resigning or being subject to removal for cause, such limited choices do not make the resulting resignation an involuntary act.'" *Id.* (quoting *Schultz*, 810 F.2d at 1136, and holding that an employees' decision to retire instead of contesting a pending disciplinary action "may have been difficult, [but] it was a voluntary decision nonetheless").

Viewed under this standard, Florence has failed to present sufficient evidence to allow a reasonable jury to conclude that his retirement was wrongfully coerced. Florence contends that he chose to retire upon learning that he would be demoted and "labeled a sexual harasser" as a result of the Trial Board recommendation. Pls.' Opp'n at 11. In *Keyes*, 372 F.3d at 439–40, the D.C. Circuit held that an employee who retired, in lieu of contesting a pending disciplinary action that may have resulted in her termination, failed to demonstrate that her retirement was "rendered involuntary on account of duress." By extension, the plaintiffs' contention that

Florence chose to retire to avoid demotion and any associated stigma cannot raise an inference that Florence was subject to constructive termination.

In any event, the plaintiffs have failed to assert a valid comparator with respect to Florence, since their proffered comparator did not engage in sexual misconduct while on duty, Florence Resps. ¶¶ 30, 32, and therefore cannot be said to have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it," *Ey*, 967 F. Supp. 2d at 345. In addition, the proffered comparator received notably similar discipline to Florence following a Trial Board hearing. Florence Resps. ¶ 31.

Moreover, to the extent that Florence contests the underlying factual findings and recommended punishment of the Trial Board that considered the disciplinary charges against him, *see, e.g.*, Pls.' SMF at 39, 41–42, this is not the appropriate forum to re-litigate the veracity of the witnesses who complained about Florence's sexual harassment and the findings of the Trial Board. Indeed, employers are entitled to make mistakes and may even make personnel decisions that appear arbitrary or unfair, so long as those decisions are not motivated by an employees' protected status. As the D.C. Circuit explained, "an employer's action may be justified by a reasonable belief in the validity of the reason given even though that reason may turn out to be false. . . . 'Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers.'" *George*, 407 F.3d at 415 (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996)). Having presented no evidence that Florence faced harsher discipline due to his race, the plaintiffs have provided "no basis in the record upon which a reasonable factfinder could conclude that whatever investigative

flaws or unfairness [Florence] may have suffered . . . were so unexplained or otherwise striking as to suggest" that his proposed discipline was improperly motived. *Burley*, 2015 WL 5474078, at *10. For these reason, the plaintiffs have failed to raise a genuine factual issue warranting a trial on Florence's claim that he was subjected to discriminatory disciplinary action.

### d)   Plaintiff Fuller

Plaintiff Fuller was terminated from his position as a firefighter after a DCFEMS Trial Board unanimously concluded that he failed to provide prompt notification to his superiors of his arrest and subsequent guilty plea for possession of an unregistered firearm and ammunition. The plaintiffs proffer ten DCFEMS employees as similarly situated comparators, but provide only summary information as to nine of these disciplined employees. Pls.' Opp'n at 44–45.

With respect to these latter comparators, the plaintiffs have adduced far too little evidence for a reasonable jury to conclude that they were similarly situated to Fuller. *See supra* Part III.E.2. For example, the plaintiffs propose as comparators DCFEMS firefighters who were not terminated after being "arrest [sic] and/or convicted of misdemeanor assaults." *See* Pls.' Opp'n at 44 (citing Pls.' SMF at 44–45). The similarity with Fuller's situation breaks down, however, because the comparators were charged with the different criminal offense conduct of assault, unlike Fuller who was charged with a firearms offense. Further, to the extent that some purported comparators were only arrested, the comparators were not convicted of a criminal offense, as was Fuller. *Id.* For example, while the plaintiffs assert that one comparator was suspended for 120 hours after being "convicted of first degree assault with racial overtones," *id.* at 45, the plaintiffs' cited documentary evidence indicates only that this employee was *arrested* for this offense. Def.'s Mem. (Thomas), Ex. Z (Summary of DCFEMS Disciplinary Actions) at

217–20, ECF No. 160-29.  This, of course, stands in contrast to Fuller who was found guilty of three firearms offenses.

The sole comparator about whom the plaintiffs have provided specific information is a DCFEMS firefighter, who was suspended for 120 hours following his arrest for first-degree assault following an altercation with his neighbor.  Pls.' Opp'n at 44.  Though the plaintiffs' assert that the assault involved a handgun, *see id.*, the plaintiffs do not dispute that the Trial Board decision addressing this incident made no mention of a firearm.  Fuller Resps. at 10.  Beyond this facial distinction, and belying the plaintiff's suggestion that this comparator engaged in "more egregious" conduct than Fuller, the comparator, in fact, pleaded guilty only to second-degree assault and was sentenced to probation before judgment.  Def.'s Mem. (Fuller), Ex. H (Trial Bd. Ltr. of Decision/Suspension) at 5, ECF No. 164-11.  By contrast, Fuller received a suspended sentence of 180 days in jail for each offense for which he pleaded guilty, in addition to nine months of unsupervised probation.  Def. Mot. (Fuller), Ex. D (Letter of Decision/Removal) at 5, ECF No. 164-7.

In light of these apparent distinctions, the plaintiffs have failed to demonstrate that a reasonable jury could conclude that Fuller and the plaintiffs' asserted comparator "engaged in the *same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Ey*, 967 F. Supp. 2d at 345 (emphasis added).  As such, the plaintiffs have failed to present evidence upon which a reasonable jury could rely to conclude that Fuller was subjected to racially disparate disciplinary action.

### e)   Plaintiff Morris

Plaintiff Morris was terminated after lying directly to two supervisors and then, three weeks later, submitting multiple falsified documents to cover up his involvement in a car

accident that resulted in his absence from duty while serving as a firefighter.  The plaintiffs proffer two comparators to support their contention that Morris was subject to disparate discipline: (1) a white firefighter suspended for 240 hours for filing a false police report; and (2) a white firefighter who was not disciplined after calling in a false fire alarm.[27]  Pls.' Opp'n at 13.  In support of these purported comparators, however, the plaintiffs refer only to the summary disciplinary descriptions provided by DCFEMS.  Pls.' SMF at 57 (citing Def.'s Mem. (Thomas), Ex. Z).  As noted above, *supra* Part III.E.2, these documents do not include, and the plaintiffs do not otherwise provide, key information necessary to ascertain whether the proffered comparators' employment situations are "nearly identical" to Morris's situation at the time of his termination (*e.g.*, these employees' prior disciplinary history and a complete account of their infractions, which may reveal important mitigating circumstances).  *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1514 (D.C. Cir. 1995).

Even based on this limited information, however, it is clear that DCFEMS treated each comparators' allege infractions seriously, requiring each comparator to appear before a Trial Board, which found each comparator guilty and imposed a significant suspension.  Def.'s Mem. (Thomas), Ex. Z at 251–53, 216–18.  Moreover, the available information suggests important distinctions between Morris's conduct and that of the putative comparators.  For example, one comparator, who submitted a false police report, received a significant suspension, as opposed to termination, Pls.' SMF at 57, but the summary information provided by the plaintiffs provides no indication that the employee either failed to report for duty or submitted false documentation

---

[27]     Although the plaintiffs contend that this firefighter twice called in false alarms, the record evidence cited by the plaintiffs shows instead that these were "[d]uplicate" entries describing the same incident and that the charge against the firefighter was ultimately dismissed.  Def.'s Mem. (Thomas), Ex. Z at 251–52.

directly to DCFEMS, *see* Def.'s Mem. (Thomas), Ex. Z at 217–21, as did Morris on at least two occasions, Def.'s SMF (Morris) ¶¶ 26–27.

In addition, though this comparator's infraction demonstrates certain superficial similarities with those for which Morris was disciplined (namely, filing false reports with public safety agencies), Morris's dishonest conduct persisted over a period of several weeks, making his conduct comparatively more serious. Consequently, the plaintiffs have failed to point to sufficient documentary evidence to demonstrate a genuine material issue as to Morris's disparate discipline allegations.

### f)   Plaintiff Rayford

Plaintiff Rayford challenges two disciplinary actions taken against him while he served as a DCFEMS firefighter: (1) a 72-hour suspension for causing a traffic accident in a DCFEMS vehicle and failing to provide a valid driver's license to the investigating police officer; and (2) his recommended termination, which Rayford claims prompted him to retire, following the positive results of multiple drug tests administered by the DCFEMS PFC, his failure to complete the DCFEMS Substance Abuse Program, and his tampering with his urine tests. Pls.' Opp'n at 14–15.

First, regarding Rayford's 72-hour suspension, the plaintiffs rely on the District's summary disciplinary information to proffer three potential comparators. Pls.' Opp'n at 50. Even based on the limited information provided in this summary information, however, the plaintiffs have failed to demonstrate that these purported comparators engaged in conduct comparable to the conduct for which Rayford was disciplined. For example, while the summary report indicates that Rayford was disciplined for an "Accident w/o license & false statement," the same report indicates that the proposed comparators were disciplined only for having "Failed

to drive in a safe manner," Def.'s Mem. (Thomas), Ex. Z at 131–34, or "Failed to maintain drivers [sic] license," *id.* at 196–99. Although a third comparator received counseling for a "Minor motor vehicle accident and no driver's license," the summary information provides no indication of the circumstances surrounding this incident. *Id.* at 142–45. Further, the summary does not indicate that the employee was charged with making a false statement in connection with the incident. *See id.* By contrast, although Rayford was not found guilty of making a false statement in connection with his accident, the Trial Board considering his charges specifically noted that Rayford presented a District of Columbia non-driver identification card to his superiors in an "improper and misleading" manner prior to being assigned to drive a DCFEMS vehicle. Def.'s Mem. (Rayford), Ex. C at 9. As such, the limited evidence presented by the plaintiffs does not raise a genuine factual issue as to whether Rayford was disparately disciplined.

Second, as to Rayford's proposed termination, the plaintiffs proffer four potential comparators: (1) a purportedly probationary employee whom the plaintiffs contend violated the Substance Abuse Policy and was not terminated; and (2) three employees whom the plaintiffs contend violated the DCFEMS Substance Abuse Policy and were not referred to the Substance Abuse Program or summarily terminated. Pls.' Opp'n at 47–50. The plaintiffs contend that their comparator evidence demonstrates that DCFEMS "did not strictly enforce the Substance Abuse Policy" against white employees, resulting in racially disparate disciplinary action against Rayford.

As interpreted by the plaintiffs, the Substance Abuse Policy provides that "[o]n a first violation of the policy, non-probationary employees get one chance to participate in a one year rehabilitation program, which includes weekly drug testing and counseling." Pls.' Opp'n at 47.

According to the plaintiffs, "[o]nce enrolled in the rehabilitation program, if an employee produces a positive test after testing negative, he/she will be recommended for termination." *Id.* Thus, the plaintiffs contend, white employees who violated the Substance Abuse Policy should have been referred to a rehabilitation program and required to submit to weekly drug and alcohol tests and, because they were not required to enter the program, these employees were not subject to potential termination upon a subsequent failed test, as was Rayford while participating in the program. *Id.* at 47–48.

Upon a review of the documentary evidence, however, the plaintiffs misconstrue the terms of the Substance Abuse Policy. In fact, although on-duty (and certain off-duty) alcohol use, as well as *any* illegal drug use, constitutes a violation of the Policy, all such violations do not necessarily require referral to a rehabilitation program or regular drug and alcohol testing. Def.'s Mem. (Rayford), Ex. D (DCFEMS Substance Abuse Policy) at 7–8. Instead, the Policy imposes mandatory placement in a rehabilitation program only where an employee registers a certain blood-alcohol level on a Breathalyzer test administered by the DCFEMS PFC. *See id.* at 15. In addition to certain random testing procedures, the Policy provides for mandatory PFC testing only in certain enumerated situations, including in connection with a required physical examination. *Id.* at 6–7. Rayford's initial failed test coincided with a required annual physical. Def.'s SMF (Rayford) ¶¶ 9–10. Likewise, following an on- or off-duty arrest, an employee must be referred to the PFC for testing prior to his or her next regularly scheduled duty shift. Def.'s Mem. (Rayford) at 6. Once enrolled in a rehabilitation program, an employee who fails to complete the program (as evidenced generally by positive drug or alcohol tests) will be recommended for termination. *Id.* at 18.

While the plaintiffs' asserted evidence demonstrates that each of their putative comparators may have experienced some degree of substance abuse, they have failed to present evidence that these employees failed to complete a mandatory rehabilitation program under the Substance Abuse Policy.  First, the plaintiffs point to no evidence to suggest that two of these proffered comparators were disciplined in connection with any violation of the Substance Abuse Policy.  *See* Pls' SMF at 65 (describing proposed comparators' off-duty arrests for alcohol-related offenses and the theft of over-the-counter medication).  Further, while the plaintiffs present evidence that one of the comparators was not automatically remanded to a rehabilitation program upon being disciplined for violation of the Substance Abuse Policy, this employee was *himself* African-American.  *See id.*; Pls.' Opp'n, Ex. 62 at 4.  More significantly, the plaintiffs have presented no evidence that these employees attempted to submit a tampered urine sample for testing while remanded to the Program.  *Id.*  Accordingly, the plaintiffs have failed to point to adequate comparator evidence to demonstrate a genuine issue of material fact as to Rayford's discriminatory discipline allegations.

### g)      Plaintiff Robinson

Plaintiff Robinson received a formal reprimand as a Lieutenant after contacting an employee sequestered in conjunction with the preparation of the 2010 promotional examinations, and claims that this amounted to discriminatory discipline.  Pls.' Opp'n at 15.

As previously noted, "[absent] additional disciplinary action such as a change in grade, salary, or other benefits," a formal reprimand generally does not constitute an adverse employment action sufficient to support a claim of employment discrimination.  *Stewart*, 275 F.3d at 1136.  For the same reason, Robinson's allegations stemming from two incident reports, neither of which resulted in any tangible change in the character of Robinson's employment, do

not constitute adverse employment actions under Title VII.  Nonetheless, even assuming

Robinson suffered cognizable harm under Title VII, the plaintiffs have presented insufficient

evidence to raise an inference that Robinson was subjected to disparate discipline.

The plaintiffs proffer as a comparator a white Battalion Fire Chief, who was not

disciplined in connection with his communication with the same sequestered employee whom

Robinson contacted.  Pls.' Opp'n at 74.  While the plaintiffs assert that Robinson and this

putative comparator engaged in comparable conduct, *id.*, the plaintiffs point to no evidence to

demonstrate that Robinson and the Battalion Fire Chief were otherwise similarly situated.  For

example, the significant difference in rank between Robinson and the plaintiffs' proffered

comparator considerably complicates any comparison of the discipline each received in

connection with this incident.  *See Prater*, 2009 WL 1725978 at *11.  Most notably, because

Robinson may have been eligible to sit for the 2010 examination, her communication with the

sequestered employee more directly raises concerns regarding the integrity of the examination

process.  Indeed, the record evidence demonstrates that white employees who *were* similarly

situated to Robinson received identical discipline.  *See* Def.'s Mem. (Thomas), Ex. Z at 247–49

(indicating that a white Lieutenant disciplined in connection with the same incident also received

a formal reprimand after speaking with the sequestered employee).  In sum, then, the plaintiffs'

asserted evidence does not present a triable issue of fact as to whether Robinson was subjected to

disparate discipline in connection with the 2010 sequester due to her race.

### h)      Plaintiff Sims

Plaintiff Sims challenges three instances of alleged disparate discipline imposed when he

was a Sergeant: (1) a demotion to firefighter in connection with his 2008 arrest for marijuana

possession; (2) a reprimand for failing to inform DCFEMS about his prior arrest in 1998 for

carrying an unregistered firearm; and (3) a twelve-hour suspension for failing to inform DCFEMS about a second prior arrest in 2002 for possession of marijuana. Def.'s SMF (Sims) ¶¶ 7–9, 21–22, 27.

The plaintiffs acknowledge that they are unable to identify a white DCFEMS Sergeant who was not demoted after being arrested and charged with marijuana possession. *Id.* ¶ 33. Seeking to avoid summary judgment, however, the plaintiffs proffer four potential comparators: (1) three DCFEMS employees, who were not suspended after failing to report arrests or convictions; and (2) a Sergeant who was not disciplined after reporting his arrest and conviction for violating a restraining order. Pls.' Opp'n at 51–52. Again, a review of the plaintiffs' proffered evidence does not support a reasonable inference of discrimination.

With regard to the first group of three proffered comparators, the plaintiffs have failed to point to competent record evidence suggesting that these employees engaged in conduct comparable to Sims. Most importantly, the plaintiffs have not demonstrated that these employees failed to report not one, but two prior arrests, and were arrested for a third time. By comparison, Sims received a reprimand for failing to report his first arrest in 1998 and a suspension for failing to report a drug arrest in 2002, and then was demoted for his third arrest in 2008 for a second drug offense. In fact, although the plaintiffs initially produced evidence of seven DCFEMS employees, whom the plaintiffs contended were disciplined less harshly following comparable infractions, Def.'s SMF (Sims) ¶¶ 34–40, three of these employees were themselves African-American. *See* Pls.' Opp'n at 51 n.4. This record evidence significantly undermines the plaintiffs' contention that Sims was subjected to more severe discipline due to his race. In sum, the plaintiffs have failed to point to record evidence that these comparators engaged in "the same conduct without such differentiating or mitigating circumstances that

would distinguish their conduct or the employer's treatment of them." *Ey*, 967 F. Supp. 2d at 345.

As to the final comparator, the plaintiffs similarly have failed to point to record evidence supporting their contention that the Sergeant comparator and Sims engaged in sufficiently similar conduct to permit an inference of discriminatory discipline. As before, the plaintiffs have presented no evidence that the Sergeant committed two other infractions prior to receiving no discipline in connection with his arrest and conviction. *See generally* Pls.' SMF at 71. Further, the plaintiffs do not assert that the Sergeant's conviction was tied in any way to illicit drugs or firearms, as were Sims. *Id.* In light of these material distinctions in criminal history, the plaintiffs have failed to present sufficient evidence to support a reasonable inference that Sims was disparately disciplined in comparison to the identified white employee. *See Wheeler v. Georgetown Univ. Hosp.*, 52 F. Supp. 3d 40, 51 (D.D.C. 2014) ("Context, after all, matters. . . . So, if an employee with a spotless record makes one awful mistake, and an employee with a spotty record makes four very bad ones, the employer—who is, of course, in the best position to judge her employees' performance—can make the final call.").

### i)   Plaintiff Thomas

Plaintiff Thomas contends that he was disparately disciplined as a Sergeant when he received: (1) a 72-hour suspension and reprimand in connection with his conviction for reckless driving and resulting failure to maintain a valid driver's license; and (2) a reprimand for failing to notify DCFEMS of his suspended license. The plaintiffs proffer ten purported comparators, including: (1) the same comparator proposed by Plaintiff Fuller, *see supra* Part III.E.2.(d), who was suspended for 120 hours following his arrest for first-degree assault and guilty plea to

second-degree assault; and (2) nine DCFEMS employees identified in the summary disciplinary materials produced by the District. Pls.' Opp'n at 52–53.

For the reasons outlined in the Court's discussion of Plaintiff Fuller's discriminatory discipline allegations, *see supra* Part III.E.2.(d), the plaintiffs have failed to demonstrate that a reasonable jury could conclude that Thomas and the plaintiffs' first proposed comparator were similarly situated. The plaintiffs have presented no evidence that the putative comparator's conduct of assaulting a neighbor had any impact on his ability to drive lawfully or to maintain a valid driver's license, a salient factor in Thomas' discipline. While the plaintiffs contend that Thomas's ability to perform his duties were unaffected by the suspension of his driver's license, the parties agree it is the duty of all members of the Department to maintain a valid driver's license. Def.'s SMF (Thomas) ¶ 18. With this important distinction in mind, the Court need not undertake the difficult—if not impossible—task of considering the relative severity of the comparator's conviction for second-degree assault, for which the employee received only probation, and Thomas's own conviction for reckless driving, for which he served 10 days in jail.

Regarding the remaining proffered comparators, the plaintiffs have failed to present evidence beyond summary disciplinary information. *See* Pls.' SMF at 72–73. Consequently, they have presented no evidence that these comparators were disciplined for failing to maintain a valid driver's license as a result of a criminal conviction or guilty plea. The plaintiffs present evidence that a white firefighter was not disciplined after pleading guilty to driving while intoxicated, but they elide important distinctions between the conduct of that employee and Thomas. Pls.' Opp'n at 53. First, and most importantly, the record evidence demonstrates that the plaintiffs' proffered comparator was not disciplined due to a procedural defect in the DCFEMS disciplinary proceedings arising from his arrest. Def.'s Resp. at 103, Ex. E (Case No.

U-08-127) at 1 (Trial Board ruling explaining that the disciplinary charges against the comparator are untimely due to an administrative oversight and must therefore be dismissed under the CBA), ECF No. 212-1.  The plaintiffs have presented no evidence, and indeed have made no specific allegation suggesting, that this apparent procedural defect was in fact motivated by racial animus.  *See generally* Pls.' Opp'n at 52–53.  Second, while Thomas was disciplined at least partially due to his failure to maintain to maintain a valid driver's license, Thomas SMF ¶ 33, the plaintiffs' proffered comparator was "permitted to drive to and from work and while at work" following his conviction.  Def.'s Resp. at 103, Ex. E (Case No. U-08-127) at 1–2; Pls.' SMF at 72.

As before, such differentiating and potentially mitigating circumstances that would distinguish this employee's conduct and any resulting disciplinary action undermines the plaintiffs' suggestion that this employee serves as a valid comparator sufficient to overcome summary judgment.  *Ey*, 967 F. Supp. 2d at 345.  In sum, because they have failed to present evidence that Thomas and their proffered comparator engaged in comparable conduct, the plaintiffs have failed to raise a genuine factual issue as to Thomas's disparate discipline allegations.

### j)    Plaintiff Walker

Plaintiff Walker alleges discriminatory discipline in connection with his referral to the DCFEMS Substance Abuse Program after he failed multiple Breathalyzer tests while he served as a firefighter, even though he was never subject to any formal disciplinary action.  Specifically, Walker contends that similarly situated white employees were not placed in the Program after being charged with alcohol-related criminal offenses and argues that DCFEMS did not initiate

disciplinary proceedings against these employees after they again violated the DCFEMS Substance Abuse Policy while participating in the Program. Pls.' Opp'n at 53–54.

Although Walker was never formally disciplined, the plaintiffs contend that, after he failed several Breathalyzer tests in the Program, he was placed on paid administrative leave between August 2010 and October 2011, "awaiting a Trial Board that never occurred." Pls.' Opp'n at 35. During this period, Walker was ineligible to receive overtime and holiday pay, which the plaintiffs assert are "guaranteed" by the CBA. *Id.* As explained above, an employee's placement on administrative leave, without the loss of pay or benefits, during an investigation of alleged misconduct generally does not constitute an adverse employment action. *See Akosile*, 938 F. Supp. 2d at 91; *Brown*, 828 F. Supp. 2d at 9. At the same time, the denial of overtime pay may constitute a cognizable harm, at least where the "plaintiff in the past sought opportunities for overtime pay or it was otherwise known to defendant that plaintiff desired such opportunities." *Bell,* 398 F. Supp. 2d at 97. Here, as the District correctly notes, the CBA provides only that DCFEMS "will make every effort to ensure that the opportunity for overtime shall be distributed and rotated equally among employees," Def.'s Mem. (Morris), Ex. C, Art 18, and the plaintiffs have failed to point to record evidence suggesting that Walker sought out opportunities to earn overtime pay, *see generally* Pls.' Opp'n at 35–36.

Nonetheless, even assuming the plaintiffs have presented evidence that Walker experienced an adverse employment action by either, or both, being placed on paid administrative leave and being referred to the DCFEMS Substance Abuse Program, they have failed to point to sufficient evidence to support an inference of discriminatory discipline. In an effort to support their allegation of discriminatory discipline, the plaintiffs proffer sixteen potential comparators. The plaintiffs suggest that each of these comparators engaged in more

serious misconduct than did Walker but were neither charged with violating the DCFEMS Substance Abuse Policy nor "immediately" placed into the DCFEMS Substance Abuse Program.[28] Pls.' Opp'n at 53–54. In particular, the plaintiffs rely primarily on summary disciplinary information to assert that certain white firefighters were merely suspended after being arrested for alcohol-related offenses while off duty, by contrast to Walker, who was placed on paid administrative leave and put in the Program. *Id.* These proffered comparators, however, have at least two significant distinguishing factors that make them useless as comparators here.

First, contrary to the plaintiffs' assertion, none of the plaintiffs' purported comparators was disciplined in connection with a violation of the DCFEMS Substance Abuse Policy, and the plaintiffs have failed to identify a single instance in which DCFEMS failed to require a white employee to enter a rehabilitation program when required to do so under the Substance Abuse Policy. *See generally* Pls.' Opp'n at 53–54. Second, the plaintiffs contend that their proffered comparators engaged in "more egregious" conduct than did Walker, since the comparators were all arrested for alcohol-related offenses, and the record evidence clearly indicates that these comparators likewise received more significant discipline of a suspension as a result of their conduct. *See, e.g.*, Def.'s Mem. (Thomas), Ex. Z at 141–44, 181–84, 206–209 (summary disciplinary information indicating that the plaintiffs' proffered comparators were each suspended as a result of their off-duty conduct). This evidence that the plaintiffs' own proposed comparators were more harshly disciplined than Walker, who in fact received *no* discipline as a result of his violation of the DCFEMS Substance Abuse Policy, largely undermines the degree to which such evidence may be relied upon to raise an inference of racial animus.

---

[28] The plaintiffs' use of the word "immediately" apparently corresponds with their assertion that a white firefighter was not placed in the Substance Abuse Program "the same day he tested positive for cocaine and marijuana." Pls.' SMF at 80. As the District correctly notes, however, the firefighter in question is in fact African-American. Def.'s Mem. (Walker), at 11–12; Def.'s Mem. (Thomas), Ex. Z at 196.

Moreover, even considering only the plaintiffs' contention that similarly situated white employees were not required to complete the DCFEMS Substance Abuse Program, the plaintiffs' unsupported assertions of racial disparity are flatly contradicted by the record evidence. In fact, a full review of the summary materials included in the record clearly indicates that white firefighters found to have violated the Substance Abuse Policy were regularly remanded to the Substance Abuse Program. *See, e.g.*, Def.'s Mem. (Thomas), Ex. Z at 111–14, 281–84. As a result, the plaintiffs cannot demonstrate a triable issue of fact as to Walker's allegation that he was subjected to disparate discipline.

### k)   **Plaintiff Anthony Williams**

Plaintiff Anthony Williams alleges that he was subjected to racially disparate treatment while serving as a Firefighter based on a DCFEMS disciplinary investigation arising out of an alleged confrontation between Williams and a white firefighter. In response to the District's summary judgment motion regarding this plaintiff, the plaintiffs offer only a brief three sentences in support of Plaintiff Anthony Williams' allegations of discriminatory discipline. Pls.' Opp'n at 54. According to the plaintiffs, Williams was "unfairly required to face a Trial Board," *id.*, which was investigating allegations that Williams engaged in misconduct while on duty, but no further allegation is made that he was placed on administrative leave or otherwise suffered any harm, *see generally id.* The D.C. Circuit has recognized that the mere initiation of a disciplinary proceeding against an employee generally does not constitute a materially adverse employment action, and therefore "courts have been unwilling to find adverse actions where the suspension is not actually served." *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008). Having failed to present evidence that Williams was subjected to any discipline as a

result of the alleged confrontation, the plaintiffs have utterly failed to present a genuine issue of material fact as to whether Williams was subjected to discriminatory discipline.

### l)      Plaintiff Antoine Williams

Plaintiff Antoine Williams challenges two instances of allegedly disparate discipline while he served as a firefighter: (1) a 24-hour suspension for his failure to maintain current EMS credentials; and (2) a 36-hour suspension for failing to report to a scheduled PFC appointment.

With regard to Williams's suspension for failing to maintain his EMS certification, the plaintiffs proffer as comparators three DCFEMS employees (two firefighters and a Lieutenant) who received a reprimand, as opposed to a suspension, for allowing their EMT certification to lapse. Pls.' Opp'n at 55. Again, however, a close inspection of this summary information fails to demonstrate that Williams faced more severe discipline on account of his race. Although the plaintiffs' asserted evidence demonstrates certain inconsistent disciplinary decisions, the plaintiffs have pointed to no evidence suggesting that these inconsistencies correlate to a disciplined employee's race. For example, the plaintiffs' first comparator is a white Firefighter who received only a reprimand due to an expired EMT certification. *Id.* (citing Case No. U-10-210). The plaintiffs fail to mention, however, that an African-American firefighter also received a reprimand for the same infraction on the same day as this putative comparator. Def.'s Mem. (Thomas), Ex. Z at 242–45. Similarly, although the plaintiffs' second and third comparators—a firefighter and a Lieutenant—each received reprimands on the same day in July 2010, the reprimanded firefighter was *himself* African-American. *Id.* at 246–48. Indeed, as the District correctly notes, the summary disciplinary information reveals that African-American firefighters were routinely issued reprimands for failing to maintain EMT credentials during this period. Def.'s Reply at 24. While it is true that Walker was punished more harshly than these

employees, the record evidence demonstrates that DCFEMS also issued a 24-hour suspension against a white employee one day after Williams received his suspension. Def.'s Mem. (Thomas), Ex. Z at 231–33.

The summary information provided by the plaintiffs fails to account for this differing treatment, but the District correctly notes that Williams was initially provided a six-month extension to obtain certification and "failed to make proper notifications to resolve [his lack of certification]." Def.'s Reply at 23–24 (citing Def.'s Mem.(Antoine Williams), Ex. J). The plaintiffs present no evidence that white employees who similarly failed to obtain certification following such a warning were disciplined less harshly than Williams. Taken together, then, the plaintiffs' asserted comparator evidence fails to raise a genuine factual issue as to whether Williams was subjected to disparate discipline due to his race.

Finally, with regard to Williams' suspension for failing to report for a scheduled PFC appointment, the plaintiffs proffer as comparators the two Captains described in support of Plaintiff Addo's disparate discipline allegations. Pls.' Opp'n at 55–56. For the same reasons that the plaintiffs have failed to demonstrate that these employees may serve as valid comparators with respect to Addo, *see supra* Part III.E.2.(a), the plaintiffs have failed to raise a triable issue of fact as to Williams' allegations stemming from his missed medical appointments. In addition to holding different ranks, these Captains apparently engaged in more serious misconduct—for which they were disciplined far more severely—than Williams. Similarly, the plaintiffs likewise have put forward no evidence to suggest that these firefighters were not promptly disciplined due to their race. As a result, the plaintiffs have failed to establish a genuine issue of fact that his asserted received less severe discipline for similar or comparable offenses.

\*                    \*                    \*

Having addressed each of the remaining plaintiffs' discriminatory discipline allegations, the Court turns lastly to the plaintiffs' claims that they have been subjected to a hostile work environment while serving as DCFEMS employees.

## F.    THE PLAINTIFFS' HOSTILE WORK ENVIRONMENT CLAIMS

In addition to alleging individual instances of discriminatory non-promotion and discipline, twelve of the remaining plaintiffs oppose the District's summary judgment motions with respect to their allegations that they have been subjected to a hostile work environment during the course of their employment by DCFEMS. Three of these plaintiffs (Rayford, Walker, and Anthony Williams) draw heavily—if not exclusively—on their prior allegations regarding particular non-promotion or disciplinary decisions. For the reasons described below, none of these twelve plaintiffs have demonstrated a triable issue of fact as to their hostile work environment allegations.

### 1.    *Legal Principles Applicable to Hostile Work Environment Claims*

A plaintiff may establish a violation of Title VII by proving that the employer created or condoned a discriminatorily hostile or abusive work environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65 (1986). Discrimination in this form occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (citation and quotation marks omitted); *Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003)). Assessing whether a hostile work environment exists has both a subjective and an objective component, such that the plaintiff must demonstrate that: (1) he or she "subjectively perceive[d] the

environment to be abusive;" and (2) the defendant's conduct was "severe or pervasive enough to create an objectively hostile or abusive work environment." *Harris,* 510 U.S. at 21–22.

While the subjective test of whether the plaintiff actually found the environment abusive may be readily satisfied in employment discrimination suits, the Supreme Court has acknowledged that the boundaries of what constitutes an objectively discriminatorily hostile work environment is not "a mathematically precise test." *Id.* at 22. The "objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 81 (1998) (internal quotations and citations omitted). This objective test requires examination of the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris,* 510 U.S. at 23.

As previously noted, the Supreme Court has been clear that Title VII does not establish a "general civility code for the American workplace." *Oncale,* 523 U.S. at 80. Indeed, "Title VII does not prohibit all verbal or physical harassment in the workplace." *Id.* "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" a hostile work environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted); *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 579 (D.C. Cir. 2013) (noting that "cases in which a single incident can create a hostile work environment are rare"). To "[prevent] Title VII from expanding into a general civility code," the Supreme Court has emphasized as "crucial" the requirement that the behavior be "so objectively offensive as to alter the conditions of the victim's employment." *Oncale,* 523 U.S. at 81; *see*

*also Faragher,* 524 U.S. at 788 ("Conduct must be extreme to amount to a change in the terms and conditions of employment . . . ."). Bosses may be harsh, unfair and rude, but conduct so characterized does not necessarily rise to the level of a Title VII violation.

In addition, the plaintiff "must always prove that the conduct at issue was not merely tinged with offensive . . . connotations, but actually constituted discrimination . . . *because of*" the employee's protected status. *Oncale,* 523 U.S. at 81 (internal quotation marks and citations omitted). In other words, plaintiffs are required to establish a causal connection between the harassment and their protected status to succeed on the claim. *See Nichols v. Truscott,* 424 F. Supp.2d 124, 140–41 (D.D.C. 2006). "It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." *Lewis v. District of Columbia,* 653 F. Supp. 2d 64, 80 (D.D.C. 2009) (citing *Bryant v. Brownlee,* 265 F. Supp. 2d 52, 63 (D.D.C. 2003)).

The same acts may "simultaneously support different types of Title VII claims" such that "plaintiffs are free to plead alternative theories of harm that might stem from the same allegedly harmful conduct." *Baird I,* 662 F.3d at 1252. Thus, a "hostile environment consists of several individual acts that 'may not be actionable on [their] own' but become actionable due to their 'cumulative effect.'" *Baird v. Gotbaum* (*Baird II*), 792 F.3d 166, 168-69 (D.C. Cir. 2015) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002)). Nonetheless, "acts giving rise to a hostile work environment claim must collectively meet the independent requirements of that claim (*i.e.*, be sufficiently severe or pervasive), and must be adequately connected to each other (*i.e.*, all acts which constitute the claim are part of the same unlawful employment practice), as opposed to being an array of unrelated discriminatory or retaliatory

acts." *Baird I*, 662 F.3d at 1252 (internal citations, alterations, and quotations omitted).  For

example, they might "involve the same type of employment actions, occur relatively frequently,

and [be] perpetrated by the same managers." *Baird II*, 792 F.3d at 169 (quoting *Baird I*, 662

F.3d at 1251) (alterations omitted in original).

### 2.    *Analysis*

In support of their hostile workplace environment claims, the plaintiffs generally rely on

two categories of evidence.  First, the plaintiffs broadly reiterate their allegations of disparate

treatment (*e.g.*, discriminatory non-promotion, discipline, etc.), as well as the statistical evidence

described above, to argue that they were subjected to a racially hostile work environment.

Second, all but three of these plaintiffs point to additional, unrelated allegations of racial hostility

to support their contention that this hostility was sufficiently severe and pervasive as to alter the

conditions their employment.   The discussion that follows begins with an analysis of the hostile

work environment claims pursued by the three plaintiffs who rely exclusively on their prior

allegations regarding particular non-promotion or disciplinary decisions.   Thereafter, the specific

allegations of each of the remaining plaintiffs are considered in alphabetical order.

### a)    **Plaintiffs Relying Solely on Disparate Treatment Allegations**

Three plaintiffs (Rayford, Walker, and Anthony Williams) rely exclusively on their

allegations of particular instances of discipline or non-promotion to contend that they were

subjected to a hostile work environment claim while employed by DCFEMS.  For the reasons

articulated above, *supra* Parts III.E.2.(f), (j), (k), each of these plaintiffs have failed to point to

sufficient evidence to support a reasonable inference that he experienced disparate treatment by

DCFEMS on account of his race.  This necessarily defeats any claim that the hostile work

environment was on account of their race since plaintiffs alleging a racially hostile work

environment must demonstrate that the conduct giving rise to their claim was not merely offensive, but in fact *discriminatory*. *Oncale,* 523 U.S. at 81 (to demonstrate a hostile work environment in violation of Title VII, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive . . . connotations, but actually constituted discrimination . . . *because of*" the employee's race" (quotation marks and emphasis omitted)).

The plaintiffs inability, despite ample opportunity for discovery, to muster sufficient evidence of that any disparate treatment by DCFEMS was due to their race is also fatal to their hostile work environment claims when both claims are predicated on the same allegations. *See Lipscomb v. Winter*, 577 F. Supp. 2d 258, 282 (D.D.C. 2008) *aff'd in part, remanded on other grounds*, No. 08-5452, 2009 WL 1153442 (D.C. Cir. Apr. 3, 2009) (where the plaintiff fails to present sufficient evidence to support an "inference of discrimination with respect to [his allegations of disparate treatment,] . . . reliance on these [allegations], therefore, falls far short of the showing he must make for a *discriminatory* hostile work environment claim") (emphasis in original); *Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148, 164 (D.D.C. 2007) *aff'd*, 309 F. App'x 422 (D.C. Cir. 2009) (same); *Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 79 (D.D.C. 2005) *aff'd*, 187 F. App'x 1 (D.C. Cir. 2006) (instances of differing treatment that do not give rise to an inference of prohibited discrimination "fail to satisfy the requirement that plaintiff show a pervasive, severe and *discriminatory* hostile work environment, because the Court has already found the acts to be non-discriminatory") (emphasis in original).

Accordingly, the District's motions for summary judgment as to these three plaintiffs' hostile work environment claims are granted.

### b)    Plaintiff Addo

Plaintiff Addo concedes that he has no direct evidence that his former supervisors treated him more harshly due to his race, Addo Resps. ¶¶ 14, 16, 17, 21, but nonetheless alleges that he was unfairly criticized by white supervisors and required to complete assignments that were not assigned to white employees, Pls.' Opp'n 61–63. As support, the plaintiffs rely solely on Addo's deposition testimony and interrogatory responses to assert that his supervisors had "noticeably different" interactions with white subordinates. Pls.' Opp'n at 62. The plaintiffs also rely on Addo's own statements to assert that Addo informed superiors of his alleged mistreatment. *Id.* In addition, Addo claims that he was not permitted to obtain medical treatment from the DCFEMS doctor of his choice following a 2009 shoulder injury. *Id.* at 63. The plaintiffs again rely on Addo's deposition testimony and interrogatory responses to contend that white employees were allowed to select their preferred doctor in similar circumstances. *Id.* In response, the District argues that the incidents Addo describes are insufficiently related either to one another or to Addo's alleged disparate discipline and non-promotion allegations to support a hostile work environment claim. Def.'s Reply at 52. The District likewise contends that these incidents are "consistent with ordinary workplace conflict" and, therefore, do not constitute a colorable claim of workplace discrimination.

Certainly the District is correct that Addo's allegations regarding his inability to obtain treatment from his preferred doctor is exactly the sort of "isolated incident[]" that does not give rise to a hostile work environment claim, *Faragher,* 524 U.S. at 788, and the plaintiffs have pointed to no evidence that this incident—even assuming the veracity of Addo's assertions— was "adequately connected" to Addo's other allegation to be "part of the same unlawful employment practice," *Baird I,* 662 F.3d at 1252. Moreover, while the plaintiffs have drawn a

connection between Addo's treatment by past superiors and his claims of disparate discipline, these allegations do not rise to the level of a hostile workplace. Indeed, "[a]llegations of undesirable job assignments or modified job functions and of [a supervisor]'s unprofessional and offensive treatment are not sufficient to establish that [the plaintiff]'s work environment was permeated with discriminatory intimidation, ridicule, and insult." *Houston v. SecTek, Inc.,* 680 F. Supp. 2d 215, 225 (D.D.C.2010). Though the plaintiffs assert that white employees were treated less harshly by Addo's superiors, they point to no evidence demonstrating that these superiors harshly criticized Addo *because of* his race. *Oncale,* 523 U.S. at 81; *cf. George,* 407 F.3d at 408, 416–17 (upholding dismissal of a plaintiff's hostile work environment claim where the plaintiff alleged that she was thrice told to "go back where she came from" and assigned to perform duties white colleagues were not required to perform).

In sum, the plaintiffs have failed to presented sufficient evidence to allow a reasonable jury to conclude that Addo was subjected to the sort of severe and pervasive harassment required to support a hostile work environment claim. *See Dudley v. Washington Metro. Area Transit Auth.,* 924 F. Supp. 2d 141, 171–72 (D.D.C. 2013) ("A litany of cases shows that simply having a rude, harsh, or unfair boss is not enough for a hostile work environment claim.").

### c)      Plaintiff Botts

Beyond his allegations stemming from his assignment to the NREMT Training Academy, Plaintiff Botts asserts three instances of alleged harassment during his employment by DCFEMS to support his hostile work environment claim: (1) a single instance of a (presumably) white Lieutenant using racial slurs while Botts was "in earshot," but not directed a Botts; (2) an incident in which a reporter described to Botts the racist attitudes of white DCFEMS employees;

and (3) an incident in which a white Fire Chief wrongfully sought to terminate an African-American employee. Pls.' Opp'n at 67–68.

Even crediting Botts' deposition testimony as to each of these events, and ignoring that his account of his interaction with the reporter constitutes "sheer hearsay" and therefore is of no use in overcoming summary judgment, *Greer*, 505 F.3d at 1315 (D.C. Cir 2007), the plaintiffs have presented no evidence that Botts himself was subjected to any unwelcome harassment, *see generally* Pls.' Opp'n at 67–68. Incidents involving only statements made by third parties to third parties, and not directed to the plaintiff, are generally considered too attenuated to support an inference that the plaintiff was subjected to a hostile work environment. *See, e.g.*, *Byrd v. Vilsack*, 931 F. Supp. 2d 27, 47 (D.D.C. 2013) ("'[c]onduct directed at others rather than at plaintiff . . . is less indicative of a hostile work environment.'" (quoting *Lester v. Natsios*, 290 F. Supp. 2d 11, 31 (D.D.C. 2003) (citing *Gleason v. Mesirow Fin. Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997) ("[T]he impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff.")); *Harris v. Wackenhut Servs.*, 590 F. Supp. 2d 54, 76 (D.D.C. 2008) ("'[w]hen racial statements are not made directly to [the] plaintiff, generally a hostile environment cannot be established.'") (alterations in original) (quoting *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 108 (D.D.C. 2005)); *Kelley v. Billington*, 370 F. Supp. 2d 151, 159 (D.D.C. 2005) ("another important factor in assessing whether harassment was sufficiently 'severe,' 'pervasive' and 'abusive' is whether the incidents of harassment are directed at others, rather than at plaintiffs. When the alleged harassment is directed at others it is considered less hostile.").

Further, the plaintiffs present no evidence suggesting that these distinct instances constituted anymore more than an "array of unrelated discriminatory . . . acts" that do not give

rise to a hostile work environment claim. *Baird I*, 662 F.3d at 1252. As such, the plaintiffs have failed to present sufficient evidence to allow a reasonable jury to conclude that Botts may prevail on his hostile work environment allegations.

### d) Plaintiff Burton

In addition to the discriminatory discipline allegations discussed above, *see supra* Part III.E.2.(b), Plaintiff Burton asserts that he was subjected to a hostile work environment based on a prior instance in which DCFEMS considered taking disciplinary action against Burton for responding to a fire to which he was not dispatched. Pls.' Opp'n at 68–69 (asserting that DCFEMS "charged Plaintiff Burton and tried to discipline him" for the alleged infraction). Although Burton ultimately received no discipline in connection with this incident, *see* Def.'s Reply at 57, relying on the same comparator evidence offered to support Burton's discriminatory discipline allegation, the plaintiffs contend that this prior disciplinary incident demonstrates that Burton was subjected to a hostile work environment while employed by DCFEMS. Pls.' Opp'n at 68–69.

Even assuming that these incidents were sufficiently related to support a hostile work environment claim, the plaintiffs point to no evidence suggesting that these incidents—one of which resulted in no disciplinary action taken against Burton—are "so objectively offensive as to alter the conditions of [Burton's] employment." *Oncale*, 523 U.S. at 81. Moreover, as explained above, *supra* Part III.E.2.(b), the plaintiffs have presented insufficient evidence to raise a genuine factual issue as to whether Burton was subjected to disparate discipline due to his race. Relying on the same comparator evidence to support Burton's hostile work environment claim, the plaintiffs have again failed to demonstrate that a reasonable jury could conclude that Burton's disciplinary history "was not merely tinged with offensive . . . connotations, but actually

122

constituted discrimination . . . because of" Burton's race. *Oncale,* 523 U.S. at 81 (quotation marks and emphasis omitted). Having failed to do so, the plaintiffs have failed to point to sufficient record evidence to survive the District's request for summary judgment as to Burton's hostile work environment claim.

### e)      Plaintiff Johnson

Beyond his allegations regarding his transfer to the NREMT Training Academy, the plaintiffs allege that Plaintiff Johnson was subjected to a hostile work environment when, early in his tenure with DCFEMS, he was asked to wait outside the firehouse when white firefighters were dispatched to a fire. Pls.' Opp'n at 69. The plaintiffs further suggest, without explanation, that Johnson experienced unwelcome harassment when a white DCFEMS employee "stole drugs and came to work with an ankle bracelet every day." *Id.* Finally, the plaintiffs assert that Johnson was pressured to agree not to pursue his allegations of racial discrimination outside of DCFEMS. *Id.* at 69–70. At best, these four incidents—which span Johnson's nearly 30-year career with DCFEMS—constitute an "array of unrelated discriminatory acts" that are not "adequately connected to each other" to support Johnson's allegation that he was subject to a hostile work environment. *Baird I,* 662 F.3d at 1252. Consequently, the plaintiffs have failed to present sufficient evidence for a reasonable jury to conclude that Johnson's tenure at DCFEMS was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris,* 510 U.S. at 21 (internal quotations and citations omitted).

### f)      Plaintiff Morris

Plaintiff Morris's hostile work environment claim is premised on two occasions of alleged harassment: (1) a 2009 incident in which a white DCFEMS employee interfered with his

medical treatment at the PFC; and (2) a single instance, occurring at an unspecified time between 2006 and 2008, in which a white coworker referred to Morris using a racial slur. Pls.' Opp'n at 70. Even crediting Morris's uncorroborated deposition testimony as to these incidents, the plaintiffs have failed to point to evidence that these ostensibly unrelated incidents are "adequately connected to each other" to demonstrate the sort of pervasive harassment necessary to support a hostile a work environment claim. *Baird I*, 662 F.3d at 1252.

g)      **Plaintiff Montgomery**

In support of his hostile work environment claim, Plaintiff Montgomery avers that he regularly witnessed white DCFEMS employees treated more favorably than African-American employees. Pls.' Opp'n at 70. He cites a number of incidents between 2000 and 2005 in which white DCFEMS employees were not punished for using racial slurs, including one incident, in 2004, when an African-American officer deleted a photograph documenting the use of a racial slur. *Id.* Finally, he alleges that DCFEMS wrongfully classified an on-duty injury such that Montgomery was unable to obtain workmen's compensation between 2005 and his retirement. *Id.* at 70–71. In response, the District correctly notes that Montgomery's allegations regarding incidents prior to 2007 fall outside the statutory limitations period applicable to Montgomery's hostile work environment claim. Def.'s Reply at 61.

In considering a § 1983 claims, this Court applies the District of Columbia's three-year residual statute of limitations for tort claims. *Earle v. District of Columbia*, 707 F.3d 299, 305 (D.C. Cir. 2012) ("We apply the three-year residual statute of limitations to a section 1983 claim.") (citing *Singletary*, 351 F.3d at 529 n.11). Nonetheless, as the Supreme Court has recognized, Title VII allows consideration of alleged harassment "outside the statutory time period, is permissible . . . so long as an act contributing to that hostile work environment takes

124

place within the statutory time period." *Morgan*, 536 U.S. at 105.  Thus, "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period."  *Id.* at 120.  Here, the plaintiffs have pointed to evidence of only a single instance of alleged harassment falling within the applicable three-year limitations period—DCFEMS's alleged misclassification of Montgomery's 2007 injury.  Even assuming the plaintiffs may rely on Montgomery's remaining allegations, which fall outside the limitations period, they have presented no evidence that these stale instances of alleged harassment are connected in any way with Montgomery's effort to obtain workmen's compensation.  *See generally* Pls.' Opp'n at 70–71.  Thus, Montgomery's hostile work environment claim must rest solely on this most recent allegation.

Again, however, the plaintiffs point to no competent evidence to indicate that the classification of Montgomery's injury was motivated by his race.  The plaintiffs rely on Montgomery's own deposition testimony to assert that injured white employees were permitted to obtain workmen's compensation "without being required to submit supporting medical documentation."  Pls.' Opp'n at 71.  This is precisely the kind of "generalized, conclusory" allegation that, being amenable to corroboration by competent documentary evidence, is "insufficient to establish a triable issue of fact."  *Akridge*, 729 F. Supp. 2d at 183.  As such, the plaintiffs have failed to establish a genuine factual issue as to Montgomery's hostile work environment claim.

### h)       **Plaintiff Pearson**

In addition to his allegations of disparate discipline and non-promotion, Plaintiff Pearson alleges he was subjected to a hostile work environment when he: (1) was unduly scrutinized by a

white superior while serving in an operations capacity; and (2) was detailed full-time to the NREMT Training Academy and denied accommodation of his childcare responsibilities due to his race. Pls.' Opp'n at 71–72. The parties neglect to specify either the nature of these responsibilities or explain the alleged adverse impact of Pearson's assignment to the Training Academy on his familial status.

Again, the plaintiffs have failed to present evidence that these claims are "adequately connected to each other (i.e., all acts which constitute the claim are part of the same unlawful employment practice)" to demonstrate that Pearson was subjected to pervasive harassment on account of his race. *Baird I*, 662 F.3d at 1252 (internal quotations and citations omitted). For example, in the one page of deposition testimony the plaintiffs rely upon to assert that Pearson was unfairly scrutinized and chastised by a white superior, the plaintiffs present no evidence that this superior was involved in any way in his assignment to the Training Academy. *See* Pls.' Opp'n at 71. Thus, failing to present sufficient evidence to allow a reasonable jury to conclude that Pearson was subjected to a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal quotations and citations omitted). Accordingly, they have failed to point to sufficient evidence to overcome the District's instance summary judgment motion.

### i)  **Plaintiff Robinson**

In support of her hostile work environment allegations, Plaintiff Robinson asserts that: (1) she was repeatedly teased by white employees during her early tenure with DCFEMS; (2) a white supervisor attempted to prevent her from receiving a performance award in 1984; (3) she was ordered to submit a special report explaining her fire station company's failure to report to

an assignment at the White House; (4) she was ordered to retire a day earlier than she intended; and (5) was ordered not to ride on DCFEMS vehicles after announcing her retirement. Pls.' Opp'n at 73–74.

As with Plaintiff Pearson, many of these incidents occurred more than two decades prior to the initiation of this suit, and the plaintiffs have presented no evidence to suggest that these incidents are materially related to incidents occurring within the applicable limitations period. As to Robinson's allegations of harassment since 2007, the plaintiffs have similarly failed to identify record evidence demonstrating that these incidents were sufficiently "severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal quotations and citations omitted). Indeed, Robinson concedes that this alleged harassment in no way amounted to a "change in the terms and conditions of employment." *Faragher,* 524 U.S. at 788. Following her submission of the 2008 special report, Robinson "didn't hear anything else" about the incident. Def.'s Reply at 64. Likewise, although she was asked to retire a day earlier than planned and directed not to ride on DCFEMS equipment following her retirement announcement, Robinson neither altered her retirement date or discontinued riding on DCFEMS vehicles. *Id.* at 65. Given that they have failed to present evidence that these incidents had a demonstrable effect on the terms and conditions of Robinson's employment, the plaintiffs have failed to establish a triable issue of fact regarding Robinson's hostile work environment allegations.

### j)      Plaintiff Thomas

In addition to his disparate discipline and non-promotion allegations, Plaintiff Thomas alleges that he was subjected to a hostile work environment as a DCFEMS employee because he "regularly witness[ed]" white employees treated more favorably than African-American

127

employees and "repeatedly" heard white employee using racial slurs when referring to African-American employees. *Id.* at 73–74. In support, the plaintiffs point to Thomas's deposition testimony of his general recollection of self-segregation among DCFEMS firefighters, as well as white firefighters' use of racial slurs. Further, the plaintiffs identify two specific instances of alleged harassment during Thomas's assignment to the DCFEMS Customer Service Unit between March 2010 and October 2010: in one instance, Thomas witnessed a white supervisor chastising an African-American employee for the appearance of his uniform while not similarly criticizing white employees; and in another instance, Thomas and other African-American employees were ordered not to attend a Fallen Firefighter's Ceremony and instead required to wash a DCFEMS vehicle. *Id.* at 74.

In response, the District argues that the bulk of the evidence proffered by the plaintiffs relates to Thomas's testimony regarding his experience at DCFEMS prior to 2006. Def.'s Reply at 66–67 (noting that Thomas testified in his that he experienced a hostile work environment "till just . . . prior to this new administration.") *Id.* at 67. While the record presents some uncertainty as to the dates of many of the instances of racial harassment described by Thomas in his deposition testimony, the District correctly notes that the plaintiffs have failed to present evidence that the discrete instances Thomas describes in his deposition testimony are adequately connected to each other to constitute the same unlawful employment practice. *Baird I*, 662 F.3d at 1252. The two incidents that occurred during Thomas's assignment to the DCFEMS Customer Service Unit, while understandably annoying to the employees affected, do not amount to the type of pervasive or frequent discriminatory conduct that would "unreasonably interfere[] with an employee's work performance," *Harris,* 510 U.S. at 23, that is required for a legally cognizable hostile work environment claim. Such allegations of "undesirable job assignments or

modified job functions" or a supervisors "unprofessional and offensive treatment" are insufficient to demonstrate a trial issue of fact as to whether Thomas was subjected to a hostile work environment due to his race. *See Houston,* 680 F. Supp. 2d at 225.

*          *          *

Just as the plaintiffs have failed to adduce evidence demonstrating that they were subjected to discrete instances of disparate treatment, the plaintiffs have failed after nearly two years of discovery to point to sufficient record evidence that they were subjected to pervasive and severe harassment during their employment by DCFEMS. Thus, the plaintiffs have each failed to raise a triable issue of fact as to their hostile work environment claims. Accordingly, the District's summary judgment motions are granted as to these claims.

## IV.   PARTIES' MOTIONS RELATING TO PRIOR SANCTIONS ORDERS

Each side in this litigation has filed a motion in connection with outstanding sanctions imposed on the plaintiffs due to their failure to comply with discovery obligations. First, the plaintiffs have requested a third extension of the deadlines by which Plaintiff Sims must tender all unpaid sanctions to the District. *See* Pl. Michael Sims' Third Mot. Ext. Time, ECF No. 216. Second, the District has moved to clarify the Court's sanctions orders to make clear that the plaintiffs and their counsel are jointly and severally liable for the remaining unpaid sanctions. Def.'s Sec. Mot. Clarification and Contempt at 4-6, ECF No. 217. The District further requests that the Court enter a civil contempt order against the plaintiffs and their counsel for failure to pay the sanctions as ordered. *Id.* at 6-7. As discussed below, Plaintiff Michael Sims' Third Motion for Extension of Time is granted, and the defendant's Second Motion for Clarification and Contempt is granted in part and denied in part.

Sanctions were previously imposed twice on the plaintiffs, on the District's motions, pursuant to Federal Rule of Procedure 37. First, due to dilatory conduct by the plaintiffs and their counsel, the Court ordered the plaintiffs to pay $12,291.00 in attorneys' fees incurred by the District in preparing a motion to compel discovery. *See* Minute Order, dated Oct. 10, 2014. Second, following their failure to appear at a scheduled depositions, plaintiff Sims and a second now-dismissed plaintiff were also ordered to pay a total of $7,872.70 representing the "costs related to [their rescheduled] depositions, including the costs of reviewing any of the documents produced by plaintiff Sims in relation to his deposition." *See* Minute Orders, dated July 31, 2014 and Dec. 11, 2014. To date, the plaintiffs have tendered a total of $12,430.40 towards the total of $20,163.70 in sanctions, leaving a remaining balance of $7,733.30. Seeking an extension of the deadlines imposed under the Court's prior orders and opposing the District's motion for clarification, the plaintiffs assert that unpaid fees are attributable solely to Sims' misconduct during discovery. *See* Pls.' Opp'n Def.'s Sec. Mot. Clarification and Contempt at 2, 6, ECF No. 219. According to the plaintiffs, Sims alone is responsible for the remaining balance, because $819.40 is his share of the unpaid fees associated with the Court's October 10, 2014 Order and $6,913.90 represents the unpaid sanctions imposed due to Sims' failure to appear for his deposition, per the Court's December 11, 2014 Order. *See id.* at 5-6.

Rule 37 permits the Court to "require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). Upon consideration of the parties' motions, and for the reasons articulated in the Court's prior sanctions orders, the Court now clarifies these orders as follows: (1) with respect to the Court's October 10, 2014 Order, because these sanctions stemmed from the collective discovery lapses

of the sanctioned plaintiffs and their counsel, these plaintiffs, as well as their counsel, are jointly and severally liable for the $819.40 remaining to be tendered to the District; and (2) with respect to the Court's December 11, 2014 Order, because these sanctions stemmed from the plaintiffs' failure to attend their properly noticed depositions (at which their attorney was present) and because the remaining costs appear to be associated entirely with the District's rescheduled deposition of Sims, Sims alone is liable for the $6,913.90 remaining to be tendered to the District.

With regard to this latter penalty, the plaintiffs have indicated that Sims is on a "fixed income," Pls.' Consent Mot. Ext. Time ¶ 3, ECF No. 197, and currently employed by DCFEMS, *see generally* Def.'s SMF (Sims), and, consequently, no evidence has been presented demonstrating that Sims is unable to comply with this Court's order or that the imposition of these sanctions is otherwise inequitable. As a result, and consistent with the Order accompanying this Memorandum Opinion, the plaintiffs and their counsel are directed to tender a total of $819.40, and Plaintiff Sims is directed to tender a total of $6,913.90, to the District by December 1, 2015. Failure to comply with the Order accompanying this opinion may result in the imposition of additional fees, including interest, and penalties.

## V.    CONCLUSION

The plaintiffs' claims cannot survive the District's motions for summary judgment since they have failed to demonstrate a material issue of fact subject to genuine dispute as to their claims of being subjected to illegal discrimination in the DCFEMS promotion, disciplinary and EMT certification processes, or to a hostile work environment. Nevertheless, the record in this case reveals unmistakable tensions within DCFEMS. In their depositions and written submissions, the plaintiffs express the genuine perception that their interests are insufficiently

represented within DCFEMS.  In many instances, this perception appears to be founded on misconceptions regarding generally applicable DCFEMS policies and procedures, including the DCFEMS Substance Abuse Policy, EMT certification requirement, and the DCFEMS disciplinary regime.  Improved transparency in, or explanation of, application of these procedures may help combat these perceptions of inequitable treatment.

That being said, after nearly five years of litigation and despite extensive discovery of relevant DCFEMS records and personnel, the plaintiffs continue to rely on only the barest of anecdotal evidence and suspicion to support their claims that they have been subjected to racial discrimination and hostility.  Without more, and in light of the contrary evidence offered both by the District and by the plaintiffs themselves, the plaintiffs have failed to demonstrate a genuine factual issue requiring resolution at trial.

Accordingly, the District's remaining summary judgment motions, *see supra* Part I.A & n.3, are granted.

Date: October 9, 2015

_____
BERYL A. HOWELL
United States District Judge